Nos. 23-10151 & 23-10171

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

HAVANA DOCKS CORPORATION,

*Plaintiff-Appellee-Cross-Appellant*,

v.

ROYAL CARIBBEAN CRUISES, LTD.; NORWEGIAN CRUISE LINE HOLDINGS LTD.; CARNIVAL CORPORATION, a foreign corporation doing business as Carnival Cruise Lines; MSC CRUISES S.A. CO.; MSC CRUISES (USA), INC., et al.,

*Defendants-Appellants-Cross-Appellees*.

————————

On Appeal from the United States District Court for the
Southern District of Florida,
No. 19-cv-23591, No. 19-cv-23590, No. 19-cv-23588

————————

**JOINT BRIEF FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES ROYAL CARIBBEAN CRUISES, LTD., NORWEGIAN CRUISE LINE HOLDINGS LTD., MSC CRUISES S.A., MSC CRUISES S.A. CO., AND MSC CRUISES (USA), INC.**

————————

DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
JONATHAN G. COOPER
NICHOLAS J. CALUDA
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for Defendant-Appellant
Norwegian Cruise Line Holdings Ltd.*

PAUL D. CLEMENT
MATTHEW D. ROWEN[*]
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm
who are members of the Virginia bar

*Counsel for Defendant-Appellant Royal
Caribbean Cruises, Ltd.*

(*Additional Counsel Listed on Inside Cover*)

June 30, 2023

ROBERT M. LOEB
ROBBIE MANHAS
JONAS Q. WANG
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20015

J. DOUGLAS BALDRIDGE
ANDREW T. HERNACKI
JUSTIN B. NEMEROFF
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001

E. JOSHUA ROSENKRANZ
KATHERINE MUNYAN
ORRICK, HERRINGTON
 & SUTCLIFFE LLP
Columbia Center
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

*Counsel for Defendants-Appellants MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A.*

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

## AMENDED CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENTS

Pursuant to 11th Cir. R. 26.1, the undersigned counsel hereby certify that the following is a complete list of the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal. All entities added since the last filing in this consolidated appeal have been marked with an asterisk.

1.  1972 Productions, Inc.

2.  A.C.N. 098 290 834 Pty. Ltd.

3.  A.J. Juneau Dock, LLC

4.  Admiral Management Inc.

5.  Adventure Island Ltd.

6.  Adventure of the Seas Inc.

7.  AIDA Kundencenter GmbH

8.  AIDAradio GmbH

9.  Air-Sea Holiday GmbH

10. Alaska Hotel Properties LLC

11. Allure of the Seas Inc.

12. Anthem of the Seas Inc.

13. Akerman LLP

14. Arrasas Limited

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

15. Baldridge, J. Douglas (Venable LLP)

16. Balmori, Daniel (Hogan Lovells US LLP)

17. Barcelona Cruise Terminal SLU

18. Bash III, John F. (Quinn Emanuel Urquhart & Sullivan, LLP)

19. Bay Island Cruise Port, S.A.

20. Behn, Aphra

21. Behn, Mickael

22. Behn-Lucain, Melanie

23. Belize Cruise Terminal Limited

24. Belize Investments Limited

25. Belize Island Holdings Ltd.

26. Bermuda Tenders, Ltd.

27. Black, Hillary S. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

28. Bloom, Judge Beth F. (United States District Judge for the Southern District of Florida)

29. Bluvacanze Spa

30. Bohrer, Sanford L.

31. Boies Schiller Flexner LLP

32. Breakaway Four, Ltd.

33. Breakaway One, Ltd.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

34. Breakaway Three, Ltd.

35. Breakaway Two, Ltd.

36. Brilliance of the Seas Shipping Inc.

37. Buffett, Warren E.

38. Burck, William A. (Quinn Emanuel Urquhart & Sullivan, LLP)

39. Caluda, Nicholas J. (Quinn Emanuel Urquhart & Sullivan, LLP)

40. Canodros CL

41. Carnival (UK) Limited

42. Carnival Bahamas FC Limited Bahamas

43. Carnival Bahamas Holdings Limited

44. Carnival Corporation (CCL)

45. Carnival Corporation & plc Asia Pte. Ltd.

46. Carnival Corporation Hong Kong Limited

47. Carnival Corporation Korea Ltd.

48. Carnival Corporation Ports Group Japan KK

49. Carnival Finance, LLC

50. Carnival Grand Bahama Investment Limited

51. Carnival Holdings (Bermuda) Limited

52. Carnival Investments Limited

53. Carnival Japan, Inc.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

54. Carnival License Holdings Limited

55. Carnival Maritime GmbH

56. Carnival North America LLC

57. Carnival PLC

58. Carnival Port Holdings Limited

59. Carnival Ports Inc.

60. Carnival Support Services India Private Limited

61. Carnival Technical Services (UK) Limited

62. Carnival Technical Services Finland Limited

63. Carnival Technical Services GmbH

64. Carnival Vanuatu Limited

65. Casey, Stephanie A. (Colson Hicks Eidson, P.A.)

66. CC U.S. Ventures, Inc.

67. CCL Gifts, LLC

68. Celebrity Apex Inc.

69. Celebrity Cruise Lines Inc.

70. Celebrity Cruises Holdings Inc.

71. Celebrity Cruises Inc. (d/b/a Celebrity Cruises Liberia)

72. Celebrity Eclipse Inc.

73. Celebrity Edge Inc.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

74. Celebrity Equinox Inc.

75. Celebrity Reflection Inc.

76. Celebrity Silhouette Inc.

77. Celebrity Solstice Inc.

78. Cisalpina Tours Spa

79. Classic Cruises, LLC

80. Classic Cruises II, LLC

81. Clement & Murphy, PLLC

82. Clement, Paul D. (Clement & Murphy, PLLC)

83. CNS Compañia Naviera Seaside 1 SA

84. Colson Hicks Eidson, P.A.

85. Compañia Naviera Evo 1 SA

86. Compañia Naviera Evo 2 SA

87. Compañia Naviera Fantasia SA

88. Compañia Naviera Meraviglia SA

89. Compañia Naviera Musica SA

90. Compania Naviera Ocean Cay SA

91. Compañia Naviera Orchestra SA

92. Compañia Naviera Pacifica S.A.

93. Compañia Naviera Preziosa SA

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

94. Compañia Naviera Seaside 2 SA

95. Compañia Naviera Serenata SA

96. Compañia Naviera Vista 1 SA

97. Compañia Naviera Vista 2 SA

98. Compañia Naviera Vista 3 SA

99. Compañia Naviera Vista 4 SA

100. Compañia Naviera Vista 5 SA

101. Compañia Naviera World Class 1 SA

102. Compañia Naviera World Class 2 SA

103. Compañia Naviera World Class 3 SA

104. Compañia Naviera World Class 4 SA

105. Compañia Naviera Yc1 SA

106. Compañia Naviera Yc2 SA

107. Compañia Naviera Yc3 SA

108. Compañia Naviera Yc4 SA

109. Compañia Naviera Yc5 SA

110. Compañia Naviera Yc6 SA

111. Constellation Inc. Liberia

112. Cooke, Judge Marcia G. (United States District Judge for the Southern District of Florida)

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

113. Cooper, Jonathan G. (Quinn Emanuel Urquhart & Sullivan, LLP)

114. Costa Crociere PTE Ltd.

115. Costa Crociere S.p.A.

116. Costa Cruceros S.A.

117. Costa Cruise Lines Inc.

118. Costa Cruise Lines UK Limited

119. Costa Cruises Customer Center S.L.U.

120. Costa Cruises Shipping Services (Shanghai) Company Limited

121. Costa Cruises Travel Agency (Shanghai) Co., Ltd.

122. Costa Cruises Turkey Turizm Gelisim A.S.

123. Costa Cruzeiros Agencia Maritima e Turismo Ltda.

124. Costa International B.V.

125. Costa Kreuzfahrten GmbH

126. Cozumel Cruise Terminal S.A. de C.V.

127. Cruise Administration Services, Inc.

128. Cruise Conglomerate Maritime Ltd.

129. Cruise Lines International Association

130. Cruise Quality Travel Spain SL

131. Cruise Ships Catering & Services International N.V.

132. Cruise Terminal Services, S.A. de C.V.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

133. Cruiseport Curacao C.V.

134. CSMART Real Estate B.V.

135. CSMART Real Estate C.V.

136. D.R. Cruise Port, Ltd.

137. Elayan-Martinez, Aziza F. (Colson Hicks Eidson, P.A.)

138. Ellis George Cipollone O'Brien Annaguey, LLP

139. Enchantment of the Seas Inc.

140. Eurosoft Corporation Limited

141. Eurosoft Cruise Line (Shanghai) Co., Ltd.

142. Explora SA

143. Explorer II New Build, LLC

144. Explorer III New Build, LLC

145. Explorer New Build, LLC

146. Explorer of the Seas Inc.

147. F.P.M. SAS

148. F.P.P. SAS

149. Fields, Lazaro (Continental PLLC)

150. Fleet Maritime Services (Bermuda) Limited

151. Fleet Maritime Services Holdings (Bermuda) Limited

152. Fleet Maritime Services International Limited

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

153. Foreman Friedman, PA

154. Fowler III, George J (Jones Walker LLP)

155. Freedom of the Seas Inc.

156. Freyre, Pedro A. (Akerman LLP)

157. Friedman, Darren Wayne (Foreman Friedman)

158. Future Investments, Ltd.

159. Gayles, Judge Darrin P. (United States District Judge for the Southern

District of Florida)

160. GG Operations Inc.

161. Gibs, Inc.

162. Global Experience Innovators, Inc.

163. Global Fine Arts, Inc.

164. Global Fleet Management LLC

165. Global Fleet Management Two LLC

166. Global Shipping Service (Shanghai) Co., Ltd.

167. Going Srl

168. Goodman, Judge Jonathan (United States Magistrate Judge for the

Southern District of Florida)

169. Goulette Cruise Holding Limited

170. Grand Cruise Shipping Unipessoal LdA

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

171. Grand Turk Cruise Center Ltd.

172. Grandeur of the Seas Inc.

173. Gray, Corey P. (Boies Schiller Flexner LLP)

174. Great Stirrup Cay Limited

175. Greensboro S.L.

176. Gwart Srl

177. GXI, LLC D

178. HAL Antillen N.V.

179. HAL Beheer B.V.

180. HAL Maritime Ltd.

181. HAL Nederland N.V.

182. HAL Properties Limited

183. HAL Services B.V.

184. Harmony of the Seas Inc.

185. Harper, Chadwick (Clement & Murphy, PLLC)

186. Harvard Law School

187. Havana Docks Corporation

188. Hernacki, Andrew T. (Venable LLP)

189. Hoch, Dorothy

190. Hogan Lovells US LLP

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

191. Holding Division Iberocruceros SLU

192. Holland & Knight LLP

193. Holland America Line Inc.

194. Holland America Line N.V.

195. Holland America Line U.S.A., Inc.

196. Hospedagm De Pomene (Mozambique) Lda

197. HSE Hamburg School of Entertainment GmbH

198. Ibero Cruzeiros Ltda.

199. Iberocruceros SLU

200. Independence of the Seas Inc.

201. Infinity Inc.

202. Information Assistance Corporation

203. Insignia Vessel Acquisition, LLC

204. International Cruise Services, S.A. de C.V.

205. International Leisure Travel Inc.

206. International Maritime Recruitment Agency, S.A. de C.V.

207. Island for Science, Inc.

208. Islas Galapagos Turismo y Vapores CA

209. Jewel of the Seas Inc.

210. Johnson, Jerry M.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

211. Jones Walker LLP

212. Klinger, Richard D. (Ellis George Cipollone O'Brien Annaguey, LLP)

213. Kroeger, Thomas (Colson Hicks Eidson, P.A.)

214. Krystalsea Limited

215. Kwazulu Cruise Terminal (Pty) Ltd.

216. Labadee Investments Ltd.

217. Landau, Christopher (Ellis George Cipollone O'Brien Annaguey, LLP)

218. Leonardo Five, Ltd.

219. Leonardo Four, Ltd.

220. Leonardo One, Ltd

221. Leonardo Six, Ltd.

222. Leonardo Three, Ltd.

223. Leonardo Two, Ltd.

224. Li, Vincent (Ellis George Cipollone O'Brien Annaguey, LLP)

225. Liberia

226. Liberty of the Seas Inc.

227. Lindsay III, Alvin Francis (Hogan Lovells US LLP)

228. Lipshultz, Zachary A. (Colson Hicks Eidson, P.A.)

229. Lipshutz, Brian M. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

230. Llamas, Luis E. (Jones Walker LLP)

231. Loeb, Robert (Orrick, Herrington & Sutcliffe LLP)

232. Lorenzo, Richard C. (Hogan Lovells US LLP)

233. Louis, Judge Lauren Fleischer (United States Magistrate Judge for the
     Southern District of Florida)

234. Lutz, Zachary P. (Quinn Emanuel Urquhart & Sullivan, LLP)

235. MacArthur Trust

236. Maderal, Francisco

237. Manhas, Robert (Orrick, Herrington & Sutcliffe LLP)*

238. Margol & Margol, P.A.

239. Margol, Rodney S. (Margol & Margol, P.A.)

240. Marina New Build, LLC

241. Mariner of the Seas Inc.

242. Mariner, LLC

243. Marseille Provence Cruise Terminal SAS

244. Martinez, Judge Jose E. (United States District Judge for the Southern
     District of Florida)

245. Martínez, Roberto (Colson Hicks Eidson, P.A.)

246. Massey & Gail LLP

247. Massey, Johnathan S. (Massey & Gail LLP)

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

248. McAliley, Judge Chris M. (United States Magistrate Judge for the

    Southern District of Florida)

249. Mediterranean Cruises Travel Agency (Shanghai) Co Ltd

250. Michel, Christopher G. (Quinn Emanuel Urquhart & Sullivan, LLP)

251. Milestone N.V.

252. Millennium Inc.

253. Moriceau, Alisha (Boies Schiller Flexner LLP)

254. MSC Crewing Services Philippines

255. MSC Cruceros SA Argentina

256. MSC Cruceros SA Spain

257. MSC Cruise Management (UK) Ltd

258. MSC Cruises (Australia) Pty Ltd

259. MSC Cruises (Canada) Ltd

260. MSC Cruises (Ireland) Ltd

261. MSC Cruises (USA), Inc.

262. MSC Cruises Asia Company Ltd.

263. MSC Cruises Barcelona Terminal SL

264. MSC Cruises Belgium NV

265. MSC Cruises Gmbh

266. MSC Cruises Japan Ltd

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

267. MSC Cruises Limited UK

268. MSC Cruises Ltd Cyprus

269. MSC Cruises S.A. Co.

270. MSC Cruises Scandinavia AB

271. MSC Cruises Ship Management (Shanghai) Ltd.

272. MSC Cruises Shipping Service (Shanghai) Ltd.

273. MSC Cruises The Netherlands BV

274. MSC Cruises, S.A.

275. MSC Cruzeiros Do Brasil Ltda

276. MSC Cruzeiros SA

277. MSC Food & Beverage Division Spa

278. MSC Italcatering Do Brasil Ltda

279. MSC Kreuzfahrten (Austria) Gmbh

280. MSC Kreuzfahrten AG

281. MSC Krstarenja Doo

282. MSC Kruvaziyer Turizm AS

283. MSC Logistics (Mozambique) Ltd.

284. Msc Malta Seafarers Company Ltd.

285. MSC Mediagrafica Srl

286. MSC Miami Cruise Terminal LLC

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

287. MSC Ocean Cay Ltd

288. MSC Starlight Cruises Pty Ltd

289. Munyan, Katherine (Orrick, Herrington & Sutcliffe LLP)

290. Musica Cruise Limited

291. Nautica Acquisition, LLC

292. Navigator of the Seas Inc.

293. Navigator Vessel Company, LLC

294. Navitrans S.R.L.

295. NCL (Bahamas) Ltd. d/b/a Norwegian Cruise Line

296. NCL (Guernsey) Limited

297. NCL America Holdings, LLC

298. NCL America LLC

299. NCL Australia Pty Ltd.

300. NCL Construction Corp., Ltd.

301. NCL Corporation Ltd.

302. NCL Cruises Ltd.

303. NCL Emerald Corporation, Limited

304. NCL Finance, Ltd.

305. NCL HK Holding, Ltd.

306. NCL Holding AS

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises,
Ltd., et al.*

307. NCL Hong Kong Limited

308. NCL International, Ltd.

309. NCL Japan KK

310. NCL Singapore Pte. Ltd.

311. NCL UK IP CO LTD

312. NCL US IP CO 1, LLC

313. NCL US IP CO 2, LLC

314. NCLC Investments Canada Ltd.

315. NCLM Limited

316. Nemeroff, Justin B. (Venable LLP)

317. New Co Armonia SA

318. New Co Lirica SA

319. New Co Opera SA

320. New Co S32 SA

321. New Co Sinfonia SA

322. Norwegian Cardinal Ltd

323. Norwegian Compass Ltd.

324. Norwegian Cruise Co. Inc.

325. Norwegian Cruise Line Agéncia de Viagens Ltda.

326. Norwegian Cruise Line Group Italy S.r.l.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

327. Norwegian Cruise Line Group UK Limited (formerly Prestige Cruise

328. Services (Europe) Limited)

329. Norwegian Cruise Line Holdings, Ltd. (NCLH)

330. Norwegian Cruise Line India Private Limited

331. Norwegian Dawn Limited

332. Norwegian Epic, Ltd.

333. Norwegian Gem, Ltd.

334. Norwegian Jewel Limited

335. Norwegian Pearl, Ltd.

336. Norwegian Sextant Ltd.

337. Norwegian Sky, Ltd.

338. Norwegian Spirit, Ltd.

339. Norwegian Star Limited

340. Norwegian Sun Limited

341. Norwegian USCRA, Ltd.

342. Nualy Investments Inc

343. O Class Plus One, LLC

344. O Class Plus Two, LLC

345. Oasis of the Seas Inc.

346. Ocean Bahamas Innovation Ltd.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

347. Ocean Medallion Fulfillment, Ltd.

348. Oceanadventures S.A.

349. Oceania Cruises S. de R.L. (formerly Oceania Cruises, Inc.)

350. OCI Finance Corp.

351. Odds On Gaming Corporation

352. Odyssey of the Seas Inc.

353. Oliu, Pascual A. (Boies Schiller Flexner LLP)

354. Operadora Catalina S.r.L.

355. Orrick, Herrington & Sutcliffe LLP

356. Otazo-Reyes, Judge Alicia M. (United States Magistrate Judge for the Southern District of Florida)

357. Ovation of the Seas Inc.

358. P&O Princess American Holdings

359. P&O Princess Cruises International Limited

360. P&O Princess Cruises Pension Trustee Limited

361. P&O Properties (California), Inc.

362. P&O Travel Limited

363. Palumbo Malta Shipyard Limited

364. Palumbo Shipyard Limited

365. Paul, Weiss, Rifkind, Wharton & Garrison LLP

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

366. Pegg, Allen P. (Hogan Lovells US LLP)

367. Pettlier, Romain Le

368. Piccapietra Finance S.r.l.

369. Ponce, Scott D. (Holland & Knight LLP)

370. Prestige Cruise Holdings S. de R.L. (formerly Prestige Cruise

Holdings, Inc.)

371. Prestige Cruise Services LLC

372. Prestige Cruises Air Services, Inc.

373. Prestige Cruises International S. de R.L. (formerly Prestige Cruises

374. International, Inc.)

375. Prestige Cruises Management S.A.M.

376. Prestige Cruises N.V.

377. Preziosa Cruise Limited

378. Pride of America Ship Holding, LLC

379. Pride of Hawaii, LLC

380. Princess Bermuda Holdings, Ltd.

381. Princess Cays Ltd.

382. Princess Cruise Corporation Inc.

383. Princess Cruise Lines, Ltd.

384. Princess Cruises and Tours, Inc.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

385. Princess U.S. Holdings, Inc.

386. Quantum of the Seas Inc.

387. Quinn Emanuel Urquhart & Sullivan, LLP

388. Radiance of the Seas Inc.

389. RCI Holdings LLC

390. RCL (UK) Ltd.

391. RCL Cruise Holdings LLC

392. RCL Cruises Ltd.

393. RCL GEO LLC

394. RCL Holdings Cooperatief U.A.

395. RCL Horizon LLC

396. RCL Investments Ltd.

397. RCL Monarch LLC

398. RCL New Vessel Holding Company LLC

399. RCL Sovereign LLC

400. RCL TUI Cruises German Holding GmbH & Co. KG

401. RCL Worldwide (Hong Kong) Limited

402. RCL Worldwide Ltd.

403. RCL Zenith LLC

404. RCT Maintenance & Related Services S.A.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

405. RCT Pilots & Related Services, S.A.

406. RCT Security & Related Services S.A.

407. Regatta Acquisition, LLC

408. Rhapsody of the Seas Inc.

409. Riviera New Build, LLC

410. Roatan Cruise Terminal S.A. de C.V.

411. Rosenkranz, E. Joshua (Orrick, Herrington & Sutcliffe LLP)

412. Rowen, Matthew D. (Clement & Murphy, PLLC)

413. Royal Caribbean Cruise Lines AS

414. Royal Caribbean Cruises (Asia) Pte. Ltd.

415. Royal Caribbean Cruises Services (China) Company Limited

416. Royal Caribbean Cruises, Ltd. (RCL)

417. Royal Hyway Tours, Inc.

418. Saieh, Sabrina S. (Colson Hicks Eidson, P.A.)

419. Saladrigas, Caitlin F. (Holland & Knight)

420. Santa Cruz Terminal, S.L.

421. Schultz, Meredith L. (Boies Schiller Flexner LLP)

422. Seabourn Cruise Line Limited

423. Seahawk One, Ltd.

424. Seahawk Two, Ltd.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

425. SeaVacations Limited

426. SeaVacations UK Limited

427. Serenade of the Seas Inc.

428. Seven Seas Cruises S. De R.L., d/b/a Regent Seven Seas Cruises

429. SG Cruises GmbH

430. SG Expeditions Cyprus Limited

431. SG Expeditions SAGL

432. Shaffer, Derek L. (Quinn Emanuel Urquhart & Sullivan, LLP)

433. Shanghai Coast Cruise Consulting Co. Lda

434. Shanmugam, Kannon S. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

435. Ship Care (Bahamas) Limited

436. Silver Cloud Shipping Co. Ltd.

437. Silver Muse Shipping Co. Ltd.

438. Silver Shadow Shipping Co. Ltd.

439. Silver Spirit Shipping Co. Ltd.

440. Silver Wind Shipping Ltd.

441. Silversea Cruise Finance Ltd.

442. Silversea Cruise Holding Ltd.

443. Silversea Cruises (Europe) Ltd.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

444. Silversea Cruises (UK) Ltd.

445. Silversea Cruises Australia Pty. Ltd.

446. Silversea Cruises Canada Ltd.

447. Silversea Cruises Ltd.

448. Silversea Cruises South Africa Pty. Ltd.

449. Silversea New Build Seven Ltd.

450. Silversea RCL Holdings LLC

451. Silversea SAM

452. Singer, Stuart H. (Boies Schiller Flexner LLP)

453. Sirena Acquisition

454. Sitmar Cruises Inc.

455. Sixthman Ltd.

456. SNC Fantasia Bail

457. SNC Splendida Bail

458. Societe Labadee Nord, S.A.

459. Spanish Cruise Services N.V.

460. Spectrum of the Seas Inc.

461. Spezia & Carrara Cruise Terminal Srl

462. Spohrer Dodd Trial Attorneys

463. SSC Finance Corp.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

464. Sullivan, Kathleen M. (Quinn Emanuel Urquhart & Sullivan, LLP)

465. Summit Inc.

466. Sun Princess II Limited

467. Sun Princess Limited

468. Sunshine Shipping Corporation Ltd.

469. Super, John (Quinn Emanuel Urquhart & Sullivan, LLP)

470. Symphony of the Seas Inc.

471. T&T International, Inc.

472. Taormina, Benjamin A. (Holland & Knight LLP)

473. Terminal De Cruceros Punta Del Este SA

474. Torcatt Enterprises Limitada

475. Tour Alaska, LLC

476. Transnational Services Corporation

477. Tribe, Laurence H. (Harvard Law School)

478. Trident Insurance Company Ltd.

479. Trieste Adriatic Maritime Initiatives Srl

480. Venable LLP

481. Venezia Investimenti Srl

482. Vice, Abigail Frisch (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

483. Vision of the Seas Inc.

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

484. Voyager of the Seas Inc.

485. Voyager Vessel Company, LLC

486. Wang, Jonas Q. (Orrick, Herrington & Sutcliffe LLP)

487. West Sicily Gates Srl

488. Westmark Hotels of Canada, Ltd.

489. Westmark Hotels, Inc.

490. Whisper SpA

491. Whitaker, Walter H.

492. White Sand Inc.

493. World Leading Cruise Management (Shanghai) Co., Ltd.

494. XP Tours S.A.

## Corporate Disclosure Statements:

Royal Caribbean Cruises, Ltd. (NYSE: RCL), certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

June 30, 2023                           */s/ Paul D. Clement*
                                        Paul D. Clement

*Nos. 23-10151 & 23-10171, Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

Norwegian Cruise Line Holdings, Ltd., a Bermuda company, files the following corporate disclosure statement:

Norwegian Cruise Line Holdings Ltd. is publicly traded on the New York Stock Exchange under ticker symbol "NCLH." There are no parent corporations or publicly-held corporations that hold ten percent or more of Norwegian Cruise Line Holdings, Ltd.'s stock.

June 30, 2023                    */s/ Derek L. Shaffer*
                                 Derek L. Shaffer

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A. certify that:

1. Real party in interest MSC Cruises (USA) LLC's parent company and sole shareholder is MSC Cruises S.A., a privately-owned Swiss corporation. Accordingly, no publicly traded company owns more than 10% of its stock.

2. MSC Cruises SA Co.'s parent company and sole shareholder is also MSC Cruises S.A. Accordingly, no publicly traded company owns more than 10% of its stock.

June 30, 2023                    */s/ E. Joshua Rosenkranz*
                                 E. Joshua Rosenkranz

## STATEMENT REGARDING ORAL ARGUMENT

Appellants submitting this joint brief respectfully request oral argument. This case raises novel and crucial questions regarding the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §6021 *et seq.*, (a.k.a. the Helms-Burton Act), and the Appellants submitting this joint brief believe that oral argument will materially assist the Court in resolving the important issues presented here.

## TABLE OF CONTENTS

AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENTS ...................................... CIP-1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF AUTHORITIES ........................................................................... v

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE ISSUES ................................................................. 4

STATEMENT OF THE CASE .................................................................... 5

    A.    Factual and Legal Background ............................................. 5

          1.    HDC secures a limited concession, set to expire in 2004, to provide cargo services on state-owned docks ............. 5

          2.    The Castro regime seizes private property in 1960. .................. 7

          3.    The interconnected federal regime governing policy toward Cuba includes the Helms-Burton Act, which provides a private cause of action for U.S. nationals who owned property confiscated by Cuba ................................ 9

          4.    OFAC's role under the Helms-Burton Act and the Trading With The Enemy Act. ................................................. 12

          5.    President Obama opens Cuba for cruises in 2016. .................. 15

          6.    Consistent with President Obama's directive, the cruise lines take steps to lawfully sail to Cuba ................................. 17

          7.    President Trump closes Cuba to cruises—and allows the Title III suspension to lapse for the first time ever— in 2019 ....................................................................................... 19

B.      Procedural Background ...................................................... 21

       1.     More than a decade after its concession's expiration date, HDC asserts interests purportedly protected by the Act. .......................................................................... 21

       2.     HDC sues, seeking billions of dollars in damages; the district court denies, then grants, then un-grants the cruise lines' motions to dismiss. ................................. 23

       3.     The district court grants summary judgment to HDC on liability, consolidates the cases for determination of damages, and awards nearly $440 million in damages............ 26

SUMMARY OF ARGUMENT.................................................... 30

STANDARD OF REVIEW ......................................................... 33

ARGUMENT .............................................................................. 34

I.     The Trafficking Claims Are Foreclosed Because Of HDC's Limited Property Interest.......................................................................... 34

     A.     HDC's Property Interest Expired by Its Own Terms Well Before Any Cruises Began. ............................................... 35

       1.     The district court misread the Helms-Burton Act to protect property interests beyond what was taken. .................. 36

       2.     The district court's justifications for ignoring the time limit on HDC's property interest do not withstand scrutiny. ..................................................................... 40

     B.     HDC's Property Interest was Limited to a Non-Exclusive Right to Cargo Services, Which Does Not Implicate the Cruises. ...................................................................... 45

II.    The Trafficking Claims Are Foreclosed Because The Cruise Lines' Use Of The Terminal Was Incident And Necessary To Lawful Travel. ...................................................................................... 47

     A.     The Cruise Lines Engaged in Lawful Travel. .................................... 48

1.    The district court should not have ignored or second-guessed the Executive's views on lawful travel. ..................... 48

2.    The district court's contrary interpretation fails at multiple levels. ......................................................... 53

3.    MSC's Cuba-to-Cuba cruises were also lawful. ..................... 59

B.    Using the Terminal Was Necessary to the Cruise Lines' Lawful Travel. ................................................... 60

III.    Trafficking Is Foreclosed Because HDC Is Not A U.S. National. ............... 65

IV.    Trafficking Is Foreclosed Because, Even If Their Conduct Was Somehow Unlawful, The Cruise Lines Did Not Knowingly And Intentionally Traffic In Confiscated Property. ............................... 69

V.    Trafficking Is Foreclosed As To MSC's Cuba-To-Cuba Cruises Because They Were Improperly Pled, And Are Now Time-Barred. ............ 76

VI.    The District Court Awarded Excessive Damages. ......................... 78

CONCLUSION ................................................................ 86

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES[*]

## Cases

*Alamo Land & Cattle Co. v. Arizona,*
   424 U.S. 295 (1976)..........................................................................38

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003)..........................................................................53

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..........................................................................34

*Ayestas v. Davis,*
   138 S.Ct. 1080 (2018)........................................................................63

*Azar v. Allina Health Servs.,*
   139 S.Ct. 1804 (2019)................................................................. 64, 83

*Bigelow v. Old Dominion Copper Mining & Smelting Co.,*
   225 U.S. 111 (1912)..........................................................................46

*BMW of North Am., Inc. v. Gore,*
   517 U.S. 559 (1996)..........................................................................84

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964)..........................................................................44

*BP P.L.C. v. Mayor & City Council of Balt.,*
   141 S.Ct. 1532 (2021)........................................................................62

*\*BUC Int'l Corp. v. Int'l Yacht Council, Ltd.,*
   517 F.3d 1271 (11th Cir. 2008)................................................... 79, 80

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
   310 F.3d 197, 201 (D.C. Cir. 2002) ..................................................53

*Catalyst Pharms., Inc. v. Becerra,*
   14 F.4th 1299 (11th Cir. 2021)..........................................................34

---

[*] Citations upon which Appellants primarily rely are marked with asterisks.

*Cellular Telecomms. Internet v. FCC*,
  330 F.3d 502 (D.C. Cir. 2003) ............................................................62

*Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*,
  636 F.3d 101 (4th Cir. 2011) ..............................................................68

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,
  931 F.2d 1472 (11th Cir. 1991) ..........................................................75

*Chavez v. Mercantil Commercebank, N.A.*,
  701 F.3d 896 (11th Cir. 2012) ............................................................33

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ............................................................................52

*Club Madonna Inc. v. City of Miami Beach*,
  42 F.4th 1231 (11th Cir. 2022) ..........................................................44

*Credit Suisse Sec. (USA) LLC v. Billing*,
  551 U.S. 264 (2007) ............................................................................70

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ............................................................................55

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ............................................................... 8, 46, 81

*De Fernandez v. Seaboard Marine, Ltd.*,
  2022 WL 3577078 (S.D. Fla. Aug. 19, 2022) .....................................39

*Del Valle v. Trivago GMBH*,
  56 F.4th 1265 (11th Cir. 2022) ............................................................7

*Encino Motorcars, LLC v. Navarro*,
  138 S.Ct. 1134 (2018) ................................................................. 32, 62

*FCOA LLC v. Foremost Title & Escrow Servs. LLC*,
  57 F.4th 939 (11th Cir. 2023) ............................................................68

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ..........................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................................53

*Garcia-Bengochea v. Carnival Corp.*,
   57 F.4th 916 (11th Cir. 2023) ....................................................... 12, 39

*\*Glen v. Club Méditerranée S.A.*,
   450 F.3d 1251 (11th Cir. 2006) .............................................. 25, 39, 74

*Glen v. Trip Advisor LLC*,
   529 F.Supp.3d 316 (D. Del. 2021) .....................................................72

*Gonzalez v. Amazon.com, Inc.*,
   2020 WL 1169125 (S.D. Fla. Mar. 11, 2020) ....................................72

*GSS Grp. Ltd v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012) ...........................................................46

*Harrison v. Granite Bay Care, Inc.*,
   811 F.3d 36 (1st Cir. 2016) ......................................................... 66, 69

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010) ................................................................. 65, 67, 69

*Higgs v. Costa Crociere S.P.A. Co.*,
   969 F.3d 1295 (11th Cir. 2020) ..........................................................79

*High Ol' Times, Inc. v. Busbee*,
   673 F.2d 1225 (11th Cir. 1982) ..........................................................44

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
   141 S.Ct. 2172 (2021) .........................................................................48

*Liberty Univ., Inc. v. Lew*,
   733 F.3d 72 (4th Cir. 2013) ................................................................70

*Marti v. Iberostar Hoteles y Apartamentos S.L.*,
   54 F.4th 641 (11th Cir. 2022) .............................................................19

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...........................................................63

*McFadden v. United States*,
  576 U.S. 186 (2015)..............................................................74

*Minpeco, S.A. v. Hunt*,
  718 F.Supp. 168 (S.D.N.Y. 1989) ........................................83

*Moore v. Baker*,
  989 F.2d 1129 (11th Cir. 1993) .............................................77

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)..............................................................60

*N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*,
  2021 WL 3741647 (S.D. Fla. Aug. 24, 2021).........................19

*N. Broward Hosp. Dist. v. Shalala*,
  172 F.3d 90 (D.C. Cir. 1999) ................................................62

*\*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ..................................... *passim*

*Osterneck v. E.T. Barwick Indus., Inc.*,
  825 F.2d 1521 (11th Cir. 1987) .............................................83

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)..............................................................46

*Raley v. Ohio*,
  360 U.S. 423 (1959)....................................................... 58, 81

*\*Regan v. Wald*,
  468 U.S. 222 (1984)...................................................... 49, 53

*Rehaif v. United States*,
  139 S.Ct. 2191 (2019)...........................................................71

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  579 U.S. 325 (2016)..............................................................60

*Rodriguez v. United States*,
  480 U.S. 522 (1987)..............................................................82

*Ruan v. United States,
    142 S.Ct. 2370 (2022) ........................................................ 70, 71, 72, 74

Sessions v. Johnson,
    95 U.S. 347 (1877) ............................................................79

Simmons v. United States,
    421 F.3d 1199 (11th Cir. 2005) .........................................76

Spellissy v. United Techs. Corp.,
    837 F.2d 967 (11th Cir. 1988) ...........................................34

St. Louis, I.M. & S. Ry. Co. v. Williams,
    251 U.S. 63 (1919) ............................................................84

State Farm Mut. Auto. Ins. Co. v. Campbell,
    538 U.S. 408 (2003) ..........................................................81

Stephens v. Dep't of Health & Hum. Servs.,
    901 F.2d 1571 (11th Cir. 1990) .........................................34

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,
    535 U.S. 302 (2002) ..........................................................39

U.S. ex rel. Knauff v. Shaughnessy,
    338 U.S. 537 (1950) ..........................................................49

United States v. Amirnazmi,
    645 F.3d 564 (3d Cir. 2011) ..............................................13

United States v. Craft,
    535 U.S. 274 (2002) ..........................................................36

United States v. Curtiss-Wright Exp. Corp.,
    299 U.S. 304 (1936) ..........................................................56

United States v. Gen. Motors Corp.,
    323 U.S. 373 (1945) ..........................................................38

United States v. Lanier,
    520 U.S. 259 (1997) ..........................................................44

*United States v. Utah Constr. Co.*,
    384 U.S. 394 (1966)............................................................46

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ...........................................34

*WM Mobile Bay Env't Ctr., Inc. v. City of Mobile*,
    2022 WL 2784606 (11th Cir. July 15, 2022) .......................68

*Wylie v. Red Bull N. Am., Inc.*,
    627 F.App'x 755 (11th Cir. 2015).......................................68

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)............................................................47

**Statutes**

5 U.S.C. §§702-704..............................................................14

22 U.S.C. §1622g..................................................................45

22 U.S.C. §1623(h) ...............................................................45

22 U.S.C. §1643, *et seq.*........................................................ 41

22 U.S.C. §1643 .....................................................................8

22 U.S.C. §1643b(a) .............................................................42

22 U.S.C. §6021 *et seq.*.........................................................10

22 U.S.C. §6022(6) ...............................................................36

22 U.S.C. §6023(4) ............................................................... 37

22 U.S.C. §6023(12)(A).........................................................36

22 U.S.C. §6023(13)(A).....................................................11, 70

22 U.S.C. §6023(13)(B).........................................................11

22 U.S.C. §6023(13)(B)(iii)................................................ 47, 62

22 U.S.C. §6023(15) ..............................................................65

22 U.S.C. §6023(15)(B) .................................................................. 10

22 U.S.C. §6032(h) ......................................................................... 54

22 U.S.C. §6042(1)(A) .................................................................... 64

22 U.S.C. §6044(b) ......................................................................... 63

22 U.S.C. §6065(b)(2)(D) ............................................................... 80

22 U.S.C. §6082(a)(1)(A) ........................................................ *passim*

22 U.S.C. §6082(a)(3) ...................................................................... 11

22 U.S.C. §6082(f)(1)(A) ................................................................ 81

22 U.S.C. §6082(f)(1)(B) ................................................................ 81

22 U.S.C. §6082(f)(2)(A) ................................................................ 80

22 U.S.C. §6083(a)(1) ..................................................................... 45

22 U.S.C. §6082(a)(1)(A)(i) ........................................................... 83

22 U.S.C. §6082(a)(3)(C)(ii) .......................................................... 83

22 U.S.C. §6084 .............................................................................. 76

22 U.S.C. §6085(b) ......................................................................... 63

22 U.S.C. §6085(c)(1)(B) ............................................................... 12

22 U.S.C. §6091(a) ......................................................................... 12

22 U.S.C. §6091(b)(2) .............................................................. 47, 70

22 U.S.C. §7209(b)(1) .................................................................... 54

22 U.S.C. §7209(b)(2) .................................................................... 54

50 U.S.C. §4304 .............................................................................. 12

50 U.S.C. §4315(b)(1) .................................................................... 52

50 U.S.C. §4315(b)(3) ............................................................... 15, 52

50 U.S.C. §4315(b)(4) .................................................................. 15, 53, 54

Pub. L. No. 104-114, 110 Stat. 785 (1996) .................................................15

Pub. L. No. 65-91, 40 Stat. 411 (1917) ......................................................12

**Rule and Regulations**

Fed. R. Civ. P. 56(c) ................................................................. 59

31 C.F.R. part 501, App. A .......................................................14

31 C.F.R. part 501, subpart D ...................................................14

31 C.F.R. part 515 ................................................................. 12

31 C.F.R. §501.703(a) ...........................................................14

31 C.F.R. §501.703(a)(1) .......................................................14

31 C.F.R. §501.703(a)(3)-(6) ..................................................14

31 C.F.R. §501.703(a)(7) ....................................................... 14

31 C.F.R. §501.706-09 .........................................................14

31 C.F.R. §501.713 .............................................................14

31 C.F.R. §501.740 .............................................................14

31 C.F.R. §501.741(a) ..........................................................14

31 C.F.R. §501.741(g) ..........................................................14

31 C.F.R. §501.742 .............................................................14

31 C.F.R. §515.560(c)(1) (2015) ...............................................16

31 C.F.R. §515.560(f) ..........................................................14

31 C.F.R. §515.565(b) ..........................................................13

31 C.F.R. §515.565(b)(2) .......................................................56

31 C.F.R. §515.565(b)(2) (2011) ...............................................15

31 C.F.R. §515.565(b)(3) ...........................................................56

31 C.F.R. §515.565(e) ...............................................................14

31 C.F.R. §515.572(a)(2)(i) ................................................. 13, 16

31 C.F.R. §515.572(a)(4) ..................................................... 13, 16

31 C.F.R. §515.701 ...................................................................14

31 C.F.R. §515.802 ...................................................................12

74 Fed. Reg. 57,593 (Nov. 9, 2009)..........................................14

80 Fed. Reg. 2,291 (Jan. 16, 2015) ...........................................16

80 Fed. Reg. 56,898 (Sept. 21, 2015) ........................................16

82 Fed. Reg. 48,875 (Oct. 20, 2017).........................................19

84 Fed. Reg. 25,986 (June 5, 2019) ...........................................20

84 Fed. Reg. 25,992 (June 5, 2019) ..........................................19

**Other Authorities**

142 Cong. Rec. H1645-02, 1996 WL 90487 (Mar. 4, 1996) ..................................64

142 Cong. Rec. H1724-04 (Mar. 6, 1996) ...............................72

Black's Law Dictionary (11th ed. 2019)................................5, 63

Brief for United States as Amicus Curiae, *Garcia-Bengochea*, 2022
    WL 1135129 (11th Cir. Apr. 11, 2022) ........................ 48, 49

Dep't of Treasury, Enforcement Release, *OFAC Settles with Airbnb
    Payments, Inc. for $91,172.29 Related to Apparent Violations of
    the Cuban Assets Control Regulations*, (Jan. 3, 2022),
    https://perma.cc/F5TW-MWGK ........................................52

Paul Guzzo, *The federal government says this man rightfully owns
    Havana's cruise port*, Tampa Bay Times (June 25, 2018),
    https://tinyurl.com/e9e38wmz ...........................................75

H.R. Rep. No. 104-202 (1995)...................................................82

*Presidential Policy Directive—United States-Cuba Normalization*, White House (Oct. 14, 2016), https://perma.cc/FA6V-9RQX ............................ 19

*Remarks by President Barack Obama*, White House (March 21, 2016), https://perma.cc/7B4M-EUNY .......................................................... 17, 49

*Statement by the President on Cuba Policy Changes*, White House (Dec. 17, 2014), https://perma.cc/TZ9N-2WF9 .......................................... 15, 56

John Yoo, *Federal Courts As Weapons of Foreign Policy: The Case of the Helms-Burton Act*, 20 Hastings Int'l & Comp. L. Rev. 747 (1997) ................................................................................................................. 9, 10

U.S. Dep't of Just., *About the Commission* (updated Apr. 10, 2023), https://perma.cc/27SE-QXDP ................................................................... 8

U.S. Dep't of Just., *Completed Programs—Cuba* (updated Apr. 21, 2022), https://perma.cc/M3A9-V5PM ................................................... 9

# INTRODUCTION

In 2016, the Obama Administration made a foreign policy decision to pursue greater engagement with Cuba and the Cuban people. As a part of that shift, the Executive licensed and authorized cruises, including those operated by the cruise lines here, to return to Cuba for the first time in decades. As to cruise ships calling in Havana, the Cuban government required docking at the cruise terminal in Havana Harbor (the "Terminal"). While Cuban government always held title to the Terminal, the plaintiff here, Havana Docks Corporation ("HDC"), once held a 99-year concession—a leasehold interest—to operate at the Terminal that, by its own terms, ended in 2004. In 1960, Fidel Castro's regime confiscated the concession. When the cruise lines used the Terminal more than a decade *after* the concession's expiration date, HDC complained to the Executive that the cruises (which the President specifically promoted) violated the Helms-Burton Act. The Executive explicitly and repeatedly told HDC that the cruise lines' use of the Terminal was necessary to lawful travel and thus permissible under the Act.

But when HDC brought its complaints to a federal district court in Miami, it received a very different answer. The court not only granted HDC summary judgment on virtually every issue, interpreting the statute to have impossible breadth and draconian consequences, but imposed nine-figure liability separately on each

cruise line (*i.e.*, *not* jointly-and-severally) simply for having undertaken conduct the Executive blessed, resulting in a half-*billion*-dollar windfall for HDC.

Those eye-popping judgments cannot stand. They rest on at least six overarching and independent errors. First, the district court allowed a concessionary interest that by its own terms expired in 2004 to form the basis of a trafficking violation based on actions not initiated until *over a decade later*, ignoring basic principles of chronology and property law. Second, the court ignored the Executive's myriad actions allowing and affirmatively encouraging the travel at issue as part of its changed policy toward Cuba and gave the Act's lawful-travel exemption an unduly narrow reading. Third, the court deemed HDC a "U.S. national" even though HDC's president lives and works in London. Fourth, the court decided—again as a matter of law—that the cruise lines knowingly and intentionally trafficked in confiscated property, despite its own earlier dismissal of HDC's complaints *with prejudice* because of the concession's time-limited nature. Fifth, the court ignored a failure to plead allegations material to liability. Sixth and finally, the court imposed outsized damages in contradiction of the one-satisfaction rule and due process. The decision below imposes draconian consequences on cruise lines that simply responded to the changing foreign policies of two successive administrations. Those profoundly mistaken yet profoundly consequential judgments cannot stand.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1332.  This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in holding, as a matter of law, that the cruise lines trafficked in HDC's confiscated property, in violation of the Helms-Burton Act, through cruises in 2015-2019 even though HDC's 99-year concession expired by its terms in 2004.

2.  Whether the district court erred in holding, as a matter of law, that the cruise lines' use of the Terminal was not necessary to lawful travel within the meaning of the Helms-Burton Act, even though the cruises operated openly and notoriously, and the Executive not only licensed cruises to Cuba generally but specifically rebuffed HDC's complaints on the ground that the complained-of uses of the Terminal here were necessary to lawful travel.

3.  Whether the district court erred in holding, as a matter of law, that HDC's principal place of business is in Kentucky for purposes of the Helms-Burton Act, even though HDC's president has been a resident of the United Kingdom since 1999.

4.  Whether the district court erred in holding, as a matter of law, that the cruise lines knowingly and intentionally engaged in trafficking involving the confiscated property of a U.S. national in violation of the Helms-Burton Act.

5.  Whether the district court erred in basing MSC's liability on purely extraterritorial cruises that HDC failed to plead within the two-year statutory time limit.

4

6.    Whether the district court erred in imposing judgments exceeding $110 million against each of the four cruise lines individually.

## STATEMENT OF THE CASE

### A.    Factual and Legal Background

**1.    HDC secures a limited concession, set to expire in 2004, to provide cargo services on state-owned docks.**

This case's roots run back to the turn of the twentieth century.  In 1904, an American named Sylvester Scovel submitted a proposal to Havana's Governor offering to build a pier and related facilities in exchange for a concession[1] to operate cargo services at the pier.  NCL.Dkt.235-1 at 7.[2]  In 1905, Cuba granted a 50-year concession to Scovel's successor-in-interest to carry out Scovel's project on the state-owned San Francisco Wharf.  *Id.* at 8; *see* Carnival.Dkt.73-3 at 2.

The concession granted certain limited rights to the concessionaire.  In particular, the concession came with the right to collect fees related to cargo services at the docks.  Cuba retained ownership of the docks, but the "State assign[ed] in

---

[1] A concession is "[a] government grant for specific privileges," *i.e.*, "[a] contract in which a country transfers some rights to a foreign enterprise which then engages in an activity (such as mining) contingent on state approval and subject to the terms of the contract."  Black's Law Dictionary (11th ed. 2019).

[2] Citations to individual dockets are as follows:  "NCL.Dkt." (No. 1:19-cv-23591); "RCCL.Dkt."  (No.  1:19-cv-23590);  "Carnival.Dkt."  (No.  1:19-cv-21724); "MSC.Dkt." (No. 1:19-cv-23588).

usufruct[3] during the term of the concession that part of the San Francisco docks, as well as the public domain area, that will be occupied by the project's works." Carnival.Dkt.73-3 at 3. Following "the expiration of the term of concession," Cuba would "replace the concession holder in the possession of the works." *Id.* at 7. The concession did not allow the concessionaire to interfere with third parties' rights. *See* NCL.Dkt.235-1 at 9; Carnival.Dkt.73-3 at 8.

The ownership and duration of the concession changed in the years that followed, eventually ending up with HDC's interest in a 99-year concession, still dating back to 1905. *See* NCL.Dkt.235-1 at 10-11, 18. The completed docks featured three piers, the San Francisco, Machina, and Santa Clara (from left to right in top).

---

[3] Usufruct refers to "[a] right for a certain period to use and enjoy the fruits of another's property." Black's Law Dictionary (11th ed. 2019).



NCL.Dkt.367 at 17.

### 2.    The Castro regime seizes private property in 1960.

In 1959, Fidel Castro's revolutionaries took control of Cuba.  *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1270 (11th Cir. 2022).  Having seized power, the Castro-led government seized all American-owned property in Cuba.  On October 24, 1960, Cuba nationalized all property owned by U.S. nationals.  NCL.Dkt.367 at 29-30.

In response, Congress allowed individuals to pursue claims against the Cuban government for expropriated property through the Foreign Claims Settlement Commission ("FCSC"), NCL.Dkt.254 at 7, "a quasi-judicial, independent agency

7

within the Department of Justice which adjudicates claims of U.S. nationals against foreign governments," U.S. Dep't of Just., *About the Commission* (updated Apr. 10, 2023), https://perma.cc/27SE-QXDP.    In 1964, Congress amended existing legislation to allow the FCSC to determine "the amount and validity of claims against the Government of Cuba … which have arisen since January 1, 1959 … out of nationalization, expropriation, intervention, or other takings of" the property of U.S. nationals.  22 U.S.C. §1643.  That decision accorded with the political branches' practice of vindicating U.S. nationals' property interests in negotiations with foreign countries.  *See generally Dames & Moore v. Regan*, 453 U.S. 654, 680-83 (1981).

HDC brought a claim against the Cuban government to the FCSC in 1967.  *See*  NCL.Dkt.235-12, -13.    "The entire pier properties," HDC's application explained, "are held under the terms of a concession granted by the Cuban Government," which "provide for transfer of ownership of the pier properties to the Cuban Government in the year 2004, in good state of preservation and service without payment to the company."  NCL.Dkt.235-12 at 2.  The application asserted that HDC's claim was worth $9,915,879.  NCL.Dkt.235-13 at 4.

In 1971, the FCSC issued its decision on HDC's claim, finding, without the benefit of adversarial testing, that the Cuban government caused a loss to HDC of $9,179,700.88.  NCL.Dkt.43-8 at 2-3.  The compensation owed HDC by Cuba, the FCSC determined, should include 6% annual interest, dating back to 1960.  *Id.*  The

FCSC's decision observed that "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004." *Id.* at 8.

Ultimately, the FCSC adjudicated more than 8,000 claims against the Cuban government. The U.S. and Cuba have yet to settle those claims. U.S. Dep't of Just., *Completed Programs—Cuba* (updated Apr. 21, 2022), https://perma.cc/M3A9-V5PM.

> **3.    The interconnected federal regime governing policy toward Cuba includes the Helms-Burton Act, which provides a private cause of action for U.S. nationals who owned property confiscated by Cuba.**

As this Court has recognized, "[f]ederal policy towards Cuba is long-standing, it is nuanced, it is highly calibrated, and it is constantly being fine-tuned." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1278 (11th Cir. 2013). "Since the early 1960s, U.S. policy toward Cuba has consisted largely of isolating the island nation through comprehensive economic sanctions, including an embargo on trade and financial transactions," subject to "numerous exceptions, permitting certain kinds of transactions with Cuba through licensing as well as through complete exemptions." *Id.* at 1275, 1277.

The embargo began with President Eisenhower, who banned most trade with Cuba following Castro's seizures. *See* John Yoo, *Federal Courts As Weapons of Foreign Policy: The Case of the Helms-Burton Act*, 20 Hastings Int'l & Comp. L. Rev. 747, 750 (1997). After the Bay of Pigs controversy, President Kennedy

imposed a total embargo on Cuba. Succeeding administrations maintained that embargo, subject to varying exceptions and licenses, into the 1990s. *Id.*

In 1996, Congress complemented the Executive's efforts with the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §6021 *et seq.*, often called the Helms-Burton Act. The Act had three primary components. First, it effectively codified the embargo. Second, it included provisions designed to encourage Cuba to move toward democratic government. Third, it took steps to discourage trafficking in property nationalized by the Cuban government. Yoo, *supra*, at 750-51.

Title III of the Act addresses trafficking in confiscated property. Under Title III, "any person that … traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property." 22 U.S.C. §6082(a)(1)(A). Two key terms for this provision are "United States national" and "traffics." Under the statute, a business or other juridical person can be a "United States national," provided that "its principal place of business [is] in the United States." *Id.* §6023(15)(B). The term "traffics" is defined as follows:

> a person "traffics" in confiscated property if that person knowingly and intentionally—
>
> > (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases,

receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking … by another person, or otherwise engages in trafficking … through another person, without the authorization of any United States national who holds a claim to the property.

22 U.S.C. §6023(13)(A). Importantly, the statute clarifies that the term "'traffics' does *not* include … transactions and uses of property incident to lawful travel to Cuba," if such activity is "necessary to the conduct of such travel." *Id.* §6023(13)(B) (emphasis added).

The Act's extraordinary penalties underscore the seriousness of a trafficking violation and help explain the types of conduct Congress sought to prohibit. First, the Act authorizes significant monetary liability and allows successful plaintiffs to recover attorneys' fees as well. *Id.* §6082(a)(1)(A). Damages are measured by the value of the confiscated property or outstanding claim, *id.* §6082(a)(1)(A)(i), and can be trebled if a U.S. national with a certified claim from the FCSC gives notice to an entity of the claim and trafficking continues post-notice, *id.* §6082(a)(3). Other provisions go far beyond damages. Title IV of the Act requires—not empowers; requires—the President to expel (kick out) or exclude (keep out) from the country not just "any alien" who engaged in trafficking, but also "any alien" who "is a corporate officer, principal, or shareholder with a controlling interest of an entity

11

which has been involved in the confiscation of property or trafficking in confiscated property … or … a spouse, minor child, or agent of a person" whose exclusion the Act requires, even if such person played no role in the trafficking.  *Id.* §6091(a).

Finally, in addition to its substantive and remedial provisions, the Act allows the President to suspend, for up to six months at a time, the private right to sue under Title III.  *Id.* §6085(c)(1)(B).  Beginning with President Clinton immediately upon passage, every President suspended the right to bring Title III suits continuously, up to and beyond 2004, when HDC's 99-year concession expired by its own terms.  *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 919 (11th Cir. 2023) (per curiam).

### 4.    OFAC's role under the Helms-Burton Act and the Trading With The Enemy Act.

Since 1963, the Executive Branch has regulated travel to Cuba under the Trading with the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) (now codified at 50 U.S.C. §§4301 *et seq.*).  *See Odebrecht*, 715 F.3d at 1275-76.  Under TWEA, the President can issue licenses that allow specific types of transactions with a designated enemy.  50 U.S.C. §4304; *see Odebrecht*, 715 F.3d at 1275.  The President has "repeatedly exercised" this licensing power and has promulgated rules governing trade with and travel to Cuba in the Cuban Assets Control Regulations (CACR), 31 C.F.R. part 515.  *Odebrecht*, 715 F.3d at 1275, 1281.  The Department of the Treasury's Office of Foreign Assets Control (OFAC), 31 C.F.R. §515.802,

issues such licenses and "administer[s] and enforce[s]" the CACR. *Odebrecht*, 715 F.3d at 1276.

OFAC licenses can take two forms: specific or general. Whereas "a specific license is a 'written document issued by OFAC to a particular person or entity, authorizing a particular transaction in response to a written license application,'" "a general license categorically authorizes 'a particular type of transaction for a class of persons without the need to apply for a license.'" *United States v. Amirnazmi*, 645 F.3d 564, 574 n.15 (3d Cir. 2011). The CACR regulations include a general license that permits travel to Cuba related to nonacademic educational activities that "promote people-to-people contact." 31 C.F.R. §515.565(b). This license authorizes carrier services to Cuba that facilitate travel featuring "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," which "take place under the auspices of" a "sponsoring organization [that] accompanies each group traveling to Cuba to ensure that each traveler has a full-time schedule of educational exchange activities" that "result[s] in meaningful interaction between the traveler and individuals in Cuba." *Id.* §515.565(b) (general license for people-to-people travel); *see also id.* §515.572(a)(2)(i), (4) (general licenses for "carrier services to, from, or within Cuba" and related lodging services).

"Transactions related to activities that are primarily tourist-oriented are not authorized." *Id.* §515.565(e); *accord id.* §515.560(f).

OFAC enforces its licenses and the CACR through the agency's extensive administrative process for investigating and adjudicating violations. 31 C.F.R. §515.701 (citing *id.* part 501, subpart D); *see id.* §501.703(a). If OFAC finds a violation, the agency may impose penalties ranging from civil monetary sanctions and license denial or suspension to referral for criminal prosecution. *Id.* part 501, App. A; *see* 74 Fed. Reg. 57,593, 57,602 (Nov. 9, 2009). OFAC must notify a suspected violator of an alleged violation, allow the suspected violator to defend itself against the alleged violation, and then determine whether the violation occurred and warrants a civil penalty. 31 C.F.R. §§501.703(a)(1)-(3), 501.706-09. If OFAC finds that the violation occurred and warrants a civil penalty, the suspected violator is entitled to a hearing before an Administrative Law Judge; a designee of the Treasury Secretary may administratively review the ALJ's decision. *Id.* §§501.703(a)(3)-(6), 501.713, 501.740, 501.741(a), 501.742. Ultimately, under the Administrative Procedure Act, suspected violators are entitled to judicial review of final decisions. *Id.* §§501.703(a)(7), 501.741(g); *see* 5 U.S.C. §§702-704.

In enacting the Helms-Burton Act, Congress built upon the licensing regime established by the TWEA and OFAC's implementing regulations, including by codifying parts of the CACR's administrative-enforcement process. For example,

the Helms-Burton Act amended TWEA to provide that the Treasury Secretary may impose civil penalties against "any person who violates any license, order, rule, or regulation issued in compliance with the provision of this [chapter]," such as the CACR. Pub. L. No. 104-114 §102(d)(1), 110 Stat. 785, 793 (1996) (codified at 50 U.S.C. §4315(b)(1)). This amendment further provides that the imposition of such penalties must conform to APA standards. 50 U.S.C. §4315(b)(3)-(4).

### 5.    President Obama opens Cuba for cruises in 2016.

In late 2014, following negotiations brokered by Pope Francis, President Obama announced that the United States would be "changing its relationship with the people of Cuba." *Statement by the President on Cuba Policy Changes*, White House (Dec. 17, 2014), https://perma.cc/TZ9N-2WF9. As part of the new policy of engagement, the President announced that his Administration would be making it "easier for Americans to travel to Cuba," because "[n]obody represents America's values better than the American people," and more Americans traveling lawfully to Cuba "will ultimately do more to empower the Cuban people." *Id.*

Pursuant to that policy, Executive Branch agencies opened Cuba up for significant travel, including cruises. For instance, OFAC amended the CACR. The CACR already provided that specific licenses could authorize people-to-people travel. 31 C.F.R. §515.565(b)(2) (2011). On the heels of the President's announcement, however, OFAC eliminated "the need for case-by-case specific

15

licensing" by providing a general license for people-to-people related travel to Cuba. 80 Fed. Reg. 2,291, 2,291, 2,297 (Jan. 16, 2015) (final rule providing the general license for people-to-people travel).

In September 2015, OFAC issued a general license authorizing cruise lines to transport passengers to Cuba. In doing so, OFAC made clear that "[p]ersons subject to U.S. jurisdiction" were "authorized to provide carrier services to, from, or within Cuba in connection with travel or transportation, directly or indirectly, between the United States and Cuba." 31 C.F.R. §515.572(a)(2)(i); *id.* §515.572(a)(4) (authorizing vessels to provide lodging onboard for such travel, "including when docked at a port in Cuba"). Still another regulation provided that "[a]ll transportation-related transactions ordinarily incident to travel to and from … Cuba are authorized." *Id.* §515.560(c)(1) (2015). Finally, the Department of Commerce's Bureau of Industry and Security ("BIS") issued regulations in the fall of 2015 alongside OFAC's general licenses specifically authorizing cruise ships to transport passengers to Cuba from the United States. *See* 80 Fed. Reg. 56,898, 56,900 (Sept. 21, 2015).

In the spring of 2016, the President himself traveled to Havana—along with a bipartisan group of nearly 40 members of Congress—and emphasized the importance of travel in "normalizing relations" between the two countries. *Remarks by President Barack Obama*, White House (March 21, 2016),

16

https://perma.cc/7B4M-EUNY. The President celebrated how, "[o]ver the past year, the number of Americans coming here has surged." *Id.* And he heralded how his Administration had successfully "*removed the last major hurdle to resuming cruises and ferry service.*" *Id.* (emphasis added).[4] The implication of opening Cuba to cruises was clear: "[E]ven more Americans visiting Cuba in the years ahead and appreciating the incredible history and culture of the Cuban people." *Id.*

The Executive confirmed that the OFAC-issued general licenses applied to all the cruise lines. All of the cruise lines sought specific licenses, but, after Carnival received a specific license, Carnival.Dkt.326-35, the other cruise lines were redirected to the newly amended general license. OFAC explained, "OFAC's policy is not to grant specific licenses authorizing transactions for which the provisions of a general license apply," and made clear that, because of the general license, OFAC would not take any further action on their applications for specific licenses. NCL.Dkt.235-18 at 2; NCL.Dkt.235-20 at 2; NCL.Dkt.367 at 56.

### 6.    Consistent with President Obama's directive, the cruise lines take steps to lawfully sail to Cuba.

The cruise lines took extensive measures to promote compliance with the Executive's regulatory framework. Before allowing passengers to board a Cuba-bound ship, for instance, Norwegian required all passengers to sign an affidavit

---

[4] The "hurdle" referred to related to anti-terrorism measures taken to secure Cuban ports. *See* 81 Fed. Reg. 15,326, 15,327 (Mar. 22, 2016).

certifying—under penalty of perjury—that they would be traveling to Cuba pursuant to and in compliance with OFAC's regulations. NCL.Dkt.238 at ¶18. Norwegian also took pains to help travelers understand their individual obligations under OFAC's regulations, including avoiding transactions with entities on OFAC's "Cuba Restricted List." *Id.* at ¶19. Other cruise lines did much the same. *See, e.g.*, MSC.Dkt.210-23 (MSC required passengers to certify that they would be traveling to Cuba pursuant to and in compliance with OFAC regulations); RCCL.Dkt.132 at 7 (similar); *see also* MSC.Dkt.210-19 at 1. The cruise lines worked to provide shore excursions intended to meet the requirements of the people-to-people category. *See, e.g.*, RCCL.Dkt.132 at 8. And none of the cruise lines set sail for Cuba from the U.S. before the general license issued. NCL.Dkt.235 at 4.

When calling in Havana, the cruise lines docked at the Terminal because there was no other choice. *Id.* at 5. Some cruise lines asked the Cuban government for permission to get their passengers ashore in other ways, like anchoring cruise ships offshore and shuttling passengers to shore in smaller vessels. Cuba refused, instead requiring cruise ships to dock at the Terminal. *See id.* at 5-7. To implement their people-to-people programs, the cruise lines each contracted with an "excursion operator" to operate shore excursions. *E.g.*, NCL.Dkt.367 at 49-50.

After the Cuba cruises began, the President hailed this change as a step forward for relations between the United States and Cuba. In the fall of 2016, the

President celebrated the fact that "the first U.S. cruise liner visited Cuban ports in May 2016." *Presidential Policy Directive—United States-Cuba Normalization*, White House (Oct. 14, 2016), https://perma.cc/FA6V-9RQX. The President likewise emphasized that, "[a]s permitted by law, we will continue to support the development of scheduled and chartered air service and maritime links." *Id.*

Cruises to Cuba continued following President Trump's election in 2016. To be sure, the Trump Administration signaled that it would take a different approach to Cuba than its predecessor. *See* 82 Fed. Reg. 48,875 (Oct. 20, 2017). But President Trump initially allowed the cruises to continue and extended the long-running practice of suspending the Act's private right of action. *See Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 644 (11th Cir. 2022).

### 7.   President Trump closes Cuba to cruises—and allows the Title III suspension to lapse for the first time ever—in 2019.

Things changed in 2019. That May, President Trump allowed the suspension of the Act's private right of action to lapse. *N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 2021 WL 3741647, at *2 (S.D. Fla. Aug. 24, 2021). For the first time in the Act's history, plaintiffs could bring suit under Title III. *Marti*, 54 F.4th at 644.

Shortly thereafter, OFAC amended the CACR to eliminate the authorization for group people-to-people educational travel, effective June 5, 2019. *See* 84 Fed. Reg. 25,992 (June 5, 2019) (amending 31 C.F.R. §515.565(b)). BIS made clear on

19

the same date that various forms of transport, including "cruise ships, … generally will be prohibited from going to Cuba." 84 Fed. Reg. 25,986, 25,987 (June 5, 2019). The cruise lines fully complied. *See* NCL.Dkt.235 at 4.

The day before cruising to Cuba ended, OFAC sent a "Cautionary Letter" to Royal Caribbean. The letter did not hint at any wider problem with the cruises that had gone to Cuba. Instead, it flagged concerns with Royal Caribbean's "compliance with its record-keeping obligations." *See* RCCL.Dkt.133-41 at 3 (OFAC Letter dated June 4, 2019). In reviewing a sampling of certifications filled out by travelers, OFAC noted that several travelers failed to properly provide a license number authorizing their travel to Cuba. *Id.* After emphasizing the importance of proper record-keeping, OFAC explained it had "decided to address this matter by issuing this Cautionary Letter instead of pursuing a civil monetary penalty or taking other enforcement action." *Id.* OFAC specifically stated that the letter represented "a final enforcement response"—notably, one that did "not constitute a final agency determination as to whether [CACR] violations have occurred." *Id.* No other action was ever taken by OFAC or any other Executive branch agency against Royal Caribbean—or any other cruise line—to suggest a CACR violation or that their travel was otherwise unlawful.

20

### B.    Procedural Background

#### 1.    More than a decade after its concession's expiration date, HDC asserts interests purportedly protected by the Act.

HDC, now run by Mickael Behn—HDC's president and, since 1999, a U.K. resident, NCL.Dkt.235 at 11—repeatedly tried to persuade the Executive to exclude cruise line affiliates from the United States for alleged unlawful trafficking.  On at least three occasions, HDC compiled its allegations and "presented these facts to State Department officials and requested a Title IV action against the foreign executives and directors of cruise lines."  NCL.Dkt.240-27 at 5.  But the State Department repeatedly refused and explained that the cruise lines' use of the Terminal was necessary for lawful travel as permitted by the Act.  The State Department's Acting Coordinator for Cuban Affairs explained:  "As previously discussed, given the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines." NCL.Dkt.237-24 at 2; *see also* NCL.Dkt.237-27 at 3 (letter co-signed by HDC's officers acknowledging that "[t]he State Department has asserted that the use of the confiscated port properties in Cuba has been 'necessary' to the conduct [of] such travel as allowed for in the law."); NCL.Dkt.237-28 at 2 ("The State [Department] lawyer specifically told me they viewed docking on our property as 'necessary' and so they wouldn't consider it trafficking.").

21

HDC also sought OFAC sanctions against the cruise lines, but conspicuously failed there too.  In 2018, a representative of HDC contacted OFAC, seeking action against the cruise lines.  He declared that he was "the claimant and legitimate owner of the port facilities in Santiago de Cuba," and that he and HDC had "serious ongoing concern[s] regarding the trafficking in our confiscated properties by the cruise line industry in clear violation of U.S. law," citing the Helms-Burton Act and the CACR.  MSC.Dkt.357-17 at 128.  An OFAC official wrote back, asking if they would "please tell us more about [your] question regarding the [CACR] so that we can better direct your inquiry."  *Id.* at 127.  After they replied citing a CACR provision and realleging CACR violations, OFAC thanked them "for the additional detail," but declined to take any enforcement action.  *Id.* at 126.

Others affiliated with HDC questioned whether HDC had a valid basis to sue the cruise lines given the concession's limited duration.  In September 2018, Robert MacArthur—an HDC shareholder—emailed Behn and said that although the "the right-to-operate was 'stolen' when Castro came into power … that right would have expired by now under the original terms."  NCL.Dkt.235-11 at 4.  MacArthur thus questioned whether it was "correct to claim that the cruise lines are operating with stolen property?"  *Id.*  MacArthur then cautioned:  "We need to be careful what we put in the press, should it come back and haunt us."  NCL.Dkt.235-11 at 5.  Nevertheless, HDC began sending letters to the cruise lines accusing them of

unlawful trafficking and informing them of HDC's FCSC claim.  NCL.Dkt.367 at 69.

> **2.    HDC sues, seeking billions of dollars in damages; the district court denies, then grants, then un-grants the cruise lines' motions to dismiss.**

HDC sued Carnival (but no other cruise line) on the same day President Trump allowed Title III's suspension to lapse.  Carnival.Dkt.1.  The complaint alleged that HDC was "the rightful owner of certain commercial waterfront real property" known as "the Havana Cruise Port Terminal."  *Id.* at 3.  The Terminal, HDC asserted, "was continuously, owned, possessed and used in Cuba by [HDC] until the communist Cuban Government confiscated it in 1960."  *Id.*  To substantiate its alleged property interest in the Terminal, HDC attached a copy of its certified claim.  *Id.* at 4.  HDC further alleged that Carnival "knowingly and intentionally commended, conducted, and promoted its commercial cruise line business to Cuba using [the Terminal]," and "participated and profited from the communist Cuban Government's possession of the" Terminal, all without HDC's authorization.  *Id.* at 4.

Carnival moved to dismiss, Carnival.Dkt.17, arguing that any use of the docks was necessary and incident to lawful travel.  *Id.* at 3-11.  Carnival further noted that HDC's concession expired in 2004, and so Carnival could not have trafficked in *that* "property" by sailing to Cuba over a decade later.  *Id.* at 11-15.

The district court denied Carnival's motion. Carnival.Dkt.47. The court ruled that the concession's 2004 expiration date did not matter. On its view, the Act did not "make any distinction whether such trafficking needs to occur while a party holds a property interest in the property at issue." *Id.* at 8.

The same day the court denied Carnival's motion, HDC filed materially similar actions against three other cruise lines, MSC, Norwegian, and Royal Caribbean. *Id.* at 9; *see* RCCL.Dkt.1; NCL.Dkt.1; MSC.Dkt1.

MSC and Norwegian moved to dismiss HDC's complaints against them on the same bases, *i.e.*, that cruises were lawful travel and that HDC's limited concession ended in 2004. MSC.Dkt.24; NCL.Dkt.31. This time around, the court *granted* the motions. MSC.Dkt.40; NCL.Dkt.42. Abandoning its prior interpretation based "upon further review and analysis," MSC.Dkt.40 at 4, the court concluded that the statute's plain language and the certified claim from the FCSC together meant that HDC's "claim can only extend as far as its property interest at the time of the Cuban Government's wrongful confiscation." *Id.* at 6. And because HDC's property rights were "limited by its own terms," the court concluded that ignoring the concession's expiration date "would lead to impermissibly broadening [HDC's] property rights." *Id.* at 7. The court thus dismissed HDC's complaints against MSC and Norwegian with prejudice, as HDC did "not dispute that the

24

property interest at stake is a concession that expired in 2004." *Id.* at 5, 10; NCL.Dkt.42 at 10.

A flurry of motions followed. Carnival sought reconsideration of the denial in its case, Carnival.Dkt.65, and Royal Caribbean (which had not yet filed a motion to dismiss) moved for judgment on the pleadings, RCCL.Dkt.26. Separately, HDC sought reconsideration of the dismissals for Norwegian and MSC and leave to file amended complaints. Carnival.Dkt.74; MSC.Dkt.42; NCL.Dkt.44; RCCL.Dkt.32.

The court then reversed course *once again*, granting HDC's motions. *See, e.g.*, NCL.Dkt.53. In explaining its re-reconsideration, the court stated that its dismissal orders were based on "impermissible findings of fact" with respect to nature of the time-limited concessionary interest of HDC. *Id.* at 14, 16. In making those findings, the court stressed, it had "only had the benefit of reviewing the Certified Claim," but now it had more to consider. *Id.* at 14, 15. The court then detailed how its "improper" findings of fact had led it to what it now viewed as a mistaken interpretation of prior decisions. *See id.* at 16-19 (discussing *Glen v. Club Méditerranée S.A.*, 450 F.3d 1251 (11th Cir. 2006)). And it worried that, since confiscation of property extinguished then-existing property interests, "[l]imiting the allowable period of recovery to the term of the underlying property interest, in effect, nullifies Title III entirely." NCL.Dkt.53 at 18. So, on its third pass, the court concluded that the Act was best read to "create[] liability for trafficking in the

broadly defined 'confiscated property,' … not in a particular interest in confiscated property." NCL.Dkt.53 at 24-25. The court thus granted HDC's motions, and the cases proceeded to discovery. *See, e.g.*, *id.* at 29.

> **3.    The district court grants summary judgment to HDC on liability, consolidates the cases for determination of damages, and awards nearly $440 million in damages.**

At summary judgment, the cruise lines filed an omnibus motion raising common arguments as well as shorter individual motions; HDC did much the same. *See* NCL.Dkt.239; NCL.Dkt.232; *see also* NCL.Dkt.367 at 5-7. The district court granted summary judgment for HDC against every one of the cruise lines[5] on almost every issue, leaving a breathtakingly broad and draconian statute and only the issue of damages for trial. NCL.Dkt.367 at 167.[6]

---

[5] As to one of the MSC entities, MSC Cruises SA Co., however, the district court held that HDC had abandoned its claims. Accordingly, the court granted summary judgment in MSC Cruises SA Co.'s favor. NCL.Dkt.367 at 24, 35, 167. HDC has not appealed that determination. MSC Cruises SA Co. is thus no longer a party to this matter. References to "MSC" in this brief therefore do not include MSC Cruises SA Co.

[6] This included granting summary judgment in favor of HDC on MSC's "Cuba-to-Cuba" cruises that occurred wholly outside of the United States. NCL.Dkt.367 at 134, 166. Such cruises departed from a homeport (here, Havana), sailed to other non-U.S. destinations, and returned to the same homeport. MSC.Dkt.218-4 ¶25; NCL.Dkt.367 at 45-46; MSC.Dkt.319-2 ¶8. Although HDC twice amended its complaint against MSC, it never expressly alleged liability based on MSC's Cuba-to-Cuba cruises. *See generally* MSC.Dkt.104. Those cruises began in December 2015 and ended in March 2019. MSC.Dkt.218-4 ¶25; NCL.Dkt.367 at 45-46; MSC.Dkt.319-2 ¶8.

The court ruled that "Carnival, MSC SA, Royal Caribbean, and Norwegian committed trafficking acts under" the Act by (1) using the Terminal and one of its piers and (2) contracting with various Cuban government entities for purposes of cruising and shore excursions. *Id.* at 86-90. After reaching that conclusion, the court addressed whether such trafficking was done "knowingly and intentionally," and held that the mere receipt of a letter from HDC asserting a claim was "enough to establish scienter." *Id.* at 90-93. In the court's view, the scienter requirement applied only to the trafficking act itself—and not to the other elements of the claim like the nature of the confiscated property or its ownership by a U.S. national. *Id.* at 96-97. Going further still—and despite its own double-reversal on the import of the FCSC claim—the court ruled that even if the scienter requirement applied more broadly, "the Certified Claim contained facts from which Defendants knew, or had reason to know, that Havana Docks once held an interest in the Terminal" and so knowledge of the claim was sufficient for liability. *Id.* at 97. As a matter of law, then, the court concluded that each cruise line knowingly and intentionally engaged in trafficking. *Id.* at 97-98.

The court next rejected any lawful-travel defense as a matter of law. The court recognized that the Act does not define "lawful travel" and that it was "an issue of first impression." *Id.* at 113. The court acknowledged that the Obama Administration had encouraged the cruise lines' conduct generally and that the State

27

Department had specifically refused to bring exclusion actions against the cruise lines because their actions were incident to lawful travel. *Id.* at 114-15. But the court dismissed the Executive's views as irrelevant. According to the district court, "'lawful travel' does not simply mean travel licensed and encouraged by the Executive Branch." *Id.* at 115-17. Instead, the court decided for itself what constituted "*proper* people-to-people travel" and found the cruise lines' shore excursion offerings inadequate. *Id.* at 119. In the court's view, none of the cruise lines met its standard of "a full-time schedule of meaningful interactions." *See id.* at 130, 137. In its view, the shore excursions that included people-to-people components did not include *enough* for "a full-time schedule of people-to-people exchanges." *Id.* at 124, 137-39. Because the cruise lines had "not met their burden of demonstrating that they complied with the people-to-people travel requirements," *id.* at 119, the court deemed the travel to be "unlawful" under the CACR and granted summary judgment to HDC.

In the alternative, the court held, even if the cruise lines had been engaged in lawful travel, "their use of the Terminal was not *necessary* to the conduct of lawful travel to *Cuba*." *Id.* at 145. The court first emphasized that the Act required travel to be necessary to travel *to Cuba*, not "'travel to Havana' or any other particular part of Cuba." *Id.* at 146. It then determined that the Act used "the strict definition of the word necessary." *Id.* at 148. With that in mind, the court posited that the cruise

28

lines could have gone to Cuba without going to Havana at all, and so they "failed to meet their burden on the lawful travel exception affirmative defense." *Id.* at 151.

Considering whether HDC qualified as a "U.S. national," the court held that there were no genuine issues of material fact as to whether HDC's principal place of business was the United States. NCL.Dkt.367 at 26, 101. The court did not mention that HDC's by-laws made its president, London resident Mickael Behn "the chief executive officer of the corporation," or that Behn was given "general charge of the business and affairs of the corporation," NCL.Dkt.237-37 at 4, ¶14, and instead primarily focused on the activities of another director, NCL.Dkt.367 at 102-03.

The court also granted summary judgment against the cruise lines on their constitutional claims. The court saw no due process issue with binding them to the results of the FCSC's proceedings, although they were *ex parte* proceedings conducted about a half-century before this litigation. NCL.Dkt.367 at 110-13. And, in its view, "neither the government's encouragement and licensure nor the history of suspending Title III is sufficient to establish a lack of fair notice under the Due Process Clause." *Id.* at 152.

That left only damages. *Id.* at 167. The cruise lines moved to confirm that the "one-satisfaction" rule would apply to HDC's damages. NCL.Dkt.412. They argued that the Act should be read to allow recovery for the claim "once, not an infinite number of times as long as the Plaintiff can continue bringing suits against

29

new defendants," *id.* at 1, and that HDC had suffered one indivisible injury because of Cuba's confiscation of its property, *id.* at 3-8. The court rejected this argument, reasoning that HDC suffered multiple injuries, NCL.Dkt.429 at 5-6, and that a more limited reading of the damages allowed would "undermine the statute's explicit deterrent purpose," *id.* at 9.

The cases were then consolidated to determine what those damages would be. NCL.Dkt.430. The court concluded that HDC was entitled to recover the full amount of the Certified Claim (over $9 million) from each cruise line, plus more than $27 million in interest from each cruise line, reflecting interest for each year dating back to 1960. NCL.Dkt.452 at 2-3. Trebling that amount and adding attorneys' fees, the court entered judgment against each cruise line individually (*i.e.*, not jointly-and-severally) for more than $110 million apiece. NCL.Dkt.452 at 2-3.

The cruise lines each appealed. HDC cross-appealed, seeking more interest. This Court consolidated the appeals and cross-appeals for briefing and argument.

## SUMMARY OF ARGUMENT

The district court's reading of the Helms-Burton Act creates a statute of impossible breadth and injects courts into an incredibly sensitive arena of foreign affairs. It expands the Act's notion of property, contracts the lawful-travel exemption, lowers the scienter requirement, and paves the way for duplicative recoveries and draconian punishments. Left standing, the decision will impinge the

President's power to calibrate the Cuban sanctions regime, negotiate with foreign leaders, and exercise discretion to allow for lawful travel. The judgments below cannot stand for six reasons.

*First*, the cruise lines never "trafficked" in the property that the Cuban government confiscated. HDC held a time-limited concession to operate the docks, but by its very terms, that interest expired a decade-plus before any of the cruises at issue here reached port. At one point, the district court itself appreciated this fatal flaw in HDC's effort to collect millions for a 2015-19 trespass on a concession that expired by its own terms in 2004. Yet it did an about-face and imposed almost a half-billion dollars of liability based on travel that took place long after HDC's concession expired. Making matters worse, the court refused to even consider that HDC's right-to-operate-cargo-services was non-exclusive and not even implicated by passenger services. The court's approach flouts the statute's text and well-settled principles of property law, not to mention bedrock principles of fair notice and due process.

*Second*, the cruise lines' use of the docks fell well within the ambit of the statutory exemption for actions incident to lawful travel. The cruise lines sailed to Cuba under licenses from the U.S. government that permitted them to go anywhere in Cuba, and they docked at the Terminal because Cuba required them to do so when calling in Havana. The district court usurped the executive's role and gave that

31

statutory exemption an impossibly narrow reading and disregarded that the cruise lines facilitated travel that the Executive affirmatively encouraged. That defies recent and emphatic instructions from the Supreme Court to give statutory exemptions fair readings, not narrow ones, *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018), and disregards the Executive's leading role in foreign affairs, while giving cruise lines none of the protections required in OFAC enforcement actions.

*Third*, HDC's suit should fail for the simple and case-specific reason that HDC is not a U.S. national and so has no right to sue. The Act only allows "U.S. nationals" to sue, and for a business entity like HDC, that means the company's principal place of business must be in the United States. That, in turn, requires ascertaining the company's "nerve center." Here, HDC's long-time president has been a resident of the U.K. since 1999, and record evidence shows that he is both in charge and in London. Accordingly, HDC cannot sue under the Act.

*Fourth*, the cruise lines did not "knowingly and intentionally" traffic in confiscated property. When Congress designed the Helms-Burton Act, it paired the Act's extraordinary punishments with a scienter requirement sufficient to screen out those who innocently or mistakenly used confiscated property. Here, the court erred in narrowing the reach of the scienter requirement. Moreover, when the Executive sees travel as lawful and affirmatively encourages it—and especially when the

32

district court itself needs three rounds of briefing to settle on an answer to the property question—the absolute least that can be said is that the question of scienter should have gone to a jury.

*Fifth*, HDC failed to plead certain MSC cruises (cruises involving no U.S.-to-Cuba travel at all).  The judgment as to those cruises should be reversed because HDC's pleading failure means that HDC failed to timely assert this basis for liability under the applicable two-year statutory time limit.

*Sixth*, the astounding damages here cannot be reconciled with the statutory text, background principles of law and equity, or due process.  Statutory text and structure, along with the long-standing "one-satisfaction" rule, show that the district court erred by adopting a reading of the Act that turned a one-time loss of less than $10 million into almost $440 million in damages—with no limiting principles to suggest that even that extraordinary figure is the end of the matter.  Such an interpretation transforms a statute designed to provide a meaningful remedy for victims of Cuba's nationalization of property into an unconstitutionally punitive regime.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's rulings on cross-motions for summary judgment," *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012), and "all the facts and inferences therefrom are viewed in the light

most favorable to the appellant," *Stephens v. Dep't of Health & Hum. Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990). And summary judgment should not be granted if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

This Court "review[s] *de novo* the district court's interpretation and application of statutory provisions." *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1306 (11th Cir. 2021). So too "questions of constitutional law," *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018), and whether claims are time-barred, *Spellissy v. United Techs. Corp.*, 837 F.2d 967, 973 (11th Cir. 1988). Compliance with pleading requirements is reviewed for abuse of discretion. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

## ARGUMENT

## I. The Trafficking Claims Are Foreclosed Because Of HDC's Limited Property Interest.

The cruise lines did not engage in trafficking because they did not use HDC's confiscated "property." 22 U.S.C. §6082(a)(1)(A). The Helms-Burton Act's usage of the word "property" reflects the well-established legal understanding of property as particular sticks in a bundle of rights. Here, HDC never owned the docks at issue. It possessed only specific and limited rights in the Terminal, and two of those limitations on that property interest mean the judgments must be reversed. First, as

34

to time, by its own terms HDC's concession expired in 2004, over a decade before any of the cruises at issue began. Because use of the Terminal *after* the expiration of a time-limited right in the Terminal cannot interfere with that time-limited property right, the temporal limit in HDC's property interest forecloses trafficking as a matter of law. Second, as to scope, HDC possessed only a non-exclusive right confined to cargo operations, which could not be impinged by docking for passenger travel.

### A.    HDC's Property Interest Expired by Its Own Terms Well Before Any Cruises Began.

The first fatal flaw in the decision below is chronological: HDC's concession expired by its own terms in 2004—more than a decade before any of the cruises at issue here. As relevant here, that time-limited concession is all that HDC owned and all the Cuban government confiscated. And because the cruises here took place more than a decade after the concession expired, the cruise lines did not traffic in HDC's confiscated property. The district court rejected that argument, then accepted it, and then finally rejected it again. NCL.Dkt.53 at 15-18. The court reasoned that the Helms-Burton Act created "liability for trafficking in the more broadly defined 'confiscated property'—a term that … is not limited solely to the interest Plaintiff originally owned in the Subject Property." NCL.Dkt.367 at 112. On that basis, the court refused to consider "any interpretation limiting 'traffics' based on a claimant's property interest or the use of that property interest." *Id.* On the court's view, then,

35

a confiscated lease expropriated a day before its expiration would give rise to perpetual trafficking claims, no less than confiscation of a fee interest. *See* NCL.Dkt.367 at 112. That makes no sense and cries out for reversal.

### 1.    The district court misread the Helms-Burton Act to protect property interests beyond what was taken.

The district court's refusal to respect the time-limited nature of HDC's property interest makes nonsense of the Helms-Burton Act's definition of "property," 22 U.S.C. §6023(12)(A), which reflects the modern, interest-based view of property as a bundle of distinct rights. And it distorts the Act's design, which aims to compensate victims of Castro's government for what was taken from them and deter others from trafficking in the same, *id.* §6022(6), not to create new perpetual property rights that never existed.

The district court's third and final ruling on this issue defies the Act's definition of "property." That definition reflects the modern, interest-based view of what constitutes property and distinguishes between permanent fee interests and leaseholds and other limited interests. *See id.* §6023(12)(A) (defining "property" to include "any property ... whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest"); *cf. United States v. Craft*, 535 U.S. 274, 278 (2002) ("A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property.").

36

Here, HDC's concession was a time-limited "leasehold interest," NCL.Dkt.367 at 110, and thus "property" under the Act. But crucially, as the FCSC explained, "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004." NCL.Dkt.43-8 at 5. As such, the relevant property confiscated by Cuba was a time-limited property right, not one that, like a fee interest, operates in perpetuity. Those who used the docks during or before 2004 could—assuming other statutory requirements were satisfied—be liable for trafficking in HDC's property. But by the time the cruise lines used the docks in 2015-2019, the only property interest of HDC's confiscated by Cuba had already expired by its own terms. Read otherwise, the Act would create new perpetual property interests rather than merely protect the actual property interests that Cuba confiscated.

Indeed, the district court's reading confuses the very meaning of "confiscated property." That term means "the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property." 22 U.S.C. §6023(4). Cuba could only confiscate the "ownership or control of property" that HDC actually possessed—here, a time-limited concession—as the Cuban government itself owned the Terminal in fee and had a reversionary interest upon the concession's expiration. And only by trafficking "in property which was confiscated by the Cuban Government" can a person become liable under the Act. *Id.* §6082(a)(1)(A). In

37

other words, because Cuba could only confiscate what someone else owned, anything beyond that ownership interest cannot be "confiscated property," no matter how "broadly defined." NCL.Dkt.367 at 112. If a dock's owner leased it to Party A until 1963, and to Party B from 1964-1974, with a reversionary interest, it would be clear that someone trespassing on the confiscated dock in 1962 would owe Party A damages, but owe Party B nothing, and vice-versa for a trespass in 1965, while owing only the original owner for a trespass in 1975 (unless the reversionary interest belonged to Cuba in which case it could not be confiscated). None of this disregards or diminishes what was taken from U.S. nationals; it just allows recovery for what was confiscated and nothing more.

The district court's contrary interpretation runs afoul of the basic property-law principle that one's interest in property extends only as far as the rights one has acquired. Consider takings of leaseholds. Courts uniformly agree that leaseholders should receive compensation for the duration and scope of the lease interests taken— no less, no more. *See, e.g.*, *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303-04 (1976); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945) (when government "takes the property, that is, the fee, the lease, whatever he may own, terminating altogether his interest, under the established law it must pay him for what is taken, not more"). Those same principles inform the valuation of confiscated property. A leasehold set to expire a month after confiscation would obviously be

38

worth less than a lease extending ten years into the future, which in turn would be worth less than a fee interest. Indeed, as this Court has noted in the Helms-Burton context, "just compensation analysis can include the amounts that would have been received by the owner *during the useful life of the property*." *Garcia-Bengochea*, 57 F.4th at 924 (emphasis added). The same principles should apply to determine whether there has been unlawful trafficking by defendants in a plaintiff's confiscated property.

Disregarding the time limit on a property interest makes no more sense than redrawing boundary lines. "An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 331-32 (2002). One cannot bring a Helms-Burton action against someone who was in the neighborhood, but never stepped foot on the plaintiff's confiscated property. *See De Fernandez v. Seaboard Marine, Ltd.*, 2022 WL 3577078, at *15 (S.D. Fla. Aug. 19, 2022). The same should apply to someone who never stepped foot on the relevant property during the timeframe of a confiscated concession. As this Court has made clear, the Act provides for actions against "traffickers *in the property*." *Glen*, 450 F.3d at 1255 (emphasis added). And when determining what that property is, *when* matters just as much as *where*. *See Tahoe-Sierra*, 535 U.S. at 331-32.

### 2.   The district court's justifications for ignoring the time limit on HDC's property interest do not withstand scrutiny.

To justify its inflated, temporally unconstrained concept of HDC's property right, the district court invoked a puzzling distinction: that HDC's concession was not "a leasehold interest ending on a date certain" in 2004, but rather "a 99-year leasehold interest." MSC.Dkt.55 at 15. The court accepted the undisputed fact that "[t]he Concession was established in 1905," NCL.Dkt.367 at 30, which necessarily means that its 99-year term would end in 2004. HDC conceded as much before the FCSC, where it stated that the concession provides "for transfer of ownership of the pier property to the Cuban Government in the year 2004." NCL.Dkt.235-12 at 2. That did not stop the court from treating a 99-year leasehold interest as having no end date.

**a.** The district court started with the misunderstanding that "the Certified Claim did not place a temporal limitation on Plaintiff's claim that expired in 2004." MSC.Dkt.55 at 15. But the claim expressly stated: "The terms of the concession granted by the Cuban Government were to *expire in the year 2004*, at which time the corporation had to deliver the piers to the government in good state of preservation." MSC.Dkt.41-8 at 5 (emphasis added). The court acknowledged that language but fixated on the FCSC's choice of tense in saying that the "concession terms *were to* expire" in 2004 rather than that "the property interests at issue *actually*

*did* expire in 2004." MSC.Dkt.55 at 15. The court read that italicized phrase to mean that somehow the property right would never expire.

That counterfactual reading is wrong. The claim, filed in 1971, used "were to" to reflect nothing more than future tense. It noted that HDC "obtained from the Government of Cuba the renewal of a concession" "on September 7, 1934," and that this concession was "nationalized by the Government of Cuba on October 24, 1960." MSC.Dkt.41-8 at 3. In later stating that "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004," *id.* at 9, the claim merely recognized that the concession's expiration date had yet to pass by the time of either of the earlier dates. Indeed, the date was decades away *when the claim itself issued* in 1971. *Id.* at 4, 13. In short, the court mistook a mundane example of future-tense phrasing for an anomalous (and cryptic) determination that a 99-year lease would last forever. Tenses aside, the most that could be gleaned from the FCSC's description is a recognition that the Cuban government had extinguished HDC's time-limited property right by confiscating it. Nothing in that proposition suggests that this deprivation somehow created a substitute property interest that extended *ad infinitum*.

Indeed, any such expansion would conflict with the International Claims Settlement Act of 1949, 22 U.S.C. §§1643, *et seq.*, the statute that authorized the FCSC to certify the claim. Under the Act, the FCSC may certify claims for losses

41

resulting from the "nationalization, expropriation, intervention, or other taking of" specific "interests" in property "owned … *at the time* by nationals of the United States." 22 U.S.C. §1643b(a) (emphasis added). The Act thus focuses on the temporal dimensions of the property interest and would award nothing for a leasehold that expired just before expropriation. The Act similarly would award only a small amount for a leasehold set to expire shortly after expropriation. The Act requires the FCSC to "take into account the basis of valuation most appropriate to the property and equitable to the claimant," such as "fair market value" and the "cost of replacement." It would ignore all those constraints to convert a time-limited concession into a perpetual property interest.[7]

**b.** The district court believed that recognizing the time-limited nature of the concession would defy this Court's decision in *Glen* and "nullify" Title III. MSC.Dkt.55 at 16-19. The court focused on *Glen*'s explanation of how Cuba's expropriations of property extinguished private property interests in Cuba. *See* NCL.Dkt.367 at 94. But *Glen* just emphasized the obvious point that a statute

---

[7] The district court also held that HDC's ownership interest in fixtures and equipment was not time-limited, NCL.Dkt.53 at 16, but that, too, is wrong. The fixtures and equipment were only on a dock owned by Cuba because of the time-limited concession. Reflecting that reality, the Certified Claim bundles the tangible assets, which would have included fixtures and equipment, with the concession, all of which would have expired in 2004. NCL.Dkt.43-8 at 2. The concession's time-limited nature defines that property interest, and ignoring that reality warps the entire statutory scheme.

designed to provide a remedy for confiscation does not let the very act of confiscation leave claimants without a remedy. It is equally true that the act of confiscation does not expand or enlarge the property interest that was owned pre-confiscation.

For similar reasons, the district court was mistaken in its concern that "[l]imiting the allowable period of recovery to the term of the underlying property interest, in effect, nullifies Title III entirely" by "essentially foreclos[ing] any recovery … for trafficking." NCL.Dkt.53 at 18. When the Cuban government expropriated the concession, HDC had another 44 years' worth of use rights. The Helms-Burton Act gave HDC a claim against parties who unlawfully used the Terminal before the concession's expiration date—*i.e.*, up to 2004. Providing a right to recover during the 44-year window corresponding to what was confiscated hardly nullifies Title III. Recognizing the limited nature of what was owned and what was confiscated (and that the two must correspond) faithfully implements the generous—but circumscribed—scheme Congress created without expanding property rights, distorting chronologies, or undermining fair notice.

If Congress had actually made private entities liable for property far beyond that taken by the Cuban regime, serious constitutional concerns would arise. The Due Process Clause prohibits an "unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347,

352 (1964); *see United States v. Lanier*, 520 U.S. 259, 266 (1997).  Relatedly, the

Due Process Clause requires that a defendant be given "fair notice … sufficient to

enable persons of ordinary intelligence to avoid conduct which the law forbids."

*High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982).

The district court's interpretation violates both principles.  The cruise lines

could not have possibly known when they were traveling to Havana that a court

would years later interpret the Act—which severely punishes "traffic[king] in

property which was confiscated by the Cuban Government," 22 U.S.C.

§6082(a)(1)(A)—to apply to property that was *neither confiscated* by the Cuban

government *nor owned* by HDC.  That interpretation was an "unexpected and

indefensible" application of the Act, unmoored from its text, the Executive's

position, and relevant case law.  *Bouie*, 378 U.S. at 354.  It also leaves ordinary

people and companies in the dark, unable to know when using a particular piece of

property might ensnare them within the Act's reach, including its crushing penalties.

*See High Ol' Times, Inc.*, 673 F.2d at 1229.  Under the canon of constitutional

avoidance, this Court should reject the district court's interpretation and avoid the

constitutional minefield it creates.  *See Club Madonna Inc. v. City of Miami Beach*,

42 F.4th 1231, 1252 (11th Cir. 2022).

44

**B.** **HDC's Property Interest was Limited to a Non-Exclusive Right to Cargo Services, Which Does Not Implicate the Cruises.**

At the very least, the district court erred in refusing to even consider the implications of HDC's limited *use* right with respect to operating the docks. As even some HDC shareholders recognized, HDC's property interest flowed from its concession, NCL.Dkt.235-11 at 4, which gave HDC a right to operate cargo services, not a right to exclude others from the state-owned docks, *see* Carnival.Dkt.73-3 at 8. That must matter—if HDC had only a non-exclusive right to operate cargo services, then providing passenger services does not implicate that interest at all.

But the district court refused to even consider that argument. *See* NCL.Dkt.367 at 109-12. Based on its reading of the FCSC's decision—which was itself based on *ex parte* and misleading representations from HDC—the district court concluded that the cargo-services limitation was irrelevant. *See id.* at 108-09. In so doing, it pointed to the Act's provision stating that "the court shall accept as conclusive proof of ownership of an interest in property" the FSCS's certification of a claim, 22 U.S.C. §6083(a)(1), and provisions of the International Claims Settlement Act of 1949 barring review of FCSC findings. *See* NCL.Dkt.367 at 112 (citing 22 U.S.C. §§1622g, 1623(h)).

That was error. The Settlement Act's provisions are designed to facilitate the normal claims-settlement process, where "direct Government-to-Government negotiation of private property claims" results in recovery via a settlement fund.

45

*Dames & Moore*, 453 U.S. at 681.  Our Constitution provides no due process protections to foreign governments in those government-to-government negotiations.  *Cf. GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) (explaining that "foreign sovereigns … are not 'persons' under the Fifth Amendment's Due Process Clause" and so do not enjoy due-process safeguards).  But the cruise lines are entitled to the full protection of the Fifth Amendment; thus in applying foreign claims principles to this domestic civil action, those principles must be squared with "the first principles of justice."  *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 131 (1912).  "It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979); *see also United States v. Utah Constr. Co.*, 384 U.S. 394, 422 (1966) (applying same principle to administrative proceedings).  Congress could not cast aside that principle in the Helms-Burton Act.  Thus, even to the extent that the FSCS's certification may be conclusive proof of HDC's property interest in the docks for purposes of recovery from *settlement between the United States and Cuba*, the district court erred in refusing to consider the scope and nature of that interest and instead treating the FSCS's *ex parte* determination as irrebuttably binding in *private litigation between HDC and the cruise lines*.  That approach raises

"serious constitutional concerns," *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001), and this Court should reject it.

In sum, the limited nature of HDC's concession meant that providing passenger services could not constitute trafficking in HDC's confiscated property.

## II. The Trafficking Claims Are Foreclosed Because The Cruise Lines' Use Of The Terminal Was Incident And Necessary To Lawful Travel.

Congress expressly exempted from the definition of unlawful "traffic[king]" all "transactions and uses of property" that are (1) "incident to lawful travel to Cuba" and (2) "necessary to the conduct of such travel."  22 U.S.C. §6023(13)(B)(iii) (Title III definition); *see also id.* §6091(b)(2) (Title IV's analog).  Here, the cruise lines fall with the heartland of that exception.  They used the docks to facilitate lawful travel to Cuba pursuant to the Executive's license and encouragement, and the Executive repeatedly refused HDC's requests to take action against them precisely because of the lawful-travel exemption.  The district court disagreed only by giving the lawful-travel exemption a narrow reading and the Executive's statements *on this exact issue* no weight.

That piled error on top of error.  Ignoring the Executive's views on lawful travel warps the Act's design and undercuts the Executive's leading role in foreign affairs, and narrowing the lawful-travel exemption flouts the Supreme Court's command that "statutory exceptions are to be read fairly, not narrowly." *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S.Ct. 2172, 2181

47

(2021). The court's errors were especially egregious here, given that OFAC was acutely aware of the cruise lines' travel and HDC's allegations but never found any CACR violation by the cruise lines. And at a bare minimum, if the Executive Branch officials tasked with enforcing the Cuban sanctions regime think travel is lawful, a reasonable jury could surely reach the same conclusion. Accordingly, if this Court does not reverse, it should at least vacate the judgments below and remand for analysis under the right standard.

**A.    The Cruise Lines Engaged in Lawful Travel.**

      **1.    The district court should not have ignored or second-guessed the Executive's views on lawful travel.**

Executive Branch officials repeatedly concluded the cruise lines were engaged in lawful travel; the district court had no valid basis to second-guess that determination about travel the Executive not only licensed but encouraged.

      **a.**    In the Act, Congress left "lawful travel" undefined—presumably because Congress drafted the lawful-travel exemption against the existing backdrop of the Executive's licensing scheme and sanctions regime. That means the "lawful travel exclusion implicitly points" to travel that is licensed and "authorized by OFAC's [CACR]," as opposed to travel that is unauthorized by the Executive and thus unlawful. Brief for United States as Amicus Curiae at 15, *Garcia-Bengochea*, 2022 WL 1135129 (11th Cir. Apr. 11, 2022). And in an area where separation-of-powers concerns are at their zenith, "[r]elying on that well-established regulatory

48

regime ensures that potentially sensitive foreign policy questions regarding the lawfulness of travel to Cuba are decided by the political branches." *Id.* at 33 (citing *Regan v. Wald*, 468 U.S. 222, 242 (1984)).

The Executive's judgment on lawful travel is especially telling—and deference especially important—because the Executive not only enforces the CACR but also the Helms-Burton Act's Title IV, where a trafficking violation results in mandatory exclusion from the United States. *See U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty," and "inherent in the executive power to control the foreign affairs of the nation"). What is more, "Congress has reposed considerable power in the President to adjust our Nation's sanctions against the Cuban Government." *Odebrecht.*, 715 F.3d at 1284-85. Thus, if the Executive liberalizes our relations with Cuba by authorizing relatively more travel to Cuba, the courts should not second-guess that decision or impose massive damages on private companies that followed the Executive's lead.

**b.**    The record here is replete with evidence that the Executive saw the cruise lines' travel as lawful. At the President's direction, the federal government licensed cruising to Cuba, and did so knowing full well that removing "the last major hurdle to resuming cruises" would mean "even more Americans visiting Cuba." *Remarks by President Barack Obama*, White House, *supra*. Indeed, that was the

49

goal.  *See supra*, pp. 15-17.  The Executive also confronted HDC's specific trafficking allegations—and rejected them based on Title IV's lawful-travel exemption.  At least three times, HDC and allies compiled their allegations and "presented these facts to State Department officials and requested a Title IV action." NCL.Dkt.240-27 at 5.  The State Department refused each time, citing "the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba."  NCL.Dkt.237-24 at 2.  Brushing aside that statement and others like it makes no sense when the Executive has looked at the same Act and same facts and refused to take action or restrict the very lawful travel it affirmatively encouraged—especially on a subject that implicates the Executive's unique role in calibrating our Nation's relative openness to Cuba.

And though the cruise lines used the Terminal openly and notoriously for years, OFAC never suggested that use was unlawful or not facilitating lawful travel in general.  Indeed, that remained true even after HDC presented its specific allegations of CACR violations to OFAC.  *See* MSC.Dkt.357-17 at 126-28, HDC14348-50 (HDC email chain with OFAC; HDC alleging that the cruise lines have engaged in "violations of … the CACR" and "CACR/OFAC sanctions violations"). OFAC was well aware of the cruises at issue here.  For example, Norwegian kept OFAC informed of its position, practices, and understanding of what it needed to be doing to ensure it was lawfully conducting people-to-people travel in

Cuba. NCL.Dkt.238 at ¶21. Norwegian's measures went so far as requiring all passengers—before ever setting foot on a Cuba-bound ship—to sign affidavits attesting under penalty of perjury that they would be traveling to Cuba in compliance with the OFAC regulations, and explaining to the passengers their obligations under the OFAC regulations. *Id.* at ¶¶18-19. Never once did the United States disapprove of Norwegian's reported operations.

Similarly, after a thorough audit of Royal Caribbean's operations, OFAC sent a Cautionary Letter to Royal Caribbean that focused on the importance of record-keeping to compliance and cited problems with a dozen or so passengers' paperwork. RCCL.Dkt.133-41. But the letter expressly said it did "not constitute a final agency determination as to whether [CACR] violations have occurred." *Id.* at 3. And while record-keeping is important, a single passenger's—or even a dozen passengers'—failure to properly complete the paperwork or follow instructions on shore would not convert activities incident to lawful travel into unlawful trafficking.

Moreover, it would show a peculiar instinct for the capillaries for OFAC to focus on paperwork deficiencies in the face of wholesale trafficking in stolen property. OFAC, after all, has been charged with policing compliance with the CACR. *Odebrecht*, 715 F.3d at 1276. And OFAC discharges those responsibilities zealously. *See, e.g.*, Dep't of Treasury, Enforcement Release, *OFAC Settles with Airbnb Payments, Inc. for $91,172.29 Related to Apparent Violations of the Cuban*

51

*Assets Control Regulations*, (Jan. 3, 2022), https://perma.cc/F5TW-MWGK. That OFAC never took steps to stop the cruise lines' use of the Terminal—despite years of open and notorious use—thus reinforces the conclusion that the Executive viewed the travel it both promoted and licensed as lawful, not as a trap for the unwary. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012) ("[W]hile it may be possible for an entire industry to be in violation of the FLSA for a long time without the Labor Department noticing, the more plausible hypothesis is that the Department did not think the industry's practice was unlawful." (brackets omitted)).

**c.** Indeed, given the background against which Congress legislated and OFAC's primary role in enforcing the Cuban sanctions regime, the district court erred by finding the cruise lines' travel unlawful in the absence of any OFAC finding that the cruise lines engaged in unlawful trafficking. In enacting the Helms-Burton Act, Congress was well aware of the statutory and administrative scheme for addressing claimed CACR violations and OFAC's critical role in that enforcement scheme. The Helms-Burton Act amended TWEA to set forth in detail how the Treasury Secretary may, via an "agency hearing," find persons in violation of "any license, order, rule, or regulation issued in compliance with the provisions of this chapter," a universe that squarely includes the CACR. 50 U.S.C. §4315(b)(1), (3). That regime for finding license violations—*i.e.*, unlawful travel—comes with substantial procedural protections for those operating under color of a license. And

52

those provisions specify that judicial review "may be had" only pursuant to the APA, *after* OFAC has imposed a penalty for a violation according to this statutorily prescribed administrative process. *Id.* §4315(b)(4).

"Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010). The district court's de novo, value-laden determination that the cruise lines violated the CACR "constitute[d] an end-run around Congress's clear intent that" OFAC "enforce" the CACR "in the first instance." *C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002). And the court's second-guessing of OFAC as to what is adequate compliance with CACR improperly undermines the Executive's "lead role" in foreign policy. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003); *see Regan v. Wald*, 468 U.S. 222, 242-43 (1984) (viewing the CACR through the lens of "classical deference to the political branches in matters of foreign policy"). That is especially true in a case like this where OFAC was fully aware of the alleged CACR violations HDC claimed but did not act upon them. *See supra*, p. 22.

### 2. The district court's contrary interpretation fails at multiple levels.

**a.** To justify its power to decide in the first instance whether the cruise lines complied with the OFAC rules, the district court opined that "'lawful travel'

does not simply mean travel licensed and encouraged by the Executive Branch" because statutes trump regulations. NCL.Dkt.367 at 116-17. The court continued, "the fact that OFAC promulgated licenses for traveling to Cuba, and Executive Branch officials, including the President, encouraged Defendants to do so, does not automatically immunize Defendants from liability if they engaged in statutorily prohibited tourism." *Id.* at 117.

But there is no such thing as "statutorily prohibited tourism" separate and apart from what is allowed under the CACR. Although the district court cited the Trade Sanctions Reform and Export Enhancement Act (TSRA) and the Helms-Burton Act to support its ruling, both piggyback on the CACR and define impermissible tourism in terms of travel that violates the CACR. *See* 22 U.S.C. §§6032(h), 7209(b)(2). And to ascertain a CACR violation, Congress provided for OFAC enforcement subject to substantial procedural protections before the agency followed by limited substantial-evidence, APA review of OFAC's determinations of violations—not de novo review or violations in the face of nonenforcement. *See* 50 U.S.C. §4315(b)(4).[8] The regime Congress created thus eliminates the prospect of

---

[8] The district court's reliance on the TSRA is further flawed because the TSRA is addressed to neither cruise lines nor individual passengers, but rather to federal officials, who are directed not to license tourist activities. 22 U.S.C. §7209(b)(1). Given that the relevant federal officials granted a general license for cruise lines to travel to Cuba, oversaw those operations without material intervention, and rejected HDC's enforcement entreaties under both the CACR and Title IV, there is no reason

parties operating under the color of executive-branch licenses facing crippling liability without any determination by the Executive that travel the Executive itself encouraged crossed a regulatory line. The district court's erroneous de novo determination simply cannot be reconciled with either the carefully reticulated regime Congress created or the executive's primary role in determining whether travel to a country like Cuba is lawful travel.

But to the district court here, none of that mattered. The court announced that statements by the Executive Branch regarding the cruise lines' lawful travel not only would receive "'no special deference,'" but "do not factor into the Court's statutory analysis" at all. NCL.Dkt.367 at 114. And it went on to hold that "lawful travel" included only what it deemed "*proper* people-to-people travel," *id.* at 119, and then fly-specked the cruise lines' various shore excursions to see if passengers had "engaged in a full-time schedule of meaningful interactions with Cuban people," *id.* at 124. As a result, the district court condemned as unlawful trafficking that which the Executive not only treated as lawful travel, but affirmatively promoted. That conflicts with the Act's design, which accords the Executive discretion in recognition of the fact that "[s]anctions are drawn not only to bar what they prohibit but to allow what they permit," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000),

---

to think that federal officials violated the TSRA or that the open and notorious actions of the cruise lines constituted impermissible tourist activities.

and with the President's powers over foreign affairs, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936).

      **b.**     Making matters worse, the court fundamentally misunderstood and misapplied OFAC's regulations. In particular, the court repeatedly criticized the cruise lines for not assembling "a full-time schedule of people-to-people exchanges." NCL.Dkt.367 at 122; *id.* at 123 (same); *id.* at 136 (same). It appeared to expect something like eight hours a day of dialogue between travelers and Cubans, *i.e.*, a "a full-time schedule of meaningful interactions." *Id.* at 129-30; *cf. id.* at 137 (counting minutes of people-to-people activities). But the regulations required "a full-time schedule of activities intended to enhance contact with the Cuban people … *result[ing] in meaningful interaction* between the traveler and individuals in Cuba." 31 C.F.R. §515.565(b)(2)-(b)(3) (emphasis added). The regulations thus accommodated both the reality that meaningful interactions are the product of a full day of activities, not a constant activity, and that the Cuban government and its affiliates constrained the degree to which visitors could meaningfully interact with the Cuban people. The regulations also reflect President Obama's initial justifications for re-opening Cuba to travel, which did not promise immediate results or constant contact, but that the re-opening would ultimately facilitate more people-to-people contacts and eventually inure to the benefit of the Cuban people. *Statement by the President on Cuba Policy Changes*, *supra*.

Having misread the regulation and invented a new (and unattainable) requirement of day-long meaningful interaction, the district court counted up the minutes designated "people-to-people" for each excursion and found the cruise lines' efforts wanting. *See, e.g.*, NCL.Dkt.367 at 137 ("there simply were not enough people-to-people components to piece together a full-time schedule of people-to-people exchanges."). That unrealistic and unduly demanding view of "*proper people-to-people*" travel, NCL.Dkt.367 at 119, was wrong and well-illustrates the dangers of second-guessing the Executive, which is much better positioned to assess whether licensed, lawful travel is resulting in meaningful interactions with the Cuban people.

In the same way, the district court zeroed in on elements of the shore excursions and optional evening activities that it deemed impermissible tourism. But that effort once again reflects a misreading of text and a failure of deference. Rather than granting any deference to the Executive's decisions, the district court scrutinized shore excursions to see if they seemed—to the district court—to be more tourism than travel. *See, e.g.*, NCL.Dkt.367 at 123 (deeming "visiting museums and enjoying art" to be "primarily tourist activities"). And it made much of optional nighttime excursions to historic Havana nightclubs, concluding that those excursions were per se unlawful tourism and faulting the cruise lines for allowing passengers to go onshore without compelling them to buy other shore excursions. *See, e.g.*, *id.* at

57

120-22.  But it makes no sense to engage in that kind of retail analysis when the ultimate question is whether the cruise lines used the docks as incident to lawful travel.  The statutory requirement calls for a wholesale analysis and cannot turn on whether an individual passenger opted for a nighttime excursion or had too much to drink.

Further, education and entertainment are not mutually exclusive, especially when the entertainment is grounded in culture and history; indeed, educational programs that are fun and entertaining can often be the most successful.  The court, however, took a very different view, criticizing programs for having cultural and historic elements such as music and dancing.  *See* NCL.Dkt.367 at 128-30.  That zero-tolerance-for-entertainment approach was not compelled by the statute, regulations, or any prior interpretations, and it was error to apply it here in finding liability.  The court's contrary understanding turned the Executive's invitation to cruise to Cuba as a manifestation of a changed executive approach to Cuba into a perverse bait-and-switch.  *Cf. Raley v. Ohio*, 360 U.S. 423, 426 (1959) (due process forbids "an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him").

**c.**    Compounding those problems, the district court resolved this issue against the cruise lines by misapplying the summary-judgment standard.  It granted summary judgment to HDC because the cruise lines had "not met their burden of

demonstrating that they complied with the people-to-people travel requirements." NCL.Dkt.367 at 119.  But summary judgment does not reduce to that kind of win-or-lose binary choice.  *See* Fed. R. Civ. P. 56(c).  There is an obvious third choice—namely, a trial.  If the Executive's licensing and views on lawful travel do not represent a complete bar to liability, they at least mean this issue should have gone to a jury.

### 3.    MSC's Cuba-to-Cuba cruises were also lawful.

MSC's Cuba-to-Cuba cruises also qualify for the lawful-travel exemption for an additional reason—they were purely extraterritorial and complied with relevant foreign laws.  The travel was aboard Panamanian-flagged ships owned by a Swiss company, and the ships sailed only from Havana to Havana, with several non-U.S. stops in between.  The cruises undisputedly complied with the laws of the non-U.S. nations involved.    MSC.Dkt.256 at 9-10; *see also* NCL.Dkt.367 at 132; MSC.Dkt.281 at 8-9.  The record is devoid of evidence that these Cuba-to-Cuba cruises entailed any travel between the U.S. and Cuba, or even that any U.S. nationals were passengers.  *See, e.g.*, MSC.Dkt.357-1 at 127-34.

The Helms-Burton Act's reference to "lawful travel" is properly read to require that the travel be lawful under the laws of the nations involved in that travel.  This nation-specific understanding follows from the principle that, even "'when a statute provides for some extraterritorial application, the presumption against

extraterritoriality operates to limit that provision to its terms.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 339 (2016) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010)). The district court thought non-U.S. law irrelevant based on its determination that the Act and the CACR apply extraterritorially. NCL.Dkt.367 at 132-33. But "the inclusion of *some* extraterritorial" application does not countenance a maximalist extraterritorial interpretation that ignores the law of other nations where travel involves only those nations. *RJR*, 579 U.S. at 339; *see id.* at 335 (courts should "avoid the international discord that can result when U.S. law is applied to conduct in foreign countries"). Notably, as detailed above, *supra*, pp. 50-52, OFAC has not found these cruises to violate the CACR, indicating that the agency charged with enforcement does not believe the CACR germane to the conduct at issue. *Cf.* MSC.Dkt.357-1 at 127-34 (describing MSC's communication with OFAC regarding its Havana-to-Havana cruises without the agency suggesting that they violated the CACR).

### B.     Using the Terminal Was Necessary to the Cruise Lines' Lawful Travel.

The district court went on to hold that even if the cruise lines' travel was lawful, use of the Terminal was not even "necessary." On its logic, *nothing* is necessary to lawful travel to anywhere in Cuba so long as one might have gone anywhere else in Cuba. That misguided analysis betrays the court's failure to give

the lawful-travel exception a fair reading and a meaningful scope, and it raises significant due process concerns.

The district court determined that the exemption hinges on whether use of property was necessary to lawful travel to anywhere in Cuba, not any particular place in Cuba, *e.g.*, Havana. NCL.Dkt.367 at 146-47. The court embraced that untenable conclusion based on two faulty premises: first, by holding that "the conduct of such travel" refers to travel to Cuba generally, not the specific travel actually engaged in, *id.*, and second, by deciding that the Act used "the strict definition of the word necessary," *id.* at 148, *i.e.*, "essential or indispensable." *Id.* From those premises, it reasoned that because the cruise lines *could* have gone elsewhere in Cuba, use of the Terminal could not be "necessary" to "lawful travel to the country of Cuba." *Id.* at 150 (emphasis omitted).

That renders the lawful-travel exemption wasted ink. If the lawful-travel exemption provides no relief whenever one could have hypothetically traveled to somewhere else in Cuba, then it means nothing—*any* piece of confiscated property within Cuba is self-evidently a subset of the nation of Cuba, so *no* piece of confiscated property is strictly necessary for travel to Cuba. The district court thought such a narrow reading of the exemption would "further the LIBERTAD Act's goal" of deterring trafficking. NCL.Dkt.367 at 148. But—as the exemption's very existence makes clear—the Act does not pursue that goal at all costs and the

Act's *goals* (plural) also include allowing for lawful travel.  "Exceptions and exemptions are no less part of Congress's work than its rules and standards," so the possibility that "a law might temper its pursuit of one goal by accommodating others can come as no surprise." *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S.Ct. 1532, 1539 (2021).  And when it comes to exemptions, courts have "no license to give the exemption anything but a fair reading." *Encino*, 138 S.Ct. at 1142.  The district court's interpretation is anything but. *See Cellular Telecomms. Internet v. FCC*, 330 F.3d 502, 511-12 (D.C. Cir. 2003) (rejecting a restrictive "definition of 'necessary'" that "admit[ted] … no obvious applications").  A fair reading of the exemption confirms that it amply covered the cruise lines' conduct.

**First**, Congress expressly excluded from the definition of "traffics" those "transactions and uses of property incident to lawful travel to Cuba" when they are "necessary to the conduct of such travel."  22 U.S.C. §6023(13)(B)(iii).  The statutory reference to "such travel" corresponds to the "lawful travel to Cuba." *See N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 95 (D.C. Cir. 1999) (explaining that "such" "represents the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent").  In fact, the statute does not just say "necessary to such travel"; it says "necessary to the *conduct* of such travel."  This reference to "conduct" reinforces that the analysis

must focus on the actual conduct that the cruise lines undertook (here, the mode of travel to Havana)—not just some hypothetical travel to Cuba generally.

**Second**, the district court compounded this statutory error with another by employing the word "necessary" in its strictest sense, *i.e.*, "essential or indispensable." NCL.Dkt.367 at 148. Read sensibly, that provision facilitates lawful travel to Cuba by permitting actions incident to such travel that are "necessary"—*i.e.*, appropriate or conducive—to "such travel," *i.e.*, the lawful travel undertaken. Ordinary speakers of English often use "necessary" to mean appropriate or helpful to some previously described end. *Ayestas v. Davis*, 138 S.Ct. 1080, 1093 (2018). Law frequently speaks the same way. *See, e.g.*, *id.*; *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819) (noting "necessary" "frequently imports no more than that one thing is convenient"); *Necessary*, Black's Law Dictionary 1029 (6th ed. 1990) ("convenient, useful, appropriate, suitable, proper, or conducive to the end sought").

Moreover, using "necessary" in this sense harmonizes it with the surrounding statutory language. For example, in 22 U.S.C. §6044(b), the Act states that the President "shall take all *necessary* steps to ensure the safety and security of the United States against espionage by Cuban journalists it believes to be working for the intelligence agencies of the Cuban Government." (emphasis added); *see also, e.g.*, *id.* §6085(b) (granting President suspension power when President determines

suspension is "*necessary* to the national interests of the United States and will expedite a transition to democracy in Cuba" (emphasis added)); *id.* §6042(1)(A) (referring to private Cuban companies' right to "pay wages and to buy materials *necessary in the operation of the businesses*" (emphasis added)).  Congress cannot fairly be understood to have used "necessary" as a restrictive or absolute term in any of these provisions.  And "necessary" serves the same purpose and should be read the same way in the lawful-travel provision.  After all, it is black-letter law that the same words in the same statute should have the same meaning.  *See Azar v. Allina Health Servs.*, 139 S.Ct. 1804, 1812 (2019).  And here, that is especially clear because Congress added the lawful-travel exemption "to remove any liability for … *any activities related to lawful travel to Cuba.*"  142 Cong. Rec. H1645-02, at H1656, 1996 WL 90487 (Mar. 4, 1996) (emphasis added).  The district court's crabbed interpretation of the lawful-travel exemption undermines Congress' design.

On a correct view of the exemption, use of the Terminal was plainly necessary. MSC's cruise ships, for instance, were too large to dock anywhere else *in Cuba* with the mandatory customs, immigration, and screening facilities.  MSC.Dkt.209 at 10-12.  And as explained, the Cuban government required the cruise lines to dock at the Terminal when calling in Havana and refused requests for alternatives. NCL.Dkt.235 at 4-7.  So even in the strictest sense of the term, use of the Terminal was necessary to the lawful travel of the passengers to Havana, and it was certainly

"appropriate" or "conducive" to it.  Again, that was exactly the Executive's view.  *E.g.*, NCL.Dkt.237-27 at 3.

## III.    Trafficking Is Foreclosed Because HDC Is Not A U.S. National.

This suit should have failed for a more basic and case-specific reason:  HDC is not a U.S. national and so has no right to sue under the Act.  *See* 22 U.S.C. §6082(a)(1)(A).  Congress sensibly restricted the Act's protections to U.S. nationals, given that the United States has a distinct interest in the claims of its nationals, and other countries have a different relationship with Cuba and have generally engaged in more commerce with it.  Accordingly, a company's principal place of business must be in the United States for it to be a U.S. national.  *Id.* §6023(15).  To find its principal place of business, one looks to where its "officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).  Here, the record shows that the answer to that question is overseas, which is where HDC's president, Mickael Behn, resides.

A long-time resident of London, Behn is HDC's chief executive in form and fact.  HDC's bylaws make its president "the chief executive officer of the corporation" with "general charge of the business and affairs of the corporation."  NCL.Dkt.237-37 at 4, ¶14.  As one of HDC's directors, Behn is also charged with managing the "business of the corporation."  *Id.* at 2, ¶4.  He has taken the leading role in doing so—to give one example, in 2018 Behn selected HDC's other director,

Jerry Johnson, and offered him a position with HDC.  NCL.Dkt.237-32 at 45:13-17.

And HDC remains largely a family affair—Behn's great-grandfather founded HDC,

and in 2019, between Behn and his kin, the Behn family held 138 of HDC's 171

outstanding shares.  NCL.Dkt.235 at 10.

As one would expect, Behn calls the shots for HDC.  Crucially here, Behn has

overseen HDC's efforts related to its Certified Claim and done so from London.  He

did so in co-signing a letter sent to the U.S. government concerning HDC's claims,

approving a billboard campaign related to the same, signing off on HDC's attempts

to exclude cruise line affiliates under Title IV, and by tweeting on HDC's behalf.

NCL.Dkt.235 at 14-15.  And the testimony of Johnson, his fellow director, reinforces

that Behn directed HDC.  *See* NCL.Dkt.237-32 at 42:5-12; NCL.Dkt.237-22 at

28:17-20 ("I do report to Mickael Behn").  Johnson testified that while he handled

some "[r]outine matters" himself, with decisions of real "magnitude," he would

always consult with Behn.  For those important decisions, if he and Behn disagreed,

Behn "would win out."  NCL.Dkt.237-22 at 29:7-17.  For his part, Behn "could not

recall a decision Johnson made about Havana Docks' Certified Claim that did not

involve [his] input."  NCL.Dkt.367 at 27-28.  And Behn picked Johnson to serve as

a director, which itself is a "concrete example" showing Behn's "actual exercise of

control" over HDC.  *See Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 42 (1st

Cir. 2016).  In sum, as president, one of two directors (the other of which he hand-

66

picked), and HDC's top decision-maker, Behn is the "corporate 'brain.'" *Hertz*, 559 U.S. at 95.

And Behn lives abroad. *See* NCL.Dkt.235 at 10 (Behn's address is "in London on Wimbledon Park Road"). And Behn made key decisions for HDC *from abroad*. *See, e.g.*, NCL.Dkt.237-32 at 235:23-236:1 (approving hirings); *id.* at 38:15 (signing off on board decisions). Additionally, HDC's business correspondence occurred "largely by email and also by many telephone conversations," and many of those calls or e-mail exchanges occurred when Behn was "in London." NCL.Dkt.237-32 at 40:14-41:9.

In concluding that HDC's principal place of business nonetheless was in Kentucky with Johnson, the court gave significant weight to Johnson's largely handling "the day-to-day business decisions for Havana Docks." NCL.Dkt.367 at 102. It also noted that HDC's corporate address was in Kentucky. *Id.* And it emphasized that, according to Behn, all HDC decisions were "executed" by Johnson, and that Johnson was "tasked" with performing certain functions to ensure HDC's continued existence. *Id.*

That misunderstands the nerve-center test, which asks where decisions are made, not where they are executed. Giving so much weight to Johnson's work on HDC's "day-to-day" affairs effectively replaces the nerve-center test with one *Hertz* rejected. *See Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101,

106 (4th Cir. 2011) (in *Hertz*, "the Supreme Court eschewed tests such as this Circuit's prior 'place of operations' test—*under which the locus of day-to-day activities would have been relevant*" (emphasis added)); *cf. WM Mobile Bay Env't Ctr., Inc. v. City of Mobile*, 2022 WL 2784606, at *2 (11th Cir. July 15, 2022) (nerve center *not* where "day-to-day activities" took place).  Nor is the corporation's listed address an especially telling sign, particularly in assessing citizenship for purposes of a statute that creates an artificial incentive to maintain a domestic address.  *See Wylie v. Red Bull N. Am., Inc.*, 627 F.App'x 755, 758 (11th Cir. 2015).  And while the court thought HDC's limited operations weighed in favor of finding its nerve center in Kentucky, NCL.Dkt.367 at 102, that makes Behn's leadership on HDC's *raison d'être*—vindicating its certified claim—all the more important.  The court thus erred in deeming Kentucky HDC's principal place of business because of "the day-to-day business decisions" Johnson handled or others he "executed."

The court also misapplied the summary-judgment standard here.  "[O]n cross-motions for summary judgment … courts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).  But the court repeatedly failed to give defendants that benefit.  For example, the court stated that evidence of Behn approving payments did "not show that Behn is *solely* responsible for approving payments," and that "even if he was, such

68

responsibility *does not establish* that Behn directed or controlled Havana Docks from the United Kingdom." NCL.Dkt.367 at 104 (emphasis added). But even assuming the *cruise lines* did "not establish that Behn directed or controlled" HDC from overseas, that hardly means that *HDC* conclusively established the opposite— especially when making all reasonable inferences in the cruise lines' favor.

The same is true of the court's emphasis on the point that Johnson "testified that Behn does not conduct any Havana Docks business in England." NCL.Dkt.367 at 103. Whatever that might have meant, Johnson also testified that Behn approved major decisions and frequently had calls and exchanged emails concerning HDC from London. *See supra*, p. 67. Finally, if a company's chief executive lives abroad, that gives reason to think that the company's nerve center resides there as well, despite some self-serving testimony to the contrary. The nerve-center inquiry, after all, "look[s] for the place where the buck stops." *Harrison*, 811 F.3d at 41.

At a minimum, then, the court erred by granting summary judgment to HDC. A reasonable jury could conclude that HDC's "center of overall direction, control, and coordination" is, with Behn, abroad. *Hertz*, 559 U.S. at 96.

## IV.  Trafficking Is Foreclosed Because, Even If Their Conduct Was Somehow Unlawful, The Cruise Lines Did Not Knowingly And Intentionally Traffic In Confiscated Property.

Even if the district court were right about the foregoing issues, its holding on scienter cannot stand. The court decided *as a matter of law* that the cruise lines all

knowingly and intentionally trafficked in confiscated property, artificially truncating the scope of the scienter provision and discounting its own triple-take on whether the cruise lines could have possibly trafficked in HDC's time-limited concession. The Act—and the Due Process Clause—requires more before defendants can suffer punitive consequences for knowing trafficking in contraband by facilitating unlawful travel.

Statutory text alone shows that Congress imposed a demanding *mens rea* requirement for a serious violation carrying consequences as dire as exclusion from the Nation. The Act provides that "a person 'traffics' in confiscated property if that person *knowingly and intentionally*" commits certain acts involving "confiscated property" of a "United States national." 22 U.S.C. §6023(13)(A) (emphasis added); *see id.* §6091(b)(2) (Title IV's analog). The Act requires knowing and intentional wrongdoing with good reason—treble damages, the moral sanction of being deemed a trafficker, and exclusion/expulsion from the Nation are serious penalties, and "Congress often wishes to punish only those who intentionally break the law." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 98 (4th Cir. 2013). Moreover, a strong scienter requirement is especially critical when it divides lawful conduct the government wants to promote and unlawful conduct it wants to prevent. *See Ruan v. United States*, 142 S.Ct. 2370, 2377 (2022); *cf. Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 279 (2007) (rejecting treble-damages liability where "a fine,

70

complex, detailed line separates activity that the [government] permits or encourages … from activity that the [government] must (and inevitably will) forbid").

*Ruan* underscores that scienter provisions like the Act's require knowledge and intent as to all the elements of the statute that separate lawful conduct from the unlawful. *Ruan* involved 21 U.S.C. §841(a), which provides that, "[e]xcept as authorized," it is "unlawful for any person knowingly or intentionally … distribute, or dispense … a controlled substance." *Ruan*, 142 S.Ct. at 2379. The Court held that to convict doctors of §841(a) violations, it was not enough to show that doctors knowing and intentionally distributed or dispensed controlled substances, the government needed to show that the doctors "knew or intended that his or her conduct was unauthorized." *Id.* at 2382. That followed from precedent holding "that a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that 'separate wrongful from innocent acts,'" *id.* at 2377 (quoting *Rehaif v. United States*, 139 S.Ct. 2191, 2197 (2019)). As a result, the scienter requirement had to apply to the "[e]xcept as authorized" clause, even though it was grammatically distant. Since this Court had interpreted the scienter provision to require less, the Supreme Court vacated Ruan's convictions. *Id.* at 2376, 2382.

In the Helms-Burton context, other courts have followed the teachings of the cases *Ruan* built upon and recognized that the scienter requirement applies to more than simply interacting with property in Cuba. *See Glen v. Trip Advisor LLC*, 529

F.Supp.3d 316, 331-32 (D. Del. 2021), *aff'd*, 2022 WL 3538221 (3d Cir. Aug. 18, 2022) (so holding and collecting cases); *Gonzalez v. Amazon.com, Inc.*, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020) (dismissing complaint that failed to allege "that the Defendants knew the property was confiscated by the Cuban government nor that it was owned by a United States citizen"). Those decisions make good sense. The Act does not prohibit setting foot in Cuba or knowingly and intentionally using property that *might be* confiscated or belong to a U.S. national. To give effect to the Act's text, courts must consider whether defendants knowingly and intentionally trafficked in confiscated property of a U.S. national or instead reasonably believed they were engaged in lawful conduct. *See Ruan*, 142 S.Ct. at 2379; 142 Cong. Rec. H1724-04, at H1737 (Mar. 6, 1996) ("the only companies that will run afoul of this new law are those that are *knowingly and intentionally trafficking in the stolen property of U.S. citizens*." (emphasis added)).

Following that logic here shows the cruise lines did not knowingly and intentionally engage in trafficking. If nothing else, the concession's 2004 expiration date means the cruise lines did not "knowingly and intentionally" engage in transactions involving that "confiscated property" more than a decade later. *See, e.g.*, NCL.Dkt.236 at 14-18; RCCL.Dkt.132 at 9-11. Moreover, Norwegian's letter to OFAC contemporaneously stating that it believed there was no basis to conclude that its use of the Terminal would fall within the Certified Claim underscores the

72

point. NCL.Dkt.214-48 at 2 n.1. Indeed, even HDC had doubts on this score. In 2018, Robert MacArthur—an HDC shareholder and descendant of the principal of a company that built the docks—emailed HDC's president and said that, although "the right-to-operate was 'stolen' when Castro came into power … that right would have expired by now under the original terms." NCL.Dkt.235-11 at 4. For all those reasons, a jury could have readily concluded that the cruise lines lacked scienter here as to critical elements of the definition of trafficking.

Yet the district court here narrowed the scope of the scienter requirement and then held that HDC's demand letters necessarily meant the cruise lines had the requisite scienter. That was doubly flawed. First, the court incorrectly held that the Act's knowing-and-intentional requirement applied only to certain trafficking acts, on the theory that the scienter requirement appears in the definition of "traffics" and so "modifies only the listed trafficking acts" that come after it in the definition. *See* NCL.Dkt.367 at 96-97. That sequencing, the court thought, distinguished *Rehaif* and related cases—*Ruan* had not been decided—since the "Act does not place the term 'knowingly' before all subsequently listed elements of a Title III claim." *Id.* at 96.

That reading was flawed from the beginning and certainly does not survive *Ruan*. *Ruan* projected a scienter requirement backwards to modify the earlier "[e]xcept as authorized" language. Thus, *Ruan* shows that what matters is not

73

sequencing—which the district court took to be crucial—but whether a statutory element "play[ed] a critical role in separating a defendant's wrongful from innocent conduct." 142 S.Ct. at 2379. That reasoning controls here. Indeed, this case is *a fortiori* from *Ruan* because "traffics"—quite literally by definition—includes the knowledge-and-intent requirement and so carries that requirement with it wherever it goes. Accordingly, "the word 'knowingly'"—and here, intentionally—"applies not just to the statute's verbs but also to the object of those verbs," *McFadden v. United States*, 576 U.S. 186, 191 (2015), *i.e.*, "confiscated property" that was owned by a "United States national."

The district court also erred in asserting that "facts from the Certified Claim" combined with *Glen*, 450 F.3d at 1255, "would lead a reasonable person to conclude that using the Terminal may constitute trafficking." NCL.Dkt.367 at 95. While the court said that "*Glen*, which is binding authority from 2006, should have warned Defendants, precluding their limiting interpretation of the Certified Claim," NCL.Dkt.367 at 95, that both misreads *Glen* and ignores the court's earlier dismissal order which not only embraced a similar "limiting interpretation" *but also cited Glen*. MSC.Dkt.40 at 7. In all events, *Glen* just reinforces that certified claims are predicated on the particular property interests once owned and then confiscated. *See supra*, pp. 42-43.

74

The district court also stumbled with its alternative holding that even if the scienter requirement applied more broadly, the Certified Claim alone meant the cruise lines had the requisite *mens rea*.  *See* NCL.Dkt.367 at 97-98.  Again, the Certified Claim itself made abundantly clear that "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004." NCL.Dkt.43-8 at 5.  And, of course, the district court was well aware of the Certified Claim—and HDC's allegations—when it issued its dismissal orders.  If a court armed with multiple rounds of briefing can (rightly) think trafficking was impossible under these circumstances, those who reasonably thought the same should not be condemned as willful traffickers—especially not by the same court at summary judgment.

Next, the cruise lines had good reason to think that HDC's nerve center was overseas:  Even media reports sympathetic to HDC made clear that Behn led HDC and lived abroad.  *See, e.g.*, Paul Guzzo, *The federal government says this man rightfully owns Havana's cruise port*, Tampa Bay Times (June 25, 2018), https://tinyurl.com/e9e38wmz (Behn "resid[es] in England").  A reasonable jury could have found for the cruise lines on that basis alone.

At the very least, the court's errors should be corrected and its judgments vacated so a jury can decide the issue.  Knowledge and intent are quintessential jury questions, *see Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991), and a jury could surely return verdicts for the cruise lines here.

**V.    Trafficking Is Foreclosed As To MSC's Cuba-To-Cuba Cruises Because They Were Improperly Pled, And Are Now Time-Barred.**

MSC's Cuba-to-Cuba cruises also cannot support liability because HDC failed to properly plead them, making them time-barred under the Act.  *See* 22 U.S.C. §6084 (a Title III action "may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur").

**A.**  HDC's operative complaint challenged only MSC's U.S.-to-Cuba cruises. HDC amended its complaint twice, without ever adding any reference to Cuba-to-Cuba cruises.  *See generally* MSC.Dkt.104.

MSC ceased its Cuba-to-Cuba cruises by March 2019.  But HDC did not pursue liability based on such cruises until over two years later—at the earliest, on June 23, 2021, when HDC asked the magistrate judge to find the cruises relevant to liability.  *See* MSC.Dkt.256 at 7-8.  Thus, those claims are time-barred.  *See Simmons v. United States*, 421 F.3d 1199, 1200 (11th Cir. 2005) (affirming dismissal of complaint because statute of repose not subject to tolling, per Supreme Court of Georgia's answer to previously certified question).

**B.**  The district court erred by refusing to dismiss these time-barred claims. *See* NCL.Dkt.367 at 86-87.  The court could not point to language in any timely pleading identifying the Cuba-to-Cuba cruises as a basis for liability.  Instead, the court pointed to the operative complaint's statement that MSC engaged in "'travel[] to Cuba, including … cruises to Cuba from Miami.'"  NCL.Dkt.367 at 85 (quoting

76

MSC.Dkt.104 ¶2).  But that generic statement cannot reasonably be construed to encompass distinct cruises starting and ending in Cuba without touching U.S. territory.  HDC made no reference to MSC's Cuba-to-Cuba cruises—cruises that happened at "different times" and involved "separate and distinct conduct."  *Moore v. Baker*, 989 F.2d 1129, 1132 (11th Cir. 1993).

The district court noted that HDC amended its complaint to expand the dates of the travel alleged from December 2018 "to after November 1996."  NCL.Dkt.367 at 86.  The court found that this expansion somehow gave notice that the complaint covered Cuba-to-Cuba cruises.  But November 1, 1996 is simply the effective date of Title III liability under the Helms-Burton Act.  HDC never so much as suggested that it was seeking to expand liability based on cruises with zero connection to the United States.  Indeed, just one month before seeking to amend to file a second complaint, HDC's counsel represented to the magistrate judge that "non-U.S. based carrier services in Cuba" "are not the subject matter" of the complaint.  MSC.Dkt.96 at 34:1-6. And then HDC expressly stated in its subsequent request for leave to amend that it was amending only for the purpose of pleading Swiss parent MSC Cruises S.A. as a defendant.  MSC.Dkt.99 at 1-2 (because defendants "are taking the position that they did not 'operate' cruises to Cuba but rather that their parent company ... did," HDC "respectfully requests leave … adding MSC Cruises SA as a defendant to this suit").  In fact, the parties agreed to limit discovery to exclude

Havana-to-Havana cruises, unless it somehow informed the necessity of using the Terminal for the subsequent Miami-to-Havana cruises.  *See* MSC.Dkt.171 at 4-6.

The district court's ruling that there was adequate notice was thus clearly erroneous and the Cuba-to-Cuba claims should be dismissed as time-barred.

## VI.    The District Court Awarded Excessive Damages.

Finally, the district court's damages award of $109,848,747.87 from each cruise line should be vacated because the award disregarded the one-satisfaction rule and is unconstitutionally excessive under the Due Process Clause.  Not only do the extraordinary damages awarded here violate the one-satisfaction rule and due process, they also underscore the critical problems with the district court's liability rulings.  Based on a certified claim worth just under $10 million, HDC stands to recover over $440 million.  The district court's rulings on damages converted an already punitive statute into a font for windfalls and unconstitutional awards.  If HDC receives any award (and it should not), it should be reduced to accord with the statute's design and due process.

The district court first calculated a base-damages amount that systematically over-compensated plaintiffs.  The Act begins with the assumption that a defendant who traffics in the plaintiff's confiscated property should pay the full amount of the certified claim for the value of the property.  *See* 22 U.S.C. §6082(a)(1)(A)(i).  That assumption works well enough when the trafficking is commensurate with the

property interest—for example, if someone takes over a fee interest in confiscated property or takes over the entirety of the remaining lease term.  But when, as here, the alleged trafficking takes the form of an occasional trespass and the value of the certified claim is calculated by the value of a multi-year concession, awarding the full amount of the latter results in systematic overcompensation.  That is true, *a fortiori*, in a case like this where the base award is trebled.  And while that degree of overcompensation may be consistent with the statutory text, there is no textual or common-law basis for multiplying that already outsized number by the number of defendants in violation of the background one-satisfaction rule.

The one-satisfaction rule is a common-law background rule and equitable doctrine that "generally provides that a plaintiff is entitled to only one satisfaction for a single injury."  *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008).  The doctrine embodies the "basic tort principle that damages are designed to make the plaintiff whole," *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1310 (11th Cir. 2020), not to provide windfalls.  Accordingly, the common-law rule has long been that one injury gives rise to one recovery.  *Sessions v. Johnson*, 95 U.S. 347, 348 (1877) ("Where a [tort] is committed by several persons, the party injured … can have but one satisfaction for the same injury.").  The one-satisfaction rule likewise draws on "equit[y]" principles, which also

"prevent multiple recoveries by a plaintiff … for a single injury." *BUC*, 517 F.3d at 1276 n.5.

The Helms-Burton Act must be read in light of these background principles of common law and equity. Crucially, instead of keying damages to the alleged harm caused by any instance of trafficking, the Act measures damages solely by the value of the confiscated property or outstanding claim. *See* 22 U.S.C. §6082(a)(1)(A)(i). For damages, then, the relevant injury is the loss of property through confiscation. Under the one-satisfaction rule, that one injury leads to one recovery.

And the Act does nothing to displace that background rule. To the contrary, Congress designed the Act "to provide *equitable* compensation to such citizens and entities for [confiscated] property." *Id.* §6065(b)(2)(D) (emphasis added). And the Act expressly limits a claimant's recovery such that "if the recovery in the action is equal to or greater than the amount of the certified claim," then the claimant cannot "receive payment on the claim under any agreement entered into between the United States and Cuba." *Id.* §6082(f)(2)(A)(i). That confirms that there is just one act of confiscation for each property interest and is consistent with background principles of diplomatic efforts to obtain compensation for U.S. nationals' expropriated property. Negotiations, executive agreements, and congressional enactments all aim to get victims of expropriation compensation from the expropriating government for the value of their property, not windfalls based on independent recoveries from

80

multiple sources. *Cf. Dames & Moore*, 453 U.S. at 679-82. And it would be perverse to think that Congress would limit the liability of the Cuban government—the direct expropriator of the property—but authorize multiple nine-figure judgments on those who traveled with the Executive's encouragement. If the Act did that, it would create serious due process problems. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (due process forbids "the imposition of grossly excessive or arbitrary punishments on a tortfeasor"); *cf. Raley*, 360 U.S. at 426.

But the Act does no such thing. Title III's election of remedies provision limits a U.S. national to bringing "an action" under Title III and bars "any other civil action or proceeding" for compensation "of the same subject matter." 22 U.S.C. §6082(f)(1)(A). Likewise, any person who sues under any provision of law other than Title III "may not bring an action under this section on that claim." *Id.* §6082(f)(1)(B). Both those provisions support a single-satisfaction reading of the Act. So too does the Act's provision of treble damages in the case of willful violations, as ignoring the one-satisfaction rule would allow a plaintiff to obtain treble damages (or more) without showing a willful violation by suing three defendants (or more). And combining treble damages and a deviation from one-satisfaction principles provides a uniquely punitive and windfall-generating statute. If doubt remained, the Act's background resolves it: The Act "contains special rules designed to prevent double compensation of certified claimants." H.R. Rep. No.

104-202, at 41 (1995).  For all those reasons, the rule of the Act is one injury, one recovery.

The district court's limitless-liability rule wrecks that carefully calibrated statutory design.  Here, HDC had a certified claim of $9,179,700.88 (before interest) which measures the value of HDC's entire property interest and thus its full loss due to the Cuban government's confiscation.  *See* NCL.Dkt.367 at 32.  Rejecting the one-satisfaction rule, the court awarded HDC not just that trebled amount plus interest—$109,848,747.87—but awarded that amount four times over by assessing it separately against each of the four cruise lines, totaling almost $440 million.  Worse still, on the district court's reasoning, HDC would be entitled to 24 times its full-compensation base-amount if there were 8 defendants, and 48 times if there were 16 defendants.  The court thought this result would best serve the Act's "deterrent purpose," NCL.Dkt.429 at 8, but so would arbitrarily adding a zero to the damages against a single defendant.  There is no valid basis for such over-deterrence, and of course no statute pursues its ends at all costs, *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987), especially when doing so would raise constitutional difficulties.

And those constitutional concerns are only compounded by the district court's decision to not only treble the amount of the certified claim, but to treble the interest on the claim.  NCL.Dkt.428 at 11-13.  That was error.  The general rule under statutes providing for treble damages and interest is to avoid trebling the interest, which is

82

dictated by considerations of timing, not the amount of damages caused. *See, e.g.*, *Minpeco, S.A. v. Hunt*, 718 F.Supp. 168, 180 (S.D.N.Y. 1989) (holding that "prejudgment interest may not be included for the purposes of trebling damages" under federal antitrust laws); *see also Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987) (noting prejudgment interest is purely compensatory, not punitive).

There is no basis for deviating from that default rule here. In fact, the statute refers to the "amount" certified by the FCSC, "plus interest," and then calls for trebling the amount. *See* 22 U.S.C. §6082(a)(3)(C)(ii); *id.* §6082(1)(A)(i).[9] The district court reached a contrary result by holding that the "amount" referred to in the trebling provision cross-references the "amount" in Paragraph (1)(A)(i)'s main clause, which states that damages shall be measured by "the amount which is the greater of" the three Subclauses described above. NCL.Dkt.428 at 12-13 (emphases

---

[9] For purposes of damages, Paragraph (1)(A)(i) sets out three potentially applicable amounts: (I) the "amount" certified by the FCSC, "plus interest"; (II) the "amount" determined under §6083(a)(2), "plus interest"; or (III) "the fair market value" of the property. That context bolsters an interest-exclusive reading of "amount." Both Subclauses I and II both use "amount" to mean a particular method of calculation that excludes interest—hence each provision states "plus interest" after specifying how to determine the applicable "amount." Because both uses of the word "amount" in these subclauses excludes interest, the word "amount" in §6082(a)(3)(C)(ii)—the trebling provision—should likewise exclude interest. *See Azar v. Allina Health Servs.*, 139 S.Ct. 1804, 1812 (2019) ("[w]hen Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout.").

omitted).  But, consistent with the default assumption that interest is not trebled and the express separation of interest out from the amount of the FCSC "award," the "amount determined applicable" for purposes of the trebling provision in this case is not Paragraph (1)(A)(i)'s main clause; it is Subclause (1)(A)(i)(I)—which is also part of Paragraph (1)(A)(i).  That inference is further bolstered by 22 U.S.C. §6082(b), which refers to the "applicable amount under subclause (I), (II), or (III) of subsection (a)(1)(A)(i)"—not the main clause—in determining the "amount in controversy."

The court's deviation from the one-satisfaction rule and its trebling of interest both raise profound constitutional concerns.  Due process prohibits statutory damages that are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919).  As is often true, the Constitution and the common law reinforce one another here, as the "principle that punishment should fit the crime 'is deeply rooted and frequently repeated in common-law jurisprudence.'" *BMW of North Am., Inc.* v. *Gore*, 517 U.S. 559, 575 n.24 (1996).  Here, there is a substantial degree of overcompensation for imposing damages including the full amount of a multi-year concession on parties that occasionally used the dock along with many others (and only after the concession's expiration date).  To take that amount and treble it and then award it four times over multiplies the disproportionality and crosses a

84

constitutional line.  To avoid rendering the Act unconstitutional, the Court should reduce any awards to be consistent with the one-satisfaction rule and due process.

## CONCLUSION

This Court should reverse the judgments below, or, in the alternative, vacate them and remand for further proceedings.

Respectfully submitted,

*/s/ Derek L. Shaffer*
DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
JONATHAN G. COOPER
NICHOLAS J. CALUDA
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for Defendant-Appellant Norwegian Cruise Line Holdings Ltd.*

ROBERT M. LOEB
ROBBIE MANHAS
JONAS Q. WANG
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20015

J. Douglas Baldridge
Andrew T. Hernacki
Justin B. Nemeroff
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001

*Counsel for Defendants-Appellants MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A.*

June 30, 2023

*/s/ Paul D. Clement*
PAUL D. CLEMENT
MATTHEW D. ROWEN*
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
Katherine Munyan
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
Columbia Center
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of allowed by this Court's order of June 29, 2023, because it contains 19,761 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

June 30, 2023

*/s/Paul D. Clement*
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/Paul D. Clement*
Paul D. Clement