**Nos. 23-10151 & 23-10171**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

HAVANA DOCKS CORPORATION,
*Plaintiff-Appellee*,

v.

ROYAL CARIBBEAN CRUISES, LTD.; NORWEGIAN CRUISE LINE HOLDINGS LTD.; CARNIVAL CORPORATION, a foreign corporation doing business as Carnival Cruise Lines; MSC CRUISES S.A. CO.; MSC CRUISES (USA), INC., et al.,
*Defendants-Appellants*.

———————————

On Appeal from the United States District Court for the
Southern District of Florida,
No. 19-cv-23591, No. 19-cv-23590, No. 19-cv-23588

———————————

## JOINT REPLY BRIEF FOR DEFENDANTS-APPELLANTS ROYAL CARIBBEAN CRUISES, LTD.; NORWEGIAN CRUISE LINE HOLDINGS LTD.; MSC CRUISES S.A., MSC CRUISES S.A. CO., AND MSC CRUISES (USA), INC.

———————————

DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
JONATHAN G. COOPER
NICHOLAS J. CALUDA
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for Defendants-Appellant
Norwegian Cruise Line Holdings Ltd.*

PAUL D. CLEMENT
MATTHEW D. ROWEN[*]
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are
  members of the Virginia bar

*Counsel for Defendant-Appellant
Royal Caribbean Cruises, Ltd.*

(*Additional Counsel Listed on Inside Cover*)

November 20, 2023

ROBERT M. LOEB
ROBBIE MANHAS
JONAS Q. WANG
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20015

ANDREW T. HERNACKI
JUSTIN B. NEMEROFF
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001

E. JOSHUA ROSENKRANZ
KATHERINE MUNYAN
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
Columbia Center
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

*Counsel for Defendants-Appellants*
*MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A.*

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Defendant-Appellants Norwegian Cruise Line Holdings Ltd. ("Norwegian"), Defendant-Appellants Royal Caribbean Cruises, Ltd. ("Royal Caribbean"), and Defendant-Appellants MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A. (collectively, "MSC"), hereby certify that the following is a complete list of the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal.

1. 1972 Productions, Inc.

2. A.C.N. 098 290 834 Pty. Ltd.

3. A.J. Juneau Dock, LLC

4. Admiral Management Inc.

5. Adventure Island Ltd.

6. Adventure of the Seas Inc.

7. AIDA Kundencenter GmbH

8. AIDAradio GmbH

9. Air-Sea Holiday GmbH

10. Alaska Hotel Properties LLC

11. Allure of the Seas Inc.

12. American Society of Travel Advisors, Inc., *Amicus Curiae*

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

13. Anthem of the Seas Inc.

14. Akerman LLP

15. Arrasas Limited

16. Balmori, Daniel (Hogan Lovells US LLP)

17. Barcelona Cruise Terminal SLU

18. Bash III, John F. (Quinn Emanuel Urquhart & Sullivan, LLP)

19. Bay Island Cruise Port, S.A.

20. Behn, Aphra

21. Behn, Mickael

22. Behn-Lucain, Melanie

23. Belize Cruise Terminal Limited

24. Belize Investments Limited

25. Belize Island Holdings Ltd.

26. Bermuda Tenders, Ltd.

27. Black, Hillary S. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

28. Bloom, Judge Beth F. (United States District Judge for the Southern District of Florida)

29. Bluvacanze Spa

30. Bohrer, Sanford L.

31. Boies Schiller Flexner LLP

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

32. Bondi, Bradley J., Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc.

33. Breakaway Four, Ltd.

34. Breakaway One, Ltd.

35. Breakaway Three, Ltd.

36. Breakaway Two, Ltd.

37. Brilliance of the Seas Shipping Inc.

38. Buffett, Warren E.

39. Burck, William A. (Quinn Emanuel Urquhart & Sullivan, LLP)

40. Caluda, Nicholas J. (Quinn Emanuel Urquhart & Sullivan, LLP)

41. Canodros CL

42. Carnival (UK) Limited

43. Carnival Bahamas FC Limited Bahamas

44. Carnival Bahamas Holdings Limited

45. Carnival Corporation (CCL)

46. Carnival Corporation & plc Asia Pte. Ltd.

47. Carnival Corporation Hong Kong Limited Carnival Corporation Korea Ltd.

48. Carnival Corporation Ports Group Japan KK

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

49. Carnival Finance, LLC

50. Carnival Grand Bahama Investment Limited

51. Carnival Holdings (Bermuda) Limited

52. Carnival Investments Limited

53. Carnival Japan, Inc.

54. Carnival License Holdings Limited

55. Carnival Maritime GmbH

56. Carnival North America LLC

57. Carnival PLC

58. Carnival Port Holdings Limited

59. Carnival Ports Inc.

60. Carnival Support Services India Private Limited

61. Carnival Technical Services (UK) Limited

62. Carnival Technical Services Finland Limited

63. Carnival Technical Services GmbH

64. Carnival Vanuatu Limited

65. Casey, Stephanie A. (Colson Hicks Eidson, P.A.)

66. CC U.S. Ventures, Inc.

67. CCL Gifts, LLC

68. Celebrity Apex Inc.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

69. Celebrity Cruise Lines Inc.

70. Celebrity Cruises Holdings Inc.

71. Celebrity Cruises Inc. (d/b/a Celebrity Cruises Liberia)

72. Celebrity Eclipse Inc.

73. Celebrity Edge Inc.

74. Celebrity Equinox Inc.

75. Celebrity Reflection Inc.

76. Celebrity Silhouette Inc.

77. Celebrity Solstice Inc.

78. Chamber of Commerce of the United States of America, *Amicus Curiae*

79. Cisalpina Tours Spa Classic Cruises, LLC Classic Cruises II, LLC

80. Clement & Murphy, PLLC

81. Clement, Paul D. (Clement & Murphy, PLLC)

82. CNS Compañia Naviera Seaside 1 SA

83. Colson Hicks Eidson, P.A.

84. Compañia Naviera Evo 1 SA

85. Compañia Naviera Evo 2 SA

86. Compañia Naviera Fantasia SA

87. Compañia Naviera Meraviglia SA

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

88. Compañia Naviera Musica SA

89. Compania Naviera Ocean Cay SA

90. Compañia Naviera Orchestra SA

91. Compañia Naviera Pacifica S.A.

92. Compañia Naviera Preziosa SA

93. Compañia Naviera Seaside 2 SA

94. Compañia Naviera Serenata SA

95. Compañia Naviera Vista 1 SA

96. Compañia Naviera Vista 2 SA

97. Compañia Naviera Vista 3 SA

98. Compañia Naviera Vista 4 SA

99. Compañia Naviera Vista 5 SA

100.    Compañia Naviera World Class 1 SA

101.    Compañia Naviera World Class 2 SA

102.    Compañia Naviera World Class 3 SA

103.    Compañia Naviera World Class 4 SA

104.    Compañia Naviera Yc1 SA

105.    Compañia Naviera Yc2 SA

106.    Compañia Naviera Yc3 SA

107.    Compañia Naviera Yc4 SA

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

108.     Compañia Naviera Yc5 SA

109.     Compañia Naviera Yc6 SA

110.     Constellation Inc. Liberia

111.     Cooke, Judge Marcia G. (United States District Judge for the

         Southern District of Florida)

112.     Cooper, Jonathan G. (Quinn Emanuel Urquhart & Sullivan, LLP)

113.     Costa Crociere PTE Ltd.

114.     Costa Crociere S.p.A.

115.     Costa Cruceros S.A.

116.     Costa Cruise Lines Inc.

117.     Costa Cruise Lines UK Limited

118.     Costa Cruises Customer Center S.L.U.

119.     Costa Cruises Shipping Services (Shanghai) Company Limited

120.     Costa Cruises Travel Agency (Shanghai) Co., Ltd.

121.     Costa Cruises Turkey Turizm Gelisim A.S.

122.     Costa Cruzeiros Agencia Maritima e Turismo Ltda.

123.     Costa International B.V.

124.     Costa Kreuzfahrten GmbH

125.     Cozumel Cruise Terminal S.A. de C.V.

126.     Cruise Administration Services, Inc.

127.    Cruise Conglomerate Maritime Ltd.

128.    Cruise Lines International Association, Inc., *Amicus Curiae*

129.    Cruise Quality Travel Spain SL

130.    Cruise Ships Catering & Services International N.V.

131.    Cruise Terminal Services, S.A. de C.V.

132.    Cruiseport Curacao C.V.

133.    CSMART Real Estate B.V.

134.    CSMART Real Estate C.V.

135.    D.R. Cruise Port, Ltd.

136.    Dvoretzky, Shay, Counsel for Amicus Curiae Cruise Lines International Association

137.    Elayan-Martinez, Aziza F. (Colson Hicks Eidson, P.A.)

138.    Ellis George Cipollone O'Brien Annaguey, LLP

139.    Enchantment of the Seas Inc.

140.    Eurosoft Corporation Limited

141.    Eurosoft Cruise Line (Shanghai) Co., Ltd.

142.    Explora SA

143.    Explorer II New Build, LLC

144.    Explorer III New Build, LLC

145.    Explorer New Build, LLC

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

146.      Explorer of the Seas Inc.

147.      F.P.M. SAS

148.      F.P.P. SAS

149.      Fields, Lazaro (Continental PLLC)

150.      Fisk, Daniel, *Amicus Curiae*

151.      Fleet Maritime Services (Bermuda) Limited

152.      Fleet Maritime Services Holdings (Bermuda) Limited

153.      Fleet Maritime Services International Limited

154.      Foreman Friedman, PA

155.      Fowler III, George J (Jones Walker LLP)

156.      Freedom of the Seas Inc.

157.      Freyre, Pedro A. (Akerman LLP)

158.      Friedman, Darren Wayne (Foreman Friendman)

159.      Future Investments, Ltd.

160.      Gayles, Judge Darrin P. (United States District Judge for the Southern District of Florida)

161.      GG Operations Inc.

162.      Gibs, Inc.

163.      Global Experience Innovators, Inc.

164.      Global Fine Arts, Inc.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

165.    Global Fleet Management LLC

166.    Global Fleet Management Two LLC

167.    Global Shipping Service (Shanghai) Co., Ltd.

168.    Going Srl

169.    Goodman, Judge Jonathan (United States Magistrate Judge for

the Southern District of Florida)

170.    Goulette Cruise Holding Limited

171.    Grand Cruise Shipping Unipessoal LdA

172.    Grand Turk Cruise Center Ltd.

173.    Grandeur of the Seas Inc.

174.    Gray, Corey P. (Boies Schiller Flexner LLP)

175.    Great Stirrup Cay Limited

176.    Greensboro S.L.

177.    Gwart Srl

178.    GXI, LLC D

179.    HAL Antillen N.V.

180.    HAL Beheer B.V.

181.    HAL Maritime Ltd.

182.    HAL Nederland N.V.

183.    HAL Properties Limited

184.    HAL Services B.V.

185.    Harmony of the Seas Inc.

186.    Harper, Chadwick (Clement & Murphy, PLLC)

187.    Harvard Law School

188.    Havana Docks Corporation

189.    Hernacki, Andrew T. (Venable LLP)

190.    Hoch, Dorothy

191.    Hogan Lovells US LLP

192.    Holding Division Iberocruceros SLU

193.    Holland & Knight LLP

194.    Holland America Line Inc.

195.    Holland America Line N.V.

196.    Holland America Line U.S.A., Inc.

197.    Hospedagm De Pomene (Mozambique) Lda

198.    HSE Hamburg School of Entertainment GmbH

199.    Ibero Cruzeiros Ltda.

200.    Iberocruceros SLU

201.    Independence of the Seas Inc.

202.    Infinity Inc.

203.    Information Assistance Corporation

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

204.    Insignia Vessel Acquisition, LLC

205.    International Cruise Services, S.A. de C.V.

206.    International Leisure Travel Inc.

207.    International Maritime Recruitment Agency, S.A. de C.V.

208.    Island for Science, Inc.

209.    Islas Galapagos Turismo y Vapores CA

210.    Jewel of the Seas Inc.

211.    Jiménez, Marcos Daniel, Counsel for Amicus Curiae Daniel Fisk

212.    Johnson, Jerry M.

213.    Jones Day, Counsel for Amicus Curiae Peter Kucik

214.    Jones Walker LLP

215.    Kats, Vitaliy, Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc

216.    Klinger, Richard D. (Ellis George Cipollone O'Brien Annaguey, LLP)

217.    Kroeger, Thomas (Colson Hicks Eidson, P.A.)

218.    Krystalsea Limited

219.    Kucik, Peter, *Amicus Curiae*

220.    Kwazulu Cruise Terminal (Pty) Ltd.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

221.    Labadee Investments Ltd.

222.    Landau, Christopher (Ellis George Cipollone O'Brien Annaguey, LLP)

223.    Leonardo Five, Ltd.

224.    Leonardo Four, Ltd.

225.    Leonardo One, Ltd

226.    Leonardo Six, Ltd.

227.    Leonardo Three, Ltd.

228.    Leonardo Two, Ltd.

229.    León Cosgrove Jiménez, LLP, Counsel for Amicus Curiae Daniel Fisk

230.    Li, Vincent (Ellis George Cipollone O'Brien Annaguey, LLP)

231.    Liberia

232.    Liberty of the Seas Inc.

233.    Lindsay III, Alvin Francis (Hogan Lovells US LLP)

234.    Lioi, Samuel V., Counsel for Amicus Curiae Peter Kucik

235.    Lipshultz, Zachary A. (Colson Hicks Eidson, P.A.)

236.    Lipshutz, Brian M. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

237.    Llamas, Luis E. (Jones Walker LLP)

238.    Loeb, Robert (Orrick, Herrington & Sutcliffe LLP)

239.    Lorenzo, Richard C. (Hogan Lovells US LLP)

240.    Louis, Judge Lauren Fleischer (United States Magistrate Judge for the Southern District of Florida)

241.    Lutz, Zachary P. (Quinn Emanuel Urquhart & Sullivan, LLP)

242.    MacArthur Trust

243.    Maderal, Francisco

244.    Marcus, Steven, Counsel for Amicus Curiae Cruise Lines International Association

245.    Margol & Margol, P.A.

246.    Margol, Rodney S. (Margol & Margol, P.A.)

247.    Marina New Build, LLC

248.    Mariner of the Seas Inc.

249.    Mariner, LLC

250.    Marseille Provence Cruise Terminal SAS

251.    Martinez, Judge Jose E. (United States District Judge for the Southern District of Florida)

252.    Martínez, Roberto (Colson Hicks Eidson, P.A.)

253.    Massey & Gail LLP

254.    Massey, Johnathan S. (Massey & Gail LLP)

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

255.  Mayer Brown LLP, Counsel for Amicus Curiae Chamber of Commerce of the United States of America

256.  McAliley, Judge Chris M. (United States Magistrate Judge for the Southern District of Florida)

257.  Mediterranean Cruises Travel Agency (Shanghai) Co Ltd

258.  Michel, Christopher G. (Quinn Emanuel Urquhart & Sullivan, LLP)

259.  Milestone N.V.

260.  Millennium Inc.

261.  Moriceau, Alisha (Boies Schiller Flexner LLP)

262.  MSC Crewing Services Philippines

263.  MSC Cruceros SA Argentina

264.  MSC Cruceros SA Spain

265.  MSC Cruise Management (UK) Ltd

266.  MSC Cruises (Australia) Pty Ltd

267.  MSC Cruises (Canada) Ltd

268.  MSC Cruises (Ireland) Ltd

269.  MSC Cruises (USA), Inc.

270.  MSC Cruises Asia Company Ltd.

271.  MSC Cruises Barcelona Terminal SL

272.     MSC Cruises Belgium NV

273.     MSC Cruises Gmbh

274.     MSC Cruises Japan Ltd

275.     MSC Cruises Limited UK

276.     MSC Cruises Ltd Cyprus

277.     MSC Cruises S.A. Co.

278.     MSC Cruises Scandinavia AB

279.     MSC Cruises Ship Management (Shanghai) Ltd.

280.     MSC Cruises Shipping Service (Shanghai) Ltd.

281.     MSC Cruises The Netherlands BV

282.     MSC Cruises, S.A.

283.     MSC Cruzeiros Do Brasil Ltda

284.     MSC Cruzeiros SA

285.     MSC Food & Beverage Division Spa

286.     MSC Italcatering Do Brasil Ltda

287.     MSC Kreuzfahrten (Austria) Gmbh

288.     MSC Kreuzfahrten AG

289.     MSC Krstarenja Doo

290.     MSC Kruvaziyer Turizm AS

291.     MSC Logistics (Mozambique) Ltd.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

292.    Msc Malta Seafarers Company Ltd.

293.    MSC Mediagrafica Srl

294.    MSC Miami Cruise Terminal LLC

295.    MSC Ocean Cay Ltd

296.    MSC Starlight Cruises Pty Ltd

297.    Munyan, Katherine (Orrick, Herrington & Sutcliffe LLP) Musica
        Cruise Limited

298.    Nautica Acquisition, LLC

299.    Navigator of the Seas Inc.

300.    Navigator Vessel Company, LLC

301.    Navitrans S.R.L.

302.    NCL (Bahamas) Ltd. d/b/a Norwegian Cruise Line

303.    NCL (Guernsey) Limited

304.    NCL America Holdings, LLC

305.    NCL America LLC

306.    NCL Australia Pty Ltd.

307.    NCL Construction Corp., Ltd.

308.    NCL Corporation Ltd.

309.    NCL Cruises Ltd.

310.    NCL Emerald Corporation, Limited

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

311.    NCL Finance, Ltd.

312.    NCL HK Holding, Ltd.

313.    NCL Holding AS

314.    NCL Hong Kong Limited

315.    NCL International, Ltd.

316.    NCL Japan KK

317.    NCL Singapore Pte. Ltd.

318.    NCL UK IP CO LTD

319.    NCL US IP CO 1, LLC

320.    NCL US IP CO 2, LLC

321.    NCLC Investments Canada Ltd.

322.    NCLM Limited

323.    Nelson, Timothy G., Counsel for Amicus Curiae Cruise Lines International Association

324.    Nemeroff, Justin B. (Venable LLP)

325.    New Co Armonia SA

326.    New Co Lirica SA

327.    New Co Opera SA

328.    New Co S32 SA

329.    New Co Sinfonia SA

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

330.    Norwegian Cardinal Ltd

331.    Norwegian Compass Ltd.

332.    Norwegian Cruise Co. Inc.

333.    Norwegian Cruise Line Agéncia de Viagens Ltda.

334.    Norwegian Cruise Line Group Italy S.r.l.

335.    Norwegian Cruise Line Group UK Limited (formerly Prestige Cruise Services (Europe) Limited)

336.    Norwegian Cruise Line Holdings, Ltd. (NCLH)

337.    Norwegian Cruise Line India Private Limited

338.    Norwegian Dawn Limited

339.    Norwegian Epic, Ltd.

340.    Norwegian Gem, Ltd.

341.    Norwegian Jewel Limited

342.    Norwegian Pearl, Ltd.

343.    Norwegian Sextant Ltd.

344.    Norwegian Sky, Ltd.

345.    Norwegian Spirit, Ltd.

346.    Norwegian Star Limited

347.    Norwegian Sun Limited

348.    Norwegian USCRA, Ltd.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

349.    Nualy Investments Inc

350.    O Class Plus One, LLC

351.    O Class Plus Two, LLC

352.    Oasis of the Seas Inc.

353.    Ocean Bahamas Innovation Ltd.

354.    Ocean Medallion Fulfillment, Ltd.

355.    Oceanadventures S.A.

356.    Oceania Cruises S. de R.L. (formerly Oceania Cruises, Inc.)

357.    OCI Finance Corp.

358.    Odds On Gaming Corporation

359.    Odyssey of the Seas Inc.

360.    Oliu, Pascual A. (Boies Schiller Flexner LLP)

361.    Operadora Catalina S.r.L.

362.    Orrick, Herrington & Sutcliffe LLP

363.    Otazo-Reyes, Judge Alicia M. (United States Magistrate Judge for the Southern District of Florida)

364.    Ovation of the Seas Inc.

365.    Paul Hastings, LLP, Counsel for Amici Curiae U.S. Travel Association, United States Tour Operators Association, Inc., and American Society of Travel Advisors, Inc.

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

366.    P&O Princess American Holdings

367.    P&O Princess Cruises International Limited

368.    P&O Princess Cruises Pension Trustee Limited

369.    P&O Properties (California), Inc.

370.    P&O Travel Limited

371.    Palumbo Malta Shipyard Limited

372.    Palumbo Shipyard Limited

373.    Paul, Weiss, Rifkind, Wharton & Garrison LLP

374.    Pegg, Allen P. (Hogan Lovells US LLP)

375.    Pettlier, Romain Le

376.    Piccapietra Finance S.r.l.

377.    Ponce, Scott D. (Holland & Knight LLP)

378.    Prestige Cruise Holdings S. de R.L. (formerly Prestige Cruise

   Holdings, Inc.)

379.    Prestige Cruise Services LLC

380.    Prestige Cruises Air Services, Inc.

381.    Prestige Cruises International S. de R.L. (formerly Prestige

   Cruises International, Inc.)

382.    Prestige Cruises Management S.A.M.

383.    Prestige Cruises N.V.

384.    Preziosa Cruise Limited

385.    Pride of America Ship Holding, LLC

386.    Pride of Hawaii, LLC

387.    Princess Bermuda Holdings, Ltd.

388.    Princess Cays Ltd.

389.    Princess Cruise Corporation Inc.

390.    Princess Cruise Lines, Ltd.

391.    Princess Cruises and Tours, Inc.

392.    Princess U.S. Holdings, Inc.

393.    Proctor, Ryan M., Counsel for Amicus Curiae Peter Kucik

394.    Quantum of the Seas Inc.

395.    Quinn Emanuel Urquhart & Sullivan, LLP

396.    Radiance of the Seas Inc.

397.    RCI Holdings LLC RCL (UK) Ltd.

398.    RCL Cruise Holdings LLC

399.    RCL Cruises Ltd.

400.    RCL GEO LLC

401.    RCL Holdings Cooperatief U.A.

402.    RCL Horizon LLC

403.    RCL Investments Ltd.

404.    RCL Monarch LLC

405.    RCL New Vessel Holding Company LLC

406.    RCL Sovereign LLC

407.    RCL TUI Cruises German Holding GmbH & Co. KG

408.    RCL Worldwide (Hong Kong) Limited

409.    RCL Worldwide Ltd.

410.    RCL Zenith LLC

411.    RCT Maintenance & Related Services S.A.

412.    RCT Pilots & Related Services, S.A.

413.    RCT Security & Related Services S.A.

414.    Regatta Acquisition, LLC

415.    Rhapsody of the Seas Inc.

416.    Rider-Longmaid, Parker, Counsel for Amicus Curiae Cruise
        Lines International Association

417.    Riviera New Build, LLC

418.    Roatan Cruise Terminal S.A. de C.V.

419.    Rosenkranz, E. Joshua (Orrick, Herrington & Sutcliffe LLP)

420.    Rowen, Matthew D. (Clement & Murphy, PLLC)

421.    Royal Caribbean Cruise Lines AS

422.    Royal Caribbean Cruises (Asia) Pte. Ltd.

423.    Royal Caribbean Cruises Services (China) Company Limited

424.    Royal Caribbean Cruises, Ltd. (RCL)

425.    Royal Hyway Tours, Inc.

426.    Saieh, Sabrina S. (Colson Hicks Eidson, P.A.)

427.    Saladrigas, Caitlin F. (Holland & Knight)

428.    Santa Cruz Terminal, S.L.

429.    Schultz, Meredith L. (Boies Schiller Flexner LLP)

430.    Seabourn Cruise Line Limited

431.    Seahawk One, Ltd.

432.    Seahawk Two, Ltd.

433.    SeaVacations Limited

434.    SeaVacations UK Limited

435.    Serenade of the Seas Inc.

436.    Seven Seas Cruises S. De R.L., d/b/a Regent Seven Seas Cruises

437.    SG Cruises GmbH

438.    SG Expeditions Cyprus Limited

439.    SG Expeditions SAGL

440.    Shaffer, Derek L. (Quinn Emanuel Urquhart & Sullivan, LLP)

441.    Shanghai Coast Cruise Consulting Co. Lda

442.    Shanmugam, Kannon S. (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

443.    Ship Care (Bahamas) Limited

444.    Skadden, Arps, Slate, Meagher & Flom, LLP, Counsel for Amicus Curiae Cruise Lines International Association

445.    Silver Cloud Shipping Co. Ltd.

446.    Silver Muse Shipping Co. Ltd.

447.    Silver Shadow Shipping Co. Ltd.

448.    Silver Spirit Shipping Co. Ltd.

449.    Silver Wind Shipping Ltd.

450.    Silversea Cruise Finance Ltd.

451.    Silversea Cruise Holding Ltd.

452.    Silversea Cruises (Europe) Ltd.

453.    Silversea Cruises (UK) Ltd.

454.    Silversea Cruises Australia Pty. Ltd.

455.    Silversea Cruises Canada Ltd.

456.    Silversea Cruises Ltd.

457.    Silversea Cruises South Africa Pty. Ltd.

458.    Silversea New Build Seven Ltd.

459.    Silversea RCL Holdings LLC

460.    Silversea SAM

461.    Singer, Stuart H. (Boies Schiller Flexner LLP)

462.    Sirena Acquisition

463.    Sitmar Cruises Inc.

464.    Sixthman Ltd.

465.    SNC Fantasia Bail

466.    SNC Splendida Bail

467.    Societe Labadee Nord, S.A.

468.    Spanish Cruise Services N.V.

469.    Spectrum of the Seas Inc.

470.    Spezia & Carrara Cruise Terminal Srl

471.    Spohrer Dodd Trial Attorneys

472.    SSC Finance Corp.

473.    Sullivan, Kathleen M. (Quinn Emanuel Urquhart & Sullivan, LLP)

474.    Summit Inc.

475.    Sun Princess II Limited

476.    Sun Princess Limited

477.    Sunshine Shipping Corporation Ltd.

478.    Super, John (Quinn Emanuel Urquhart & Sullivan, LLP)

479.    Symphony of the Seas Inc.

480.    Stander, Robert N., Counsel for Amicus Curiae Peter Kucik

481.    T&T International, Inc.

482.    Tager, Evan M., Counsel for Amicus Curiae Chamber of Commerce of the United States of America

483.    Taormina, Benjamin A. (Holland & Knight LLP)

484.    Terminal De Cruceros Punta Del Este SA

485.    Torcatt Enterprises Limitada

486.    Tour Alaska, LLC

487.    Transnational Services Corporation

488.    Tribe, Laurence H. (Harvard Law School)

489.    Trident Insurance Company Ltd.

490.    Trieste Adriatic Maritime Initiatives Srl

491.    U.S. Travel Association, *Amicus Curiae*

*492.*    United States Tour Operators Association Inc., *Amicus Curiae*

493.    Venable LLP

494.    Venezia Investimenti Srl

495.    Vice, Abigail Frisch (Paul, Weiss, Rifkind, Wharton & Garrison LLP)

496.    Vision of the Seas Inc.

497.    Voyager of the Seas Inc.

498.    Voyager Vessel Company, LLC

499.    Wang, Jonas Q. (Orrick, Herrington & Sutcliffe LLP)

500.    West Sicily Gates Srl

501.    Westmark Hotels of Canada, Ltd.

502.    Westmark Hotels, Inc.

503.    Whisper SpA

504.    Whitaker, Walter H.

505.    White Sand Inc.

506.    World Leading Cruise Management (Shanghai) Co., Ltd.

507.    XP Tours S.A.

**Corporate Disclosure**.  Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1-1, 26.102, & 26.1-3, Norwegian, Royal Caribbean, and MSC respectfully submit that the Corporate Disclosure Statements included in the Opening Brief (11th Cir. Case No. 23-10171, Dkt. 80) remain true and correct.

November 20, 2023

<div style="text-align: right;">

s/Paul D. Clement
Paul D. Clement
*Counsel for Defendant-Appellant Royal Caribbean Cruises, Ltd.*

</div>

Nos. 23-10171, 23-10151, *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., et al.*

/s/ Derek L. Shaffer
Derek L. Shaffer
*Counsel for Defendants-Appellant*
*Norwegian Cruise Line Holdings Ltd.*

/s/ E. Joshua Rosenkranz
E. Joshua Rosenkranz
*Counsel for Defendants-Appellants*
*MSC Cruises S.A. Co., MSC Cruises*
*(USA), Inc., and MSC Cruises, S.A.*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.................................................................CIP-1

TABLE OF AUTHORITIES.................................................................... iii

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 4

I.  HDC's Trafficking Claims Fail Because Its Limited Property Interest Expired Over A Decade Before Appellants Set Sail For Havana And Did Not Cover Passenger Travel ................................. 4

    A.  HDC's Property Interest Expired Long Before Appellants Cruised to Cuba ............................................................... 5

    B.  HDC's Confiscated Property Interest Was Limited to Cargo Services, Which Passenger Cruises Do Not Implicate.......................11

II.  HDC's Trafficking Claims Fail Because Appellants' Use Of The Terminal Was Incident And Necessary To Lawful Travel........................... 12

    A.  Appellants Engaged in Lawful Travel................................. 13

        1.  The Executive made crystal clear that it viewed Appellants' conduct as lawful travel........................................ 13

        2.  HDC's ahistorical efforts to void post-1996 changes to the Cuban Assets Control Regulations fail .............................. 23

        3.  MSC's Cuba-to-Cuba cruises were also lawful ....................... 29

    B.  Using the Terminal at the Havana Docks Was Necessary to the Conduct of Appellants' Lawful Travel ......................... 31

III.  HDC Is Not A "United States National"........................................ 35

    A.  HDC Is Not a "United States Citizen" ............................... 36

    B.  Granting HDC Summary Judgment on the Principal-Place-of-Business Question Was Reversible Error ........................... 39

i

IV.    Appellants Lacked The Requisite Scienter ...................................... 43

V.     Trafficking Is Foreclosed As To MSC's Cuba-to-Cuba Cruises
       Because The Claims Are Time-Barred ........................................... 46

VI.    The District Court Awarded Excessive Damages ........................... 48

       A.    The Act Does Not Authorize the Damages Awards ........................... 49

       B.    If the Act Does Require $440 Million in Damages, Due
             Process Compels Reduction ................................................. 53

CONCLUSION ..................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## Cases

*Access Now, Inc. v. Sw. Airlines Co.*,
  385 F.3d 1324 (11th Cir. 2004) ........................................................... 46

*BP P.L.C. v. Mayor & City Council of Balt.*,
  141 S.Ct. 1532 (2021) ........................................................................ 34

*Bryan v. United States*,
  524 U.S. 184 (1998) ........................................................................... 39

*BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*,
  517 F.3d 1271 (11th Cir. 2008) ........................................................... 49

*Clark v. Martinez*,
  543 U.S. 371 (2005) ..................................................................... 29, 45

*Edward J. DeBartolo Corp.*
  *v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568 (1988) ........................................................................... 39

*Empresa Cubana del Tabaco v. Culbro Corp.*,
  399 F.3d 462 (2d Cir. 2005) ............................................................... 22

*Encino Motorcars, LLC v. Navarro*,
  138 S.Ct. 1134 (2018) ........................................................................ 32

*Farmer v. Higgins*,
  907 F.2d 1041 (11th Cir. 1990) ........................................................... 32

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ........................................................................... 45

*FCOA LLC v. Foremost Title & Escrow Servs. LLC*,
  57 F.4th 939 (11th Cir. 2023) ............................................................. 43

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................... 21

---

[*] Citations upon which Appellants primarily rely are marked with asterisks.

*Friends of Everglades v. S. Fla. Water Mgmt. Dist.*,
  570 F.3d 1210 (11th Cir. 2009) ..........................................................26

*Glen v. Club Mediterranee, S.A.*,
  450 F.3d 1251 (11th Cir. 2006) ............................................................7

*Gonzalez v. Reno*,
  212 F.3d 1338 (11th Cir. 2000) ......................................................... 13

*Griffis v. Delta Fam.-Care Disability*,
  723 F.2d 822 (11th Cir. 1984) ...........................................................43

*Havana Club Holding, S.A. v. Galleon S.A.*,
  961 F.Supp. 498 (S.D.N.Y. 1997) .....................................................18

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
  467 U.S. 51 (1984)..............................................................................34

*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010)........................................................... 40, 41, 42

*Hoschar v. Appalachian Power Co.*,
  739 F.3d 163 (4th Cir. 2014) .............................................................41

*In re Coffman*,
  766 F.3d 1246 (11th Cir. 2014) .........................................................39

*Liberty Univ., Inc. v. Lew*,
  733 F.3d 72 (4th Cir. 2013) ...............................................................45

*Moore v. Baker*,
  989 F.2d 1129 (11th Cir. 1993) .........................................................48

*Nguyen v. United States*,
  556 F.3d 1244 (11th Cir. 2009) .........................................................52

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ............................................... *passim*

*Osterneck v. E.T. Barwick Indus., Inc.*,
  825 F.2d 1521 (11th Cir. 1987) .........................................................53

*Pine v. City of W. Palm Beach*,
   762 F.3d 1262 (11th Cir. 2014)...........................................................45

*Regan v. Wald*,
   468 U.S. 222 (1984)..............................................................................25

*Rescue Army v. Mun. Court*,
   331 U.S. 549 (1947)..............................................................................30

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016)..............................................................................30

*Ruan v. United States*,
   142 S.Ct. 2370 (2022)...........................................................................45

*Sekhar v. United States*,
   570 U.S. 729 (2013)..............................................................................17

*Simmons v. United States*,
   421 F.3d 1199 (11th Cir. 2005) ............................................................48

*Staples v. United States*,
   511 U.S. 600 (1994)..............................................................................49

*State Farm Mut. Auto Ins. v. Campbell*,
   538 U.S. 408 (2003)..............................................................................54

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
   535 U.S. 302 (2002)................................................................................8

*United States ex rel. Schutte v. SuperValu Inc.*,
   598 U.S. 739 (2023)..............................................................................46

*United States v. Campbell*,
   26 F.4th 860 (11th Cir. 2022) ..............................................................46

*United States v. Caniff*,
   955 F.3d 1183 (11th Cir. 2020) ............................................................33

*United States v. Church of Scientology of Boston, Inc.*,
   933 F.2d 1074 (1st Cir. 1991) ...................................................... 33, 34

*United States v. Davila-Mendoza,*
   972 F.3d 1264 (11th Cir. 2020) ........................................................30

*United States v. Plummer,*
   221 F.3d 1298 (11th Cir. 2000) ........................................................24

*United States v. Weingarten,*
   632 F.3d 60 (2d Cir. 2011) ...............................................................30

*W. Va. Univ. Hosps., Inc. v. Casey,*
   499 U.S. 83 (1991) ...........................................................................39

*Wakefield v. ViSalus, Inc.,*
   51 F.4th 1109 (9th Cir. 2022) ..........................................................53

*West Virginia v. United States,*
   479 U.S. 305 (1987) .........................................................................53

*Young v. New Process Steel, LP,*
   419 F.3d 1201 (11th Cir. 2005) ........................................................48

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .........................................................................29

*Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) .............................................................................24

**Statutes**

19 U.S.C. §4452(f)(7) .............................................................................39

22 U.S.C. §1641 .....................................................................................38

22 U.S.C. §1642(1) .................................................................................39

22 U.S.C. §1643(a)(1) .............................................................................39

22 U.S.C. §1644a(1) ...............................................................................39

22 U.S.C. §1645a(1) ...............................................................................39

22 U.S.C. §6023(12)(A) ............................................................................4

22 U.S.C. §6023(13)(A) ..........................................................................44

22 U.S.C. §6023(13)(B) ................................................................ *passim*

22 U.S.C. §6023(15) ................................................................3

22 U.S.C. §6023(15)(A) ................................................................36

22 U.S.C. §6023(15)(B) ................................................................36

22 U.S.C. §6032(h) ................................................................ 25

22 U.S.C. §6042 ................................................................24

22 U.S.C. §6082(a)(1)(A) ................................................................ *passim*

22 U.S.C. §6082(a)(3) ................................................................ 51, 52

22 U.S.C. §6082(b) ................................................................52

22 U.S.C. §6083(a)(1) ................................................................ 10

22 U.S.C. §6091 ................................................................51

22 U.S.C. §6091(b)(2) ................................................................13

22 U.S.C. §7209(b)(2) ................................................................ 26

50 U.S.C. §4131(c) ................................................................39

50 U.S.C. §4303(a) ................................................................51

50 U.S.C. §4315(a) ................................................................22

50 U.S.C. §4315(b) ................................................................ 21, 22

**Regulations**

31 C.F.R. §501.701 ................................................................51

31 C.F.R. §515.201 (1996) ................................................................24

31 C.F.R. §515.565(b)(1)-(4) (2017) ................................................................19

31 C.F.R. §515.565(b)(2) ................................................................14

31 C.F.R. §515.565(b)(3) ................................................................14

31 C.F.R. §515.801(b)(6) (1996) ..............................................................24

82 Fed. Reg. 48,875 (Oct. 20, 2017).......................................................... 19

**Other Authorities**

59 Am. Jur. 2d Parties (2023).....................................................................37

Black's Law Dictionary (11th ed. 2019).....................................................37

Brief for United States as Amicus Curiae, *Garcia-Bengochea*
    *v. Carnival Corp.*, No. 20-12960, 2022 WL 1135129
    (11th Cir. Apr. 11, 2022) ................................................................. 2, 15

142 Cong. Rec. H1645-02, 1996 WL 90487 (Mar. 4, 1996) .................... 34

Encyclopedia Brittanica, https://bit.ly/45Xutnw ......................................32

Reed Lindsey & Daneil Montero, *Billboards and Backchannels: Deep*
    *Inside the Lobbying Campaign to Crush Investment in Cuba*,
    Miami New Times (Sept. 8, 2023), https://bit.ly/3Qza3Nc..............................42

Restatement (Second) of Torts (1979) ........................................................50

U.S. Dep't of State, *Cuba International Travel Information*,
    https://bit.ly/3u1Vf0H (last updated Dec. 30, 2022) ..........................20

**INTRODUCTION**

HDC reimagines this case as a simple gamble gone wrong for the cruise lines. In fact, Royal Caribbean, Norwegian, and MSC ("Appellants") played it safe, setting sail to Havana only after obtaining explicit authorization and encouragement from the Executive.  There was no question in the Executive's eyes about the lawfulness of Appellants' travel.  That is clear not just because the Executive granted general licenses authorizing cruising to Cuba and told Appellants they did not require— indeed, could not even apply for—specific licenses, but also because HDC doggedly pressed the Executive to take action against Appellants to no avail.  What HDC condemns as unlawful trafficking, the Executive deemed lawful travel.

The problems with HDC's claims hardly end there.  In fact, HDC's claim to a nearly half-a-billion-dollar windfall depends on running the table in defense of a series of district court rulings that cannot withstand scrutiny.  First, HDC cannot overcome the reality that the Cuban government owned the docks at issue before and after Castro's confiscation, and that HDC's only "property" interest was a concession to use the docks for specified purposes for a limited term that expired long before the supposed trespasses underlying the massive judgment below.  Cuba obviously did not "confiscate" its own fee interest in the docks, and neither logic nor chronology allows HDC to recover for a 2017 "trespass" on a leasehold that expired in 2004.  HDC's factual argument that the concession included passenger travel

further confirms the decision below cannot stand, because the district court refused even to consider evidence on the issue.

Second, Appellants' travel to Cuba was lawful.  Congress exempted from the definition of "traffic[king]" all "transactions and uses of property" that are "incident to lawful travel to Cuba" and "necessary to the conduct of such travel."  22 U.S.C. §6023(13)(B)(iii).  Travel-related transactions are lawful under the Act if "they are authorized by OFAC regulations at the time of the transaction."  Brief for United States as Amicus Curiae at 15, *Garcia-Bengochea v. Carnival Corp.*, No. 20-12960, 2022 WL 1135129 (11th Cir. Apr. 11, 2022).  And here, the Executive not only told Appellants that "the provisions of [the] general license" that OFAC had granted authorized their cruising, NCL.Dkt.235-18 at 2, but repeatedly rebuffed HDC's entreaties to the Executive to treat them as unlawful traffickers for that reason.

Given that two Administrations with highly divergent approaches to Cuba endorsed Appellants' activity, HDC invites this Court to ignore the Executive's view and invalidate all post-1996 Executive actions that loosened the sanctions regime in any respect.  But HDC's position defies text, history, and precedent—not to mention bedrock constitutional principles.  The Helms-Burton Act did not disturb the Executive's primacy in foreign affairs; and travel deemed lawful in real time by the Executive cannot be second-guessed with dramatic consequences for private parties

that followed the Executive's lead in facilitating people-to-people exchanges and U.S.-Cuba policy.

Third, HDC is not a U.S. national entitled to sue for damages under the Act in the first place. Consistent with its role in facilitating the kind of expropriation claims that the United States would espouse in negotiations with Cuba, the Act is limited to "United States citizens" and corporate entities with their "principal place of business in the United States." 22 U.S.C. §6023(15). That makes sense, as the claims of foreign citizens are the concerns of foreign nations, many of which have very different policies vis-à-vis Cuba. HDC is obviously not a U.S. citizen, and its principal place of business is abroad. That precludes HDC's recovery. Its president and largest shareholder works and lives in England—which likely explains why HDC is not even registered to do business in Kentucky, where it claims to be based. At a minimum, the district court should not have granted HDC summary judgment— a point to which HDC only briefly (and unpersuasively) responds.

Fourth, the district court's scienter ruling is deeply flawed. A party that acted only with the Executive's authorization and encouragement should not have to roll the dice, with $100 million (or more) at stake. Yet that is the natural consequence of the decision below. And HDC's defense of that view only adds insult to injury. In HDC's telling, knowingly engaging in commerce involving property in Cuba that is somehow linked to a certified claim suffices for liability under the Act, even if

(among other things) no reasonable person would have thought that the plaintiff's property interest was still operable at the time.  That is not what the Act says, and it is not what the Act means.

Fifth and finally, the district court allowed HDC to parlay a limited property interest valued at $9.2 million into a $440-million recovery.  The text of the Act does not require that extraordinary windfall, and due process forbids it.  Far from being a "paradigm[atic]" case for liability, HDC.Br.33, this is in fact a highly flawed one. This Court should reverse, or at the very least vacate and remand for a trial.

## ARGUMENT

I.  **HDC's Trafficking Claims Fail Because Its Limited Property Interest Expired Over A Decade Before Appellants Set Sail For Havana And Did Not Cover Passenger Travel.**

The Helms-Burton Act imposes liability on those who traffic "in property which was confiscated by the Cuban Government," 22 U.S.C. §6082(a)(1)(A), and defines "property" in accord with the well-established understanding that not all property interests last forever or grant their holders the whole bundle of sticks, *see id.* §6023(12)(A).  The threshold question in every case brought under the Act is thus:  What "property" of the plaintiff did Cuba's government "confiscate[]"?  *Id.* §6082(a)(1)(A); *see id.* §6023(12)(A).  The answer to that question here is clear— and bars HDC's recovery on two separate grounds.  First, when the Castro regime reasserted plenary control of the docks in 1960, HDC held only a time-limited

4

concession set to expire in 2004. HDC.Br.52-53. With or without that confiscation, HDC had no "property" interest in the docks when Appellants used them more than a decade later. Second, the concession only ever granted HDC a limited right to operate cargo services, which could not be impinged by docking for passenger travel. Appellants therefore did not engage in trafficking in HDC's property for the simple reason that they never used HDC's confiscated property.

### A.    HDC's Property Interest Expired Long Before Appellants Cruised to Cuba.

HDC is unable to deny that it never held any property interest in the docks extending beyond 2004 under any circumstances. Thus, echoing the district court, HDC responds that all that matters is whether HDC had a property interest on the date of confiscation—and that exactly *what* the property interest was—whether time-limited or otherwise restricted—somehow matters only for purposes of valuing what the cruise lines owe it, not for determining whether the cruise lines are liable in the first place. But both statutory text and the undisputed facts squarely foreclose that argument. The Act imposes liability for trafficking in "property … confiscated by the Cuban Government." 22 U.S.C. §6082(a)(1)(A). Because a claimant's particular "property" interest is all that Cuba could "confiscate[]," anything beyond that interest cannot be "confiscated property"—and thus cannot be the basis for trafficking liability. And the undisputed record confirms that—as HDC itself admits—the "property" the Cuban government "confiscated" from HDC was a

concessionary interest, the terms of which "were to expire in the year 2004." HDC.Br.53 (emphasis omitted).

It makes nonsense of the words "property" and "confiscation" (and the whole notion of a concession to use state-owned property) to say Appellants trafficked in HDC's confiscated property by using state-owned docks more than a decade *after* HDC's confiscated concession's end-date. The only stick in the bundle HDC held—and the only stick Cuba confiscated from it—expired before Appellants sailed to Havana. Nothing Appellants did in Cuba implicated HDC's "confiscated property."

HDC's suggestion that Appellants demand "a *current* property interest at the time of trafficking," HDC.Br.54, attacks a strawman. Confiscation plainly extinguished private ownership rights in confiscated property. *See* Joint.Br.41-42. But Cuba could not confiscate or extinguish *more than private parties owned at that time*. Here, Cuba owned the docks and Terminal in fee—so all it confiscated from HDC was a concession to use them for specified purposes until 2004.

HDC cannot avoid its critical chronological problem by shifting the focus from its property interest to its certified claim. *See* HDC.Br.40-46, 53. At the risk of stating the obvious, the "cause of action" the Act creates permits recovery only based on use of what the Castro regime "confiscated," and the Castro regime did not confiscate any certified claims, just whatever property interests were in private hands at that juncture. Moreover, the certified claim (and the nature of HDC's concession

6

and corresponding rights in usufruct) only underscores that what Cuba confiscated from HDC was not the docks themselves—Cuba already owned them—but a time-limited right to use them. The certified claim explicitly recognizes that the "terms of the concession granted by the Cuban Government were to expire in the year 2004." MSC.Dkt.41-8 at 9. HDC quibbles about tenses, *see* HDC.Br.53, but all the subjunctive mood signifies is that HDC no longer held the property interest, not that confiscation somehow expanded, tolled, or otherwise changed the nature of the property interest.

That should be the end of the matter. While the Act recognizes the rights of those who hold certified claims, it provides for actions only against "traffickers *in the property*" that the Castro regime confiscated. *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (emphasis added). Here, that property was HDC's time-limited interest in property Cuba owned in fee. HDC's own discussion of how its concession gave it rights "in usufruct … during the term of the concession" underscores this limitation. HDC.Br.44. As HDC concedes, usufruct refers to a "right for a certain period to use and enjoy the fruits of *another's property*." HDC.Br.45 (emphasis added). Precisely because HDC's concession gave it a "right of limited duration on *the property of another*," HDC.Br.45 (emphasis added), all HDC owned—and all Cuba could seize from it—was a time-

limited concession.  So, while HDC likes to refer to "the confiscated docks," *see, e.g.*, HDC.Br.3, the Cuban government could not confiscate what it already owned.

HDC asserts that "[a]ny temporal limitations on [the confiscated] property interests are reflected in the value of the claim, not the scope of the property subject to trafficking." HDC.Br.54.  That is only half-true.  While a leasehold is worth less than a fee interest, and a cargo concession worth less than a plenary lease, that is precisely because the less-valuable items are property interests of different and reduced scopes.  The Supreme Court has said as much:  "An interest in real property is defined by the metes and bounds that describe its geographic dimensions *and the term of years that describes the temporal aspect of the owner's interest*." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 331-32 (2002) (emphasis added).  Someone who actually traffics in a less-valuable property interest—for example, by using the docks for cargo unloading in 2003—will owe less than if the plaintiff owned the docks in fee.  But someone who never trespassed on the limited property interest at all—for example, by using the docks for passenger unloading in 2005—should owe nothing.  That is obviously true of the spatial limits on property interests.  A farm would be worth more if it included the neighboring parcel; but a trespasser on the neighboring parcel owes the farm-owner nothing—not just less—because he did not traffic in the farm-owner's property at all.  That is equally true of temporal limits on property interests.  Just as someone cannot be held

liable for going *where* a plaintiff never had a property interest, someone cannot be deemed to have trafficked in a plaintiff's property interest at a point in time *when* the plaintiff never had a property interest at all.  *See* Joint.Br.39.

HDC's own hypothetical proves the point.  HDC says a U.S. national with a lease set to end in 1965 may recover if another company used that building in 2016.  HDC.Br.56-57.  Nonsense.  While the owner of the confiscated building would surely have a trafficking claim (provided that all other statutory elements were satisfied), the person with a time-limited lease would have no more claim than the owner of the adjacent building or the renter of a different unit in the same building.[1]  The statute protects the property interests actually confiscated, not street addresses or zip codes.  The lessee's property right never extended to 2016, and neither confiscation nor the Act changed that.  Thus, using the building in 2016 *is not using the lessee's confiscated property*.  HDC's contrary argument makes no more sense than saying that President Biden is trespassing in President Eisenhower's Oval Office.

---

[1] HDC's theory suggests that the former lessee could go after someone using the building years later even if that party has *the fee-simple owner's blessing*.  That nonsensical result is essentially what HDC says happened here, and shows that its theory creates perpetual property interests that exceed the time-limited interests actually owned and actually confiscated.

In the end, HDC resorts to a naked policy argument, claiming that limiting liability to those who actually trafficked in confiscated property would undercut the Act's provision concerning certified claims or undermine the claims-settlement process. HDC.Br.40-43. But while imposing liability on third parties who actually used what was confiscated by Cuba was a novel but logical way to supplement the claims-settlement process, imposing liability on people who simply visited the vicinity or came onto the scene long after a time-limited property interest expired would be a complete overreach, especially in light of the draconian consequences of being labeled a trafficker. *See* Joint.Br.43.[2] The Act's provision concerning certified claims is wholly consistent with that limitation. Indeed, the fact that the claim serves as "proof of ownership of *an interest in property*" only underscores that what matters under the Act is the property interest *that Cuba actually confiscated*, not some broader interest in the docks, which Cuba owned in fee all along. 22 U.S.C. §6083(a)(1) (emphasis added). It certainly does not mean, or even imply, that HDC's time-limited "interest in property" became—via confiscation or legislation—an interest that extends into the future, world without end.

---

[2] For cases involving certified claims and those without them, determining whether trafficking *in confiscated property* occurred necessarily looks to what was used and when. The certified claim establishes ownership of an interest at the time of confiscation (and sets the claim's value), but it does not render confiscated property's time-limited nature irrelevant to liability, and it would be bizarre to do so when those limitations are crucial for valuation and damages.

**B.    HDC's Confiscated Property Interest Was Limited to Cargo Services, Which Passenger Cruises Do Not Implicate.**

HDC's property interest was not just time-limited; it was limited to cargo operations.  HDC had the right to operate cargo services at the state-owned docks until 2004, but never enjoyed the right to exclude others from them.  Joint.Br.45; Carnival.Br.27-29.  Providing passenger services thus did not implicate property that HDC *ever* held.  HDC tries to avoid that limit by citing evidence that it "used the docks for passenger operations," HDC.Br.48, but that resort to the record only serves to confirm that the decision below cannot stand, as the district court *refused even to consider evidence on this issue.  See* Joint.Br.45-46.

The problems with that refusal cannot be papered over by distorting Appellants' arguments.  *Contra* HDC.Br.50, "what the cruise lines are really complaining about" are not Congress's drafting choices in the Act, but the due-process problems inherent in the district court's choice to refuse to consider exculpatory evidence in private litigation while blindly deferring to an over-reading of the results of *ex parte* proceedings designed to inform government-to-government negotiations.  The Act does not command that approach, and it could not consistent with due process.  Joint.Br.45-46.  So, at the very least, this Court must vacate and remand—at which point the evidence would squarely foreclose HDC's argument, as HDC's own records show that the affiliated revenues attributed to "Passengers" were

de minimis.[3]  To the extent HDC managed to extract some marginal (ultra vires) revenue from the occasional passenger berth on a cargo ship, that would not change the concession's terms or the fundamental problem that the district court effectively converted a time-limited and purpose-limited concession into a generalized right to exclude.  The property interest was not the *physical docks*, but a limited concession for a certain kind of *use* of those docks.  The district court committed reversible error by failing to recognize that HDC's claim was precluded by its concession's limits, or, at minimum, by foreclosing adversarial testing of its scope.

## II.    HDC's Trafficking Claims Fail Because Appellants' Use Of The Terminal Was Incident And Necessary To Lawful Travel.

Congress exempted from the definition of unlawful "traffic[king]" all "transactions and uses of property" (1) "incident to lawful travel to Cuba" and (2) "necessary to the conduct of such travel."   22 U.S.C. §6023(13)(B)(iii).  Appellants fall within the heartland of that exemption.  The district court disagreed only by giving the exemption an unduly narrow reading and affording the Executive's actions no weight.  HDC embraces that intrusion on executive power, arguing that Congress took away the President's ability to manage foreign policy as to Cuba, "le[aving] the Executive discretion only to *tighten* the embargo."

---

[3] For example, in 1958 and 1959, "Passengers" accounted for less than one percent of HDC's revenues.  *See* NCL.Dkt.220-35 at 148 (HDC00009226).

HDC.Br.62. That is not what the Act says; it is not how this Court (or any other) has interpreted it; and doing so would raise serious constitutional concerns.

## A. Appellants Engaged in Lawful Travel.

### 1. The Executive made crystal clear that it viewed Appellants' conduct as lawful travel.

"[I]n no context is the executive branch entitled to more deference than in the context of foreign affairs." *Gonzalez v. Reno*, 212 F.3d 1338, 1353 (11th Cir. 2000). Yet the district court afforded the Executive no deference whatsoever. HDC repeatedly pressed Executive officials to act against Appellants for docking in Havana, but the Executive repeatedly rebuffed it, precisely because the Executive had green-lighted Appellants' Cuba operations and the Act defines trafficking to exclude lawful travel. *See* Joint.Br.49-52; 22 U.S.C. §6023(13)(B)(iii) (Title III); *id.* §6091(b)(2) (Title IV). The district court completely discounted that evidence and instead decided for itself what counts as "*proper* people-to-people travel" under the regulations. NCL.Dkt.367 at 119. That was reversible error.

The district court's zero-deference approach led it to misunderstand the relevant OFAC regulations as requiring "a full-time schedule of meaningful interactions," NCL.Dkt.367 at 130, 137, which it took to mean something like eight hours a day of dialogue. Unsurprisingly, no one passed that made-up test, *see* Joint.Br.56-58, and HDC does not even attempt to defend it. That is wise. Unlike the district court's distorted standard, the actual regulatory language requires a

13

holistic analysis. *See* Joint.Br.56-58. Whether one particular excursion was focused more on fun than constant dialogue is not what matters in determining "meaningful interactions" with the Cuban people under "people-to-people" travel. *Contra* HDC.Br.74-75. The analysis requires evaluating the conduct of travel as a whole. *See* 31 C.F.R. §515.565(b)(2)-(b)(3); *see also* CLIA.Amicus.Br.14-18. That accommodates the reality that travel in Cuba (and meaningful interactions with Cubans) can be limited by realities practical and political, and is a stark contrast to deeming a group trip to Hemingway's Havana home unlawful travel simply because time spent on a bus did not involve deep dialogue with Cubans. *See* NCL.Dkt.367 at 122-23.

While the district court apparently relied on an innate sense of what constitutes "*proper* people-to-people travel," NCL.Dkt.367 at 119, the concept of "people-to-people" travel did not emerge *ex nihilo*. The idea of people-to-people travel originated in Cold-War-era programs that allowed high school students to travel abroad and learn about other cultures—including through "visits to museums, historical spots[,] and other points of interest"—while serving as ambassadors for American values in their interactions with nationals of the other country. Kucik.Amicus.Br.7-8. Appellants' activities followed in that tradition and fell well within the ambit of *truly* "proper" people-to-people travel. That a host of other groups undertook travel to Cuba with similar itineraries reflects both a widely shared

understanding that such conduct was lawful people-to-people travel and the limited universe of practically available itineraries at a time when the Executive clearly wanted this travel to occur. *See* CLIA.Amicus.Br.20-24. Likewise, the regulatory context presumably explains why OFAC's audit of Royal Caribbean did not result in so much as a word of warning about shore excursions themselves. *See* p.17, *infra*.

Indeed, the whole notion of "lawful travel" is defined by reference to the regulations calibrated and enforced by OFAC. *See* Joint.Br.48. As the United States has previously argued to this Court, by leaving "lawful travel" undefined in the statute, Congress pointed to "travel that is permissible under OFAC regulations"— meaning that travel-related transactions are lawful within the meaning of the Act so long as "they are authorized by OFAC regulations *at the time of the transaction*." Brief for United States as Amicus Curiae at 15, *Garcia-Bengochea*, 2022 WL 1135129 (emphasis added); *see also id.* at 34. Perhaps recognizing that reality, HDC tries to sow doubt about whether the Executive really meant to green-light Appellants to travel to Cuba. But its *post hoc* efforts are no more successful than its efforts to convince OFAC to take enforcement action in real time.

First, HDC's assertion that "OFAC never reviewed nor approved [Appellants'] shore tours," HDC.Br.78, ignores the reason for that lack of regulatory flyspecking. There is no need to examine the specifics when there is a general license to proceed. Indeed, OFAC specifically told Appellants that their conduct fell

within the general license, and accordingly ignored their specific-license applications as unnecessary. Appellants certainly did not try to hide the details or scale of their shore excursions. For instance, in applying for a specific license, Royal Caribbean not only discussed how it provided over "5.2 million land-based tours to passengers" in a single year, but presented details of potential shore excursions for OFAC's approval. RCCL.Dkt.133-5 at 5; *see also, e.g.*, RCCL.Dkt.133-6 at 117-18 (providing example Royal Caribbean itineraries, including a trip to Hemingway's home and a walking tour of Old Havana); NCL.Dkt.238-1 at 2 (discussing Norwegian's vision for various potential "requisite onshore activities"). But OFAC responded to Appellants' requests for permission by telling them that no action would be taken on their applications, given that "OFAC's policy is not to grant specific licenses authorizing transactions *for which the provisions of a general license apply.*" Joint.Br.17 (emphasis added) (quoting NCL.Dkt.235-18 at 2). The very specifics that HDC and the district court obsessed over were beside the point for the Executive given the general license that authorized carrier services as lawful travel. *See* USTA.Amicus.Br.11.[4]

---

[4] HDC invokes a 2015 statement from Norwegian's CEO, *see, e.g.*, HDC.Br.70, which expressed doubt about the potential for lawful cruises to Cuba. But that statement of uncertainty preceded Appellants' specific applications, OFAC's response, and the general licenses that were ultimately issued by the Executive, including OFAC and BIS. Such an expression of doubt before asking for permission

As for HDC's broader assertion that OFAC "never reviewed" Appellants' shore excursions, HDC.Br.78, that both ignores the nature of a general license and blinks reality. HDC ignores (among many other things) the audit that OFAC conducted related to Royal Caribbean's operation. During that audit, the materials Royal Caribbean provided to the agency included multiple descriptions of its shore excursions. *See* RCCL.Dkt.133-39 at 2 (Topow Dec.); *id.* at 38-44 (RCL-Havana0000110-0000116); *id.* at 95-99 (RCL-Havana 0000167-0000171). In HDC's revisionist (and fictional) narrative, OFAC reviewed materials laying bare years of open and notorious primary lawlessness, but warned Royal Caribbean only about not keeping better records of the transgressions. *See* Joint.Br.51-52. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 736 (2013). In reality, OFAC said nothing about the shore excursions because those excursions were well within the terms of the general license *and not unlawful*.

So, when HDC casts Appellants as having engaged in "self-licensing," HDC.Br.78, it really takes issue with OFAC's decision to direct Appellants to the general licenses in the Cuban Assets Control Regulations ("CACR"). But OFAC's choice of a general versus specific license "rest[ed] upon foreign policy considerations and judgments of the Executive Branch that should not be disturbed

---

only underscores Appellants' interest in proceeding lawfully and with Executive approval when it came to travel to Cuba.

by the courts." *Havana Club Holding, S.A. v. Galleon S.A.*, 961 F.Supp. 498, 503 (S.D.N.Y. 1997). For courts to *post hoc* assume the OFAC role and scrutinize past conduct as the agency might examine proposed conduct in evaluating a specific-license application—as the district court did here—has the "perverse result" of making "a general-license regime less friendly to travel than a specific-license regime." Kucik.Amicus.Br.23. It converts a general license into a proceed-at-your-own-risk regime. That makes little sense as law and even less as foreign policy.

Next, HDC's efforts to downplay the State Department's extensive refusals to treat Appellants as unlawful traffickers, *see* HDC.Br.78-80, fail on their own terms. HDC attempts to trivialize an email from the State Department's Acting Coordinator for Cuban Affairs. But that email hardly stands alone. As an HDC ally told members of the House of Representatives, he complained "to State Department officials" three times in an effort to secure Title IV sanctions—but the State Department steadfastly refused, telling him "it was necessary for the cruise lines to use our properties." NCL.Dkt.240-27 at 5. Moreover, while HDC speculates that the Acting Coordinator had not herself reviewed records "other than the e-mail chain that [the] e-mail is responding to," HDC.Br.80, the underlying email chain is extensive, *see* MSC.Dkt.357-17 at 98-105, and it shows that, after HDC had an in-person meeting with State to discuss its allegations, the Department's legal team and Cuban Affairs team both investigated them, *see* MSC.Dkt.357-17 at 99, 104. So, when the Acting

Coordinator told HDC that the State Department was not pursuing Title IV actions because of "the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba," that was hardly some ill-informed, off-the-cuff comment. *See* MSC.Dkt.357-17 at 98.

Nor does it help HDC that most of the cruising at issue here took place after President Trump had taken office. *See* HDC.Br.82. In fact, the chronology makes clear that Appellants' activities were undertaken under the oversight of two Presidents with decidedly different views on Cuba. Instead of eliminating cruising wholesale when he took office, President Trump initially removed the general license just for self-directed people-to-people travel, *see* 31 C.F.R. §515.565(b)(1)-(4) (2017), while allowing cruises (and group people-to-people travel) to continue for years, Joint.Br.19-20. The Trump Administration apparently saw that allowance as consistent with President Trump's stated commitment to "[e]nsure adherence to the statutory ban on tourism to Cuba." 82 Fed. Reg. 48,875, 48,876 (Oct. 20, 2017); *see also id.* (explaining that new regulations would not prohibit "air and sea operations that support permissible travel"). There is, after all, a meaningful difference between regulating limited and supervised onshore excursions and simply allowing U.S. tourists to flock to Cuban beaches. Recognizing that the Executive has the power to draw such distinctions in managing the ebb and flow of relations with Cuba does not entail the assumption that "the Executive has *unfettered*

19

discretion to legalize any economic interactions with Cuba." HDC.Br.86 (emphasis added). It just means that the President enjoys "*considerable* discretion" to "adjust our Nation's sanctions against the Cuban Government." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1284-85 (11th Cir. 2013) (emphasis added).

Similarly, HDC's assertion that Appellants cannot have taken "passengers to Cuba 'to promote people-to-people contact' … because they obviously took passengers to Cuba to promote their own business interests," HDC.Br.77, rests on an utterly false dichotomy. Promoting people-to-people contact and having a profit motive are not remotely mutually exclusive. If Congress wanted to limit the lawful-travel exemption to 501(c)(3) corporations, it could have—but it did not.

HDC's reliance on contracts with the Cuban government for "tourism services" and the like, HDC.Br.71-72, fares no better, as the Executive's own actions confirm that use of the word "tourism" (or variations thereon) does not render activities per se unlawful. To illustrate the point, the State Department advises that a "Tourist Visa" is required for travel to Cuba, and in the same breath explains that tourism remains prohibited. U.S. Dep't of State, *Cuba International Travel Information*, https://bit.ly/3u1Vf0H (last updated Dec. 30, 2022). That may sound contradictory to the uninitiated, but it is entirely in keeping with the Executive's approach to people-to-people exchanges (which are facilitated through museum

visits and other activities generally associated with tourism) in general, and its respect for the realities of life on and travel to Cuba in particular. Given that the Cuban government still dominates the country's economy, it is inevitable that many groups that engaged in people-to-people travel to Cuba also contracted with state-run businesses. *See, e.g.*, CLIA.Amicus.Br.23. What matters is not whether Cuba viewed those visits as tourism, but whether the U.S. government viewed them as permissible people-to-people exchanges as distinct from the kind of unfettered beach holidays that remained unlawful. *See* Joint.Br.54-55.

The problems with HDC's approach run deeper still. Because OFAC has never found a violation by Appellants under the Trading with the Enemy Act's administrative-review scheme, the district court lacked the authority to find the CACR violated. Joint.Br.52-53. This is an independent ground for reversal. HDC ignores the statutory framework Congress set up for Treasury to find CACR violations and to issue civil penalties, which provides for administrative enforcement followed by judicial review. 50 U.S.C. §4315(b). The Helms-Burton Act is not a backdoor to circumvent the review process Congress established for the Executive to determine a CACR violation—a process Congress "designed to permit agency expertise to be brought to bear on" the sensitive foreign-policy issue of the CACR's enforcement. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010); *see* Joint.Br.53.

21

No one disputes that courts have a role in interpreting the CACR. *Contra* HDC.Br.84-85. The question is what that role looks like—and Congress answered that question by providing for judicial review of OFAC's determinations of CACR violations only under the APA, following the exhaustion of administrative review, *see* 50 U.S.C. §4315(b). That quintessential legislative choice of review mechanism forecloses the route the district court took here—namely, bypassing the Executive and policing CACR violations in the first instance. *See* Joint.Br.53.[5]

Facing the reality that neither OFAC nor the State Department ever took any action against Appellants (save OFAC's cautionary letter to Royal Caribbean regarding record-keeping, *see* p.17, *supra*), HDC tries to chalk it all up to "prosecutorial discretion." HDC.Br.87. But granting a general license is a far cry from mere non-prosecution, and the Executive did not just stay its hand, but *affirmatively celebrated* cruising. And HDC's windfall recovery did not depend on a showing that one cruise line radically deviated from the norm and thereby fell outside the general license. Instead, the district court found liability based on

---

[5] In fact, HDC's own authorities reinforce the Executive's primacy in making the initial determination whether travel violated the CACR. HDC cites "criminal prosecutions," *see* HDC.Br.85, but *the Executive* decides whether to bring such prosecutions at its sole discretion, *see* 50 U.S.C. §4315(a). Likewise, the trademark cases HDC cites just underscore that courts typically follow OFAC's lead. *See, e.g.*, *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 475 (2d Cir. 2005) (in interpretation of CACR, "the agency charged with enforcing the embargo is normally controlling").

prototypical excursions in the heartland of the general license that one President affirmatively celebrated and another President tolerated even as he condemned ordinary tourism.  Imposing draconian liability under those circumstances deprives the lawful-travel exemption of any practical effect.

### 2. HDC's ahistorical efforts to void post-1996 changes to the Cuban Assets Control Regulations fail.

Unwilling to defend the district court's view and unable to change the fact that two Presidential Administrations authorized Appellants' conduct, HDC invites this Court to ignore and invalidate all post-1996 amendments to the CACR that loosen the embargo in any respect.  HDC.Br.61-67.  There is no reason to accept that dangerous invitation.  HDC's claim that Congress stripped the President of all policymaking authority vis-à-vis Cuba must be met with the greatest of skepticism.  Yet all HDC offers is a reading at odds with text, history, precedent, and common sense.

HDC insists that 22 U.S.C. §6032(h)'s reference to the "restrictions" in effect in 1996 must mean that Congress "stripped OFAC of statutory authority to relax the embargo."  HDC.Br.62 n.7.  But that zero-discretion approach makes nonsense of other provisions of the statute.  In particular, the Act provides the "sense of the Congress" as to how the President should exercise his retained discretion to reinstitute general licenses for family remittances to Cuba and "travel to Cuba by individuals resident in the United States who are family members of Cuban

23

nationals" in Cuba.  22 U.S.C. §6042.  Obviously, Congress would not provide its views on *how* the President should exercise his discretion to loosen restrictions if he had none left.

HDC's argument also misses the forest for the trees.  As HDC points out, the Act prohibits the President from "lift[ing]" the embargo without first "consult[ing] with Congress."  *United States v. Plummer*, 221 F.3d 1298, 1309 n.6 (11th Cir. 2000); *see* HDC.Br.62.  But that further proves the point:  Congress cabined the President's discretion *only as to lifting the embargo*; Congress did not disable the President from recalibrating its details in light of the shifting sands of world affairs.  Indeed, the whole concept of "lawful travel" suggests a paradigm where what is lawful can shift.  And adjusting the boundaries of lawful travel abroad falls within the heartland of the President's discretion.  *Cf. Zivotofsky v. Kerry*, 576 U.S. 1, 21-23 (2015).  That explains this Court's explicit recognition in *Odebrecht* that the Executive Branch enjoys "considerable power [] to adjust our Nation's sanctions against the Cuban Government," as "amply evidenced by the periodic tightening and loosening of sanctions related to travel."  715 F.3d at 1284-85.[6]

---

[6] This was clear in the 1996 version of the CACR itself, which incorporated considerable presidential discretion into the regulatory restrictions.  *See, e.g.*, 31 C.F.R. §515.801(b)(6) (1996) (explaining that licenses could be issued "in accordance *with such regulations, rulings and instructions* as the Secretary of the Treasury or the Office of Foreign Assets Control *may from time to time prescribe*" (emphasis added)); *id.* §515.201 (1996) (recognizing ability to authorize transactions

Indeed, this Court went further still in *Odebrecht*, recognizing that "the President has *enormous discretion to calibrate the sanctions*" regime. *Id.* at 1284 (emphasis added). HDC's position runs headlong into that statement, which was no offhand, unconsidered dictum. The Court went on to detail how "[t]he considerable discretion afforded the President has been amply evidenced by," *inter alia*, "the periodic tightening and loosening of sanctions related to travel." *Id.* And the Court specifically highlighted that "President Clinton loosened some sanctions"— including "loosening restrictions *on travel to Cuba for certain travelers*"—and that President Obama "relaxed the restrictions on travel" as well. *Id.* (emphasis added).

Obviously, this Court did not condemn all of that Presidential foreign policymaking as per se unlawful. *Contra* HDC.Br.62. To be sure, *Odebrecht* noted that the key provision on which HDC bases its argument, 22 U.S.C. §6032(h), "codifie[d] the regulatory sanctions that were in place on March 1, 1996." 715 F.3d at 1277. But it is clear on the face of the opinion that this Court *rejected* the extraordinary notion that all subsequent loosening of the regulatory regime vis-à-vis Cuba was verboten. Indeed, the Court plainly saw all the post-1996 loosening as

---

otherwise prohibited by regulations). Thus, to the extent Congress codified "the economic embargo against Cuba" circa 1996, it codified a regime of executive discretion where "the regulations have been 'alternately loosened and tightened in response to specific circumstances.'" *Odebrecht*, 715 F.3d at 1275 n.1 (quoting *Regan v. Wald*, 468 U.S. 222, 243 (1984)).

25

evidence that "Congress has reposed considerable power in the President to adjust our Nation's sanctions against the Cuban Government." *Id.* at 1284-85; *see also id.* at 1275 n.1.

Legislative history cannot redeem HDC's atextual construction. We are governed by laws, not legislators, and courts "interpret and apply statutes, not congressional purposes." *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1226 (11th Cir. 2009). To the extent some legislators (or staffers) had other intentions, *cf.* HDC.Br.61-62; Fisk.Amicus.Br.1-2, 22-25, the Constitution requires them to translate those aspirations into law replete with bicameral approval and presentment.[7]

Moreover, subsequent developments refute HDC's reading of legislative history. As noted, President Clinton loosened travel restrictions under the CACR in 1999, including for people-to-people travel. *See Odebrecht*, 715 F.3d at 1285. Yet far from repudiating that approach, Congress built upon it, enacting the Trade Sanctions Reform and Export Enhancement Act ("TSRA"), which defined unlawful tourist travel *by reference to the CACR regime that President Clinton had just recalibrated. See* 22 U.S.C. §7209(b)(2); Kucik.Amicus.Br.5-6.

---

[7] HDC's reliance on a memorandum from Cruise Lines International Association ("CLIA") is misplaced. That memorandum was only "preliminary analysis" (as it stated expressly), and it emphasized "the fluid nature of the issues and lack of clear precedent associated with the Title III issues." Carnival.Dkt.318-41 at 187, 196.

HDC tries to turn the TSRA into an ally, HDC.Br.67 n.8, but the TSRA no more disabled the President from recalibrating the sanctions regime than the Helms-Burton Act did. *See Odebrecht*, 715 F.3d at 1277 (discussing TSRA). That the President retains "considerable discretion" post-TSRA, *id.* at 1284, is underscored by the use of a general license to authorize people-to-people travel during parts of the Obama, Trump, and Biden administrations. *See* Kucik.Amicus.Br.11; *see also* Joint.Br.54 n.8. And insofar as HDC tries to capitalize on differences between specific licenses and general licenses, HDC.Br.67, that theory—one absent from its summary-judgment briefing—ignores that OFAC made clear that no such specific license was needed. *See* p.16, *supra*; Joint.Br.17. For instance, after Carnival applied for a specific license (including in its application descriptions of activities "similar to the shore excursions offered by Carnival and the other cruise lines," Carnival.Br.11), OFAC's subsequent "letter granting the carrier-services specific license stated that it was not granting a further specific license for people-to-people travel, *because the CACR already authorized people-to-people travel by general license*." NCL.Dkt.367 at 38 (citing Carnival.Dkt.326-26 at 32) (emphasis added).

HDC's unduly narrow construction of the statute would also render the "lawful travel" provision essentially superfluous. If lawful travel were limited to uses of property separately authorized by another statute or by contract or consent, then there would be no need for an express carveout. HDC's position also effectively

27

delegates management of the Cuba embargo not to the Nation's lead foreign policy official, but to a collection of property owners from the 1950s. That is why even the district court rejected HDC's radical view. NCL.Dkt.367 at 118.

But that is not the worst of it. HDC's position would steer this Court into (rather than away from) serious constitutional problems. On HDC's view, the Executive has engaged in—and Congress has simply ignored—repeated cycles of lawlessness in relaxing the sanctions regime vis-à-vis Cuba, and private parties should be left footing the bill. Instead of recognizing that "the President is acting at the zenith of his power when he exercises the discretion afforded him by Congress to direct our Nation's economic policy towards Cuba," *Odebrecht*, 715 F.3d at 1285, HDC would set the political branches at odds with each other and force the Article III courts to referee those separation-of-powers disputes, all while punishing private parties that helped fulfill the President's foreign policy with the apparent blessing (or at least acquiescence) of Congress. There is no reason to wade into that thicket— and every reason not to. Text, structure, and history all make clear that "the President has enormous discretion to calibrate the sanctions" regime embodied in the CACR not in spite of Congress' legislative efforts, but because of them. *Odebrecht*, 715 F.3d at 1284-85.

Finally, HDC's approach creates extraordinary fair-notice problems. Just about everyone who undertook conduct with respect to Cuba based on the

President's loosening of the embargo—an approach endorsed by this Court in *Odebrecht*—would suddenly become a lawbreaker facing the prospect of a massive judgment. That would obviously raise "serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Put differently, there is room for some fuzziness as to whether the President is acting with the authorization or mere acquiescence of Congress, as even Justice (Robert) Jackson would concede. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634-54 (1952) (Jackson, J., concurring). That level of imprecision and play in the joints is generally tolerable and even desirable. But before private citizens are going to be hit for treble damages for actions that appeared to all the world to be consistent with the President's foreign policy, there would need to be congressional language of the greatest clarity. The language on which HDC hinges its theory does not come close.

### 3. MSC's Cuba-to-Cuba cruises were also lawful.

**a.** It was error to find liability regarding the MSC Cuba-to-Cuba cruises given that they were purely extraterritorial and complied with the applicable laws where they took place. Joint.Br.59-60.

HDC tries to elide those key points by arguing that MSC "is subject to jurisdiction in the United States." HDC.Br.75 n.9. But that does not answer the questions of whether the Cuba-to-Cuba cruises were barred or whether they were "lawful travel" and immune from liability.

Even where "a statute provides for some extraterritorial application," courts must be careful in construing the reach of such statutes. *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 339 (2016). That caution applies with full force here. MSC's U.S. subsidiary had no involvement in the Cuba-to-Cuba cruises. MSC.Dkt.210 at 2-3. Those cruises were conducted by a foreign-flagged ship, owned by a foreign company, carrying out travel without any U.S. stops or travel in U.S. waters. And those cruises complied with the laws of all nations involved. As explained (Joint.Br.59-60), to the extent that the Act applies at all, its "lawful travel" exemption would properly be read to apply to the Cuba-to-Cuba cruises.

As this Court has held, "the Constitution withholds" from Congress power to "intrud[e] on the sovereignty of other Nations" "based solely on extra-territorial conduct when the United States was neither a party to, nor a target of, the commerce." *United States v. Davila-Mendoza*, 972 F.3d 1264, 1276-77 (11th Cir. 2020) (noting that the Foreign Commerce Clause cannot sweep in "wholly foreign" commerce).[8] The general purpose of deterring trafficking HDC cites (HDC.Br.75

---

[8] This Court need not decide where that constitutional line is because Congress, in passing the Helms-Burton Act, did not clearly cover Cuba-to-Cuba travel. *Cf. Rescue Army v. Mun. Court*, 331 U.S. 549, 569 (1947); *United States v. Weingarten*, 632 F.3d 60, 70-71 (2d Cir. 2011) ("[O]ur determination that [18 U.S.C. §2423] does not extend to travel occurring wholly between foreign nations and without any territorial nexus to the United States appropriately avoids the necessity of addressing whether such an exercise of congressional power would comport with the Constitution.").

n.9) is wholly insufficient to provide the requisite clear statement to encompass such foreign conduct or to treat the Cuba-to-Cuba travel as unlawful.

**b.** Independently, MSC's Cuba-to-Cuba cruises complied with U.S. law—and thus there is no need to reach the extraterritoriality issue—because OFAC made no findings of a CACR violation relating to the Cuba-to-Cuba travel. Indeed, OFAC never warned or found the travel was improper. Joint.Br.52-53; *see* Joint.Br.60 (MSC communicated with OFAC regarding its Cuba-to-Cuba cruises, without any indication from OFAC that such cruises violated the CACR); MSC.Dkt.357-1 at 127-34 (OFAC official stated authorization for Cuba-to-Cuba cruises was not required). As explained, *see* pp.21-22, *supra*, under the administrative-review scheme Congress prescribed, the district court had no authority to find in the first instance that MSC's travel—both U.S.-to-Cuba and Cuba-to-Cuba—was unlawful under the CACR. This by itself renders MSC's Cuba-to-Cuba travel lawful, even putting aside MSC's compliance with foreign law. *See* HDC.Br.75 n.9.

### B.    Using the Terminal at the Havana Docks Was Necessary to the Conduct of Appellants' Lawful Travel.

In trying to defend the district court's conclusion that Appellants' use of the Terminal was not "necessary" to their lawful travel, HDC lays bare just how extreme and atextual its position really is. The lawful-travel exemption states that "transactions and uses of property incident to lawful travel to Cuba" are not unlawful trafficking if such activity is "necessary to the conduct of such travel." 22 U.S.C.

31

§6023(13)(B).  The Act does not say "necessary to travel to Cuba"; it says "necessary to *the conduct* of *such* travel."  That textual choice confirms that the analysis must focus on the actual travel a defendant undertook, not just some hypothetical travel to Cuba generally.  *See* Joint.Br.62-63.  Hence, when rebuffing HDC's requests for action, the State Department explained that it "was *necessary* for the cruise lines to use" the docks.  *See* NCL.Dkt.240-27 at 5 (emphasis added).

HDC ignores all of this.  In its view, Appellants' use of the Terminal was not "necessary" simply because Appellants "did not need to dock in Havana at all to travel to Cuba."  HDC.Br.90.  That nonsensical reading leaves the lawful-travel exemption with zero work to do.  After all, Cuba consists of "an archipelago of about 1,600 islands, islets, and cays."  *Cuba*, Encyclopedia Brittanica, https://bit.ly/45Xutnw.  So, on HDC's anywhere-in-Cuba theory, it would never be "necessary" to touch Cuba's main island, let alone any specific piece of property on it, *at all*.  HDC cannot explain why Congress would go through all the trouble to create an exemption that exempts nothing, *see Farmer v. Higgins*, 907 F.2d 1041, 1044 (11th Cir. 1990) (this Court does "not assume Congress to have done a useless, ineffective, or absurd thing"), or how its null-set exemption complies with the Supreme Court's command that statutory exceptions must be given fair readings, not narrow ones, *see Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018).  At the very least, HDC's position would create a fact-intensive dispute about what

is "necessary" in every case where the lawful-travel exemption is invoked—a result that would nullify the predictable safe harbor Congress sought to create.

HDC insists on giving "necessary" its strictest possible construction, HDC.Br.88-90, but that approach suffers from many of the same problems and more, *see* Joint.Br.63-64. As noted, §6023(13)(B)(iii) exempts "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." HDC contends that the words "to the extent" are "limiting language" that require the strict definition of "necessary" here, citing a decision by then-Judge Breyer addressing a restriction on the IRS's power to investigate religious organizations' finances. HDC.Br.89-90 (citing *United States v. Church of Scientology of Boston, Inc.*, 933 F.2d 1074, 1075-79 (1st Cir. 1991)). But that decision did not purport to convert "to the extent necessary" into a term of art with a one-size-fits-all meaning; it did what all good statutory interpretation should do and read the phrase in the context of the particular statute in which it appeared. *Cf., e.g.*, *United States v. Caniff*, 955 F.3d 1183, 1189 (11th Cir. 2020) (applying the basic principle that "the meaning of a statutory term should not be 'determined in isolation,' but instead 'must be drawn from the context in which it is used'"). The context there (which included predecessor statutes and legislative history) showed that Congress (presumably sensitive to First Amendment concerns) had acted to constrain the IRS's power to dig into church records. *See*

33

*Church of Scientology*, 933 F.2d at 1076-79.  That action is lightyears away from adding an exemption designed "to remove any liability for … any activities *related to* lawful travel to Cuba."  142 Cong. Rec. H1645-02, at H1656, 1996 WL 90487 (Mar. 4, 1996) (emphasis added).  In light of that context, "necessary" has a far more flexible connotation akin to its meaning in Article I, Section 8, clause 18.

Next, HDC's assertion that Appellants' reading would render the words "to the extent" surplusage gets things exactly backwards.  HDC.Br.90.  Had Congress intended the strictest meaning of "necessary" here, it presumably would have excised the "incident to" language—since whatever that language brings in would be screened out by the strict meaning of "necessary."  And HDC's *ipse dixit* that "Congress would not have added a necessity requirement to allow putative traffickers to argue … that their use of confiscated property was 'helpful,' 'useful,' or 'convenient,'" HDC.Br.90, flips this statutory exemption inside-out.  Exemptions are just as much a part of a statute as its prohibitions, *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S.Ct. 1532, 1539 (2021), and Congress would not have crafted an exemption only to subject those engaged in lawful travel to crushing liability any time some use of confiscated property was not absolutely impossible to avoid, *cf. Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 n.13 (1984) ("To say to these appellants, 'The joke is on you.  You shouldn't have trusted us,' is hardly worthy of our great government." (citation omitted)).

Finally, HDC fleetingly argues that use of the Terminal was not necessary even for travel to Havana specifically, *see* HDC.Br.91, but the record disproves that assertion. As to the specific example HDC offers, undisputed summary judgment record shows that MSC's cruise ships were too large to dock anywhere else in Cuba with the required customs, immigration, and screening facilities. Joint.Br.64; MSC.Dkt.209 at 10-12. And when MSC tried to explore other options—including an alternative terminal *in Havana*—the Cuban government would not grant authorization to dock elsewhere. MSC.Dkt.256 at 21-22; MSC.Dkt.210-38 ¶13. More generally, Cuba rejected the cruise lines' requested docking alternatives. If this contention succeeds in doing anything, it is underscoring that the district court erred in deciding the necessity (and lawfulness) of the Appellants' travel against Appellants at summary judgment.

## III.   HDC Is Not A "United States National."

HDC is free to organize itself however it wishes and choose whoever it wants as its leader. But choices have consequences, and the choice to have Mickael Behn, HDC's president and largest shareholder, leading and controlling the company (and its campaign to recover on its certified claim in particular) from London means that HDC cannot recover under the Helms-Burton Act. *See* Joint.Br.65-69. Consistent with its link to the limited set of claims that the United States would espouse in state-to-state negotiations with Cuba, the Act provides a damages action only to U.S.

35

nationals. *See* 22 U.S.C. §6082(a)(1)(A). For a company, that means a company that has its principal place of business—or "nerve center"—in the United States. But Behn *is* HDC's nerve center, and he lives and works in England, a country with a materially different Cuba policy. The decision below granting HDC summary judgment on this issue defies statutory text and geographic reality.

### A. HDC Is Not a "United States Citizen."

Unable to disprove that Behn leads the company, *see* Part III.B, *infra*, HDC boldly claims that Behn's role makes no difference. The Helms-Burton Act defines "United States national" disjunctively as "any United States citizen," 22 U.S.C. §6023(15)(A), or "any other legal entity which is organized under the laws of the United States, or of any State … and which has its principal place of business in the United States," *id.* §6023(15)(B). HDC argues that subsection (A) ("any United States citizen") includes not just natural persons with U.S. citizenship, but domestic corporations too, since the latter can be "deemed to be a citizen" of their state of incorporation for diversity-jurisdiction purposes. The problems with this argument are manifest.

Whatever one might think about HDC's theory if §6023(15)(A)'s reference to "citizen" stood alone, it does not stand alone; it is part of a disjunctive definition, with half of the definition specifically focused on artificial entities like corporations. HDC's reading ignores the specificity with which §6023(15)(B) addresses artificial

entities and their principal place of business, and it would render the second half of the definition largely superfluous. Thus, in context, §6023(15)(A)'s reference to a "citizen" employs the ordinary meaning of the term "citizen" as "[s]omeone who, by either birth or naturalization, is a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections." *Citizen*, Black's Law Dictionary (11th ed. 2019). That ordinary meaning excludes artificial entities like corporations, which are neither born nor naturalized. That is presumably why there is a second half to the definition specifically focused on artificial entities and their places of business.

HDC suggests that subsection (B)'s reference to "*other* legal entities" must mean that at least *some* corporations are within subsection (A). HDC.Br.93. While that argument has some superficial appeal, its flaws run deep. Natural persons can sometimes be considered legal entities—especially in the context of defining who can sue and be sued. *See, e.g.*, 59 Am. Jur. 2d Parties §24 (2023) (listing "natural persons" among the "classes of legal entities with the inherent power to sue and be sued"). Alternatively, "other" may just underscore the disjunctive nature of the definition, and that there is another way to come within the statutory definition.

The Act's definition of "United States national" thus is naturally read to refer to two separate kinds of parties: (A) American natural persons; and (B) American companies—"[i]n other words, U.S. citizens and U.S. corporations," respectively.

*Odebrecht*, 715 F.3d at 1282-83 n.5.[9]  That is perfectly reasonable—as is precluding "some certified claim holders from recovering under the LIBERTAD Act."  *Contra* HDC.Br.95.  Companies can quite easily relocate their business abroad post-certification and thus negate the United States' interest in espousing their claims through government-to-government negotiations.  *See* Joint.Br.65.

HDC tries to invoke other statutes to suggest that Congress wanted to lump corporations into subsection (A), *see* HDC.Br.93, but its string-cite just shows that, in this area of law, Congress consistently distinguishes between U.S. nationals who are flesh-and-blood people and those that are not.  Every provision HDC cites has a citizen subset (which includes only natural persons) and a company subset (which includes criteria related to a company's place of organization and ownership by U.S. citizens or nationals).  *See, e.g.*, 22 U.S.C. §1641 (defining "national of the United States" as "a natural person who is a citizen of the United States, or … (B) a corporation or other legal entity which is organized under the laws of the United States, [or] any State … if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum [or more] of the outstanding capital stock …");

---

[9] Likely for that reason, HDC did not allege that it was a "United States national" under §6023(15)(A) until summary judgment.  In all its operative pleadings, HDC claimed to be "a U.S. National *under 22 U.S.C. §6023(15)(B)*."  *E.g.*, RCCL.Dkt.46 at ¶1 (emphasis added).  If HDC now finds itself "relegated to subsection (B)," HDC.Br.96, that is because the Act (and its own pleadings) put it there.

*id.* §§1642(1), 1643(a)(1), 1644a(1), 1645a(1) (similar); *cf.* 50 U.S.C. §4131(c) (similar, save that natural persons are subdivided between citizens and those owing permanent allegiance to the U.S.); 19 U.S.C. §4452(f)(7) (similar, for "United States person").  Instead of assuming that Congress meant to sneak corporations into the citizen-subset here *and here alone*, the far better reading of the Act is that Congress did here what it did elsewhere.  After all, it is this Court's "role to make sense rather than nonsense out of the *corpus juris*."  *In re Coffman*, 766 F.3d 1246, 1250 (11th Cir. 2014) (quoting *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991)).

Finally, HDC cannot remedy the defects in its reading by pointing to statements from the Act's opponents.  *See* HDC.Br.95.  The "fears and doubts of the opposition are no authoritative guide to the construction of legislation," *Bryan v. United States*, 524 U.S. 184, 196 (1998), as "[i]n their zeal to defeat a bill, they understandably tend to overstate its reach," *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 585 (1988).  HDC's felt-need to resort to critics' arguments as evidence that the Act (mal)functions in this way reflects the weakness of its argument.  HDC is not a U.S. citizen; it is a corporation—and its nerve center is across the pond, as explained below (and at Joint.Br.65-69).

## B.  Granting HDC Summary Judgment on the Principal-Place-of-Business Question Was Reversible Error.

Although its arguments about §6023(15) make no sense and have no basis in the statute, HDC's eagerness to avoid the principal-place-of-business question is

39

understandable, as its position requires insisting that no rational jury could think that its president, Mickael Behn, is *actually* in charge.  *See* HDC.Br.96-105.

To find a company's principal place of business, courts look to where its "officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).  Unlike the state of incorporation, a company's principal place of business cannot be determined by looking to pieces of paper alone. Indeed, the Supreme Court has explicitly recognized the dangers of allowing "the mere filing of a form" with a company's preferred address on it to show a company's nerve center, as that approach "would readily permit jurisdictional manipulation." *Id.* at 97.  For that reason, the mere fact that HDC lists a bank in Lexington, Kentucky (where its other director, Jerry Johnson, works) "as its headquarters in every document," is hardly dispositive.  *Contra* HDC.Br.97-99.  What matters is *who* is in control—and from *where* that person exercises control over the company.

The answer to those questions here are "Mickael Behn" and "London, England," respectively.  HDC does not dispute that "HDC's business correspondence occurred 'largely by email and also by many telephone conversations,'" or that "many of those calls or e-mail exchanges occurred when Behn was 'in London.'" Joint.Br.67 (quoting NCL.Dkt.237-32 at 40:14-41:9).  Perhaps HDC thinks these facts are irrelevant—but as the Supreme Court presciently observed in *Hertz*, "in this era of telecommuting, some corporations may divide their command and

40

coordinating functions among officers who work at several different locations, perhaps communicating over the Internet." 559 U.S. at 95-96. That describes the facts here to a T. Indeed, for all its talk of its old Kentucky home, HDC never acknowledges that Behn *has not set foot in Kentucky since childhood*. *See* NCL.Dkt.367 at 26.

Nor does HDC respond to Appellants' argument detailing why the district court erred in focusing on Johnson's role in "the day-to-day business decisions" that are decidedly not relevant under *Hertz*, NCL.Dkt.367 at 102. *See* Joint.Br.67-68. HDC never even acknowledges, much less refutes, that point. It instead tries to repackage the same facts as proof that HDC's nerve center must be with Johnson in Kentucky. *See* HDC.Br.101-02. But the reality remains that a "corporation's day-to-day operations are not relevant to the nerve center test under *Hertz*." *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 172 (4th Cir. 2014) (quotation marks and alterations omitted). Similarly, HDC tries to dismiss the highly inconvenient fact that it is not registered to do business in Kentucky, HDC.Br.104 n.13, but that is yet one more reason a jury might think that HDC's nerve center is not where Johnson handles HDC's day-to-day business decisions, but instead lies with its president in London.

HDC tries to head off that line of thinking by arguing that its bylaws and Behn's "formal title and authority" are effectively ceremonial, having no bearing on

how HDC is actually run.  HDC.Br.100-01.  But there is nothing improper about considering a company's chain of command and binding bylaws when analyzing its nerve center; after all, such governance documents exist to set forth a company's mechanism for governing itself.  And HDC never denies that, under its bylaws, Behn is supposed to be in charge.  *See* Joint.Br.65.

And the record confirms that Behn exercises decisionmaking authority for HDC.  First, he picked Johnson to serve as a director.  *See* Joint.Br.65-66.  Moreover, Behn's leadership was especially key with respect to HDC's campaign to publicize and vindicate its LIBERTAD claim.  *See* Joint.Br.66; MSC.Dkt.357-17 at 155-60 (email exchanges with reporter regarding press coverage); *see also* Reed Lindsey & Daneil Montero, *Billboards and Backchannels: Deep Inside the Lobbying Campaign to Crush Investment in Cuba*, Miami New Times (Sept. 8, 2023), https://bit.ly/3Qza3Nc (discussing Behn's activity in advocating for Title III's suspension to be lifted and noting that an HDC ally "attributes Title III's implementation to his and Behn's lobbying efforts and their publicity campaign").  Given that HDC recognizes that recovering on its claim is its very reason for being, *see* HDC.Br.99, Behn's leadership on that front is all the more reason to think that he is the company's "brain," *see Hertz*, 599 U.S. at 95.

At a minimum, the district court should not have granted summary judgment here, a point HDC only briefly and obliquely responds to.  *See* HDC.Br.103-04.  In

so doing, HDC tries to attribute some significance to the fact that the parties cross-moved for summary judgment.  HDC.Br.103-04.  But this Court has long recognized that there can be "questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist." *Griffis v. Delta Fam.-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984).  Tellingly, HDC does not even try to engage the argument that the district court misapplied the summary-judgment standard in multiple respects here.  *See* Joint.Br.68-69.  Presumably that is because there is no real way to argue that the district court "consider[ed] the evidence in the light most favorable to the" Appellants or drew inferences in their favor.  *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).  So if the Court does not reverse on this basis (which it should, for the reasons discussed above), the Court at the very least should vacate and remand for a jury to decide the principal-place-of-business question.

## IV.   Appellants Lacked The Requisite Scienter.

Appellants lacked the scienter necessary for liability under the Act, as they did not knowingly and intentionally traffic in the confiscated property of a U.S. national.  *See* Joint.Br.69-75.  The district court reached the opposite conclusion by artificially limiting the scope of the Act's scienter requirement and ignoring its own triple-take on the property issue—which, at a minimum, shows that Appellants acted in accord with a reasonable reading of the law and facts here.  *See* Joint.Br.75.

43

HDC's contrary arguments underscore its effort to construct a statute of impossible scope and draconian consequences. HDC first argues that the Act requires only knowing and intentional *commercial activity* involving some piece of property in Cuba that is somehow linked to a certified claim. HDC.Br.106-07. By that logic, so long as they were not forced into the Terminal by a tempest, Appellants are unlawful traffickers and can be on the hook for nine-figure judgments. HDC also alternatively argues (for the first time) that giving the Act's scienter provision a more realistic reading would do Appellants no good, on the theory that they are estopped from contesting scienter. HDC.Br.109-11. Both arguments fail.

First, Appellants' interpretation is no "manifest distortion of the statute's plain language." HDC.Br.106. The definition of trafficking puts "knowingly and intentionally" before a series of acts—all of which themselves relate to "confiscated property"—and then concludes with reference to a lack of authorization from relevant U.S. nationals. *See* 22 U.S.C. §6023(13)(A). It would make no sense to find trafficking in the absence of scienter as to property's confiscated status or a U.S. national's status; both those terms follow the knowledge-and-intent requirement, and are part and parcel of the definition of trafficking.

Moreover, while HDC demeans the lower-court decisions that cut against it, *see* HDC.Br.108-09, it cannot point to a single decision adopting the district court's exceedingly narrow view of the scienter requirement. That may explain, but does

not excuse, HDC's argument (at HDC.Br.108) that *Ruan v. United States*, 142 S.Ct. 2370 (2022), and all the other cases Appellants cited are irrelevant. In civil law no less than criminal law, "Congress often wishes to punish only those who intentionally break the law." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 98 (4th Cir. 2013). That is especially so here, where a complex statutory and regulatory scheme permits lawful travel but imposes extraordinary punishments—from treble damages to exclusion—for unlawful trafficking. *See* Joint.Br.70-75. And as to both the status of HDC's confiscated property and its status as a U.S. national, an objectively reasonable view of the facts and law supported Appellants' conduct. *See* Joint.Br.74-75.

At a minimum, the cramped view of scienter pushed by HDC and adopted by the district court raises profound due-process concerns. The American legal order requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). If a federal court—equipped with multiple rounds of adversarial briefing—can reach one conclusion, reverse itself 180 degrees, and then spin around once more, those fair-notice concerns provide good reason to avoid HDC's watered-down scienter standard, which raises "serious constitutional doubts" by imposing devastating consequences for guessing wrong. *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1270 (11th Cir. 2014).

Yet HDC insists that an objectively reasonable view of the law is irrelevant, invoking *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023). *See* HDC.Br.109-110. That reads far too much into far too little. To be sure, *SuperValu* clarified the scienter required under the False Claims Act. But that is all it did. And unlike the Helms-Burton Act, the False Claims Act does not countenance such extraordinary punishments as permanent exclusion or expulsion from the country.

Finally, HDC tries to convert a privilege fight that it lost into a total victory on scienter by injecting a new estoppel issue. *See* HDC.Br.109-11. But when Appellants all raised various scienter arguments (*e.g.*, as to the scope of HDC's confiscated property and U.S. national status) at summary-judgment below, HDC said not a word about estoppel in its oppositions, *see* NCL.Dkt.285 at 18-19; MSC.Dkt.258 at 19-21; RCCL.Dkt.182 at 18-21; *cf.* NCL.Dkt.367 at 90-98 (addressing scienter without mentioning estoppel). Having waited until its appellate brief to raise the issue, HDC forfeited the point. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). And it has not even attempted to explain what "extraordinary circumstances" justify consideration of the issue now. *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc).

## V. Trafficking Is Foreclosed As To MSC's Cuba-to-Cuba Cruises Because The Claims Are Time-Barred.

HDC cannot elide that its Cuba-to-Cuba claims against MSC are time-barred. *See* Joint.Br.76-78. *Contra* HDC.Br.112-13, the only way this Court could avoid the

46

issue would be to reverse for reasons that eliminate liability across the board (for all cruise lines)—namely, (1) HDC's limited property interest; (2) the cruise lines' lawful travel; (3) HDC's lack of U.S.-national status; or (4) the cruise lines' lack of the requisite scienter.  Liability is properly reversed for any one of those reasons. But absent such a dispositive ruling, this Court must reach the Cuba-to-Cuba issue.

Doing so is hardly advisory, as HDC argues.  HDC.Br.112.  The district court found MSC liable based on both its U.S.-to-Cuba and its Cuba-to-Cuba cruises.  *See* NCL.Dkt.367 at 85-86.  Thus, unless the Cuba-to-Cuba liability finding is otherwise reversed, this Court must reach the issue as to whether those claims are time-barred.

In trying to argue it raised the Cuba-to-Cuba claims in its earlier pleading (which would have been timely), HDC falls back on the vague pleading of its second amended complaint, relying on the phrase "including the cruises to Cuba from Miami."  HDC.Br.113-14 (emphasis omitted).  But the language "including … to Cuba from Miami" is plainly not addressing travel "to Cuba, from Cuba."  *See* Joint.Br.76-78.  HDC's only stated reason for filing the second amended complaint was that it had previously neglected to sue MSC's parent company, MSC Cruises SA, and therefore sought to "add MSC Cruises SA as a defendant," which HDC itself said operated "cruises *from Miami, Florida to Cuba*."  MSC.Dkt.99 at 1-2, 4 (emphasis added); *contra* HDC.Br.114.  Thus, the second amended complaint did not cover Cuba-to-Cuba travel, and HDC's efforts at summary judgment to include

47

those claims after the limitations period had already run should have been rejected. *See* Joint.Br.76; *Simmons v. United States*, 421 F.3d 1199, 1200 (11th Cir. 2005).[10]

Notably, HDC fails to respond to MSC's argument that the Cuba-to-Cuba cruises happened at "different times" and involved "separate and distinct conduct" from the U.S.-to-Cuba cruises. *See* Joint.Br.76-77; *Moore v. Baker*, 989 F.2d 1129, 1132 (11th Cir. 1993). This is fatal. The Cuba-to-Cuba cruises require HDC "to prove completely different facts than" the U.S.-to-Cuba cruises. *Id.* Because HDC never pled such cruises, HDC cannot "relate back to the [operative] complaint" to make them timely. *Id.* The district court's contrary conclusion requires reversal. *Young v. New Process Steel, LP*, 419 F.3d 1201, 1203 (11th Cir. 2005) (an error of law "is by definition an abuse of discretion").

## VI.    The District Court Awarded Excessive Damages.

If this Court upholds liability, it at least should reduce the excessive and unsupported damages awards. The district court allowed HDC to parlay a limited property interest valued at $9.2 million into a $440-million recovery. Neither the Act nor due process countenance that extraordinary windfall. *See* Joint.Br.78-85;

---

[10] As explained (Joint.Br.77-78), the parties agreed to limit discovery to exclude Cuba-to-Cuba cruises. *See* MSC.Dkt.171 at 6 ("HDC voluntarily chose not to seek information beyond US-Cuba cruises." (emphasis omitted)). HDC evinced no intent to plead Cuba-to-Cuba cruises in the second amended complaint. Indeed, HDC planned to file a *third* amended complaint "intended to clarify that MSC's … homeport operations … are within the scope of this case." MSC.Dkt.171-11 at 3. HDC, however, never made that amendment. MSC.Dkt.256 at 4.

Chamber.Amicus.Br.7-31.  Yet HDC not only endorses that result, but embraces the prospect that it could receive an *unlimited* stream of such awards in the future—an implausible notion that underscores that HDC's interpretation cannot be correct.

### A.    The Act Does Not Authorize the Damages Awards.

The district court's damages decision reflects two significant errors of statutory interpretation:  (1) improperly permitting duplicative recoveries for the same injury, and (2) mistakenly trebling interest.

**1.** As relevant here, Congress defined the measures of damages for unlawful trafficking by reference to the amount of a plaintiff's certified claim, *i.e.*, the value of the confiscated property.  22 U.S.C. §6082(a)(1)(A)(i)(I).  For damages purposes, the Act thus treats the injury to be remedied as the confiscation of the property.  And under well-accepted principles, a plaintiff is entitled to one recovery for such an injury—no more.  *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008).  The Act's most natural reading is thus that HDC may recover the full value of its certified claim as damages for the asserted trafficking—not that full value over and over again *ad infinitum*.  *See* Joint.Br.79-82; Chamber.Amicus.Br.23-27.

HDC observes that the background one-satisfaction rule does not appear in the statutory text.  HDC.Br.117-18.  But that is true by definition of all background rules, and courts nevertheless frequently consult them in construing federal statutes.

49

*See, e.g.*, *Staples v. United States*, 511 U.S. 600, 619 (1994).  HDC then cites provisions of the Act that prevent other duplicative recoveries.  HDC.Br.118-19.  But that hardly suggests Congress *authorized* duplicative recoveries in the Act's core private damages provision.  *See* Joint.Br.80-81.  Indeed, HDC seems to concede that its position gives greater protection against duplicative judgments to the *Cuban Government* than to U.S. defendants.  HDC.Br.119.  That verges on the absurd.

HDC separately contends that the one-satisfaction rule "does not apply here by its own terms" because it suffered a separate injury every time one of the cruise lines used the Terminal.  HDC.Br.120.  While that theory of harm may suffice for Article III standing, *see* HDC.Br.121, it is a blatant mismatch for statutory recovery in the full amount of certified claim.  *See* 22 U.S.C. §6082(a)(1)(A)(i)(I).  Indeed, even HDC shies away from the logical consequences of its position, which would call for it to receive the full value of its certified claim (trebled) for each of the hundreds of times that cruise ships used the Terminal—a result that would transgress even the narrowest understanding of due process.

HDC insists that such duplicative damages are necessary to fulfill the Act's deterrent purposes.  HDC.Br.123-24.  But under the one-satisfaction rule, any future traffickers would be liable for contribution to those who paid HDC's initial judgment (*i.e.*, Appellants).  *See* Restatement (Second) of Torts §886A (1979) (discussing familiar contribution rule among jointly-liable defendants).  Moreover, Title IV of

the Act, the Trading with the Enemy Act, and the CACR all authorize severe civil and, in some cases, criminal penalties—along with potential exclusion or expulsion from the United States—for unlawful commercial activity in Cuba.  *See* 22 U.S.C. §6091; 50 U.S.C. §4303(a); 31 C.F.R. §501.701.  Deterrence hardly requires HDC's unlimited-damages reading.

**2.** The district court also erred by trebling not only the entire value of HDC's certified claim, but the interest on that amount.  *See*  Joint.Br.82-84; Chamber.Amicus.Br.15-16.  Trebling the interest increased the award against each cruise line by roughly $54 million, nearly half of the $110-million individual awards (and thus nearly $220 million in total)—an astounding example of the tail wagging the dog.  NCL.Dkt.452 at 2-3.  Statutory text does not compel that counterintuitive result, and it is foreclosed by well-established damages principles that even HDC does not dispute.

The Act's treble-damages provision states that the "amount" to be trebled is "the amount determined applicable under paragraph (1)(A)(i)."  22 U.S.C. §6082(a)(3)(C).  The portion of "paragraph (1)(A)(i)" that HDC asserts is "applicable" is subclause (I), which references "the amount … certified to the claimant by the [FCSC] … , *plus interest*," *id.* §6082(a)(1)(i)(I) (emphasis added).  That provision plainly differentiates between the applicable "amount" of damages

(the amount of the certified claim) and the separately awarded "interest."  Thus, the

trebling provision applies to the damages, but not to the separately stated "interest."

HDC responds by asserting that "the Act sets baseline damages by reference

to a claim's *present value*, which includes interest."  HDC.Br.125.  But the phrase

"present value" appears nowhere in the text, and HDC cites no authority for its

extratextual adoption.  HDC also observes that the word "amount" appears not only

in subclause (I) of paragraph (1)(A)(i), but also in the introductory clause of

paragraph (1)(A)(i).  HDC.Br.126.  But the most that shows is that the "amount"

subject to trebling under §6082(a)(3)(C) could refer to *either* the introductory clause

of paragraph (1)(A)(i) *or* the particular subclause on which HDC relies.  And the far

more natural reading is that "the amount … applicable under paragraph (1)(A)(i),"

*id.* §6082(a)(3)(C)(ii), is the particular amount HDC claims to be applicable for its

damages claim—*i.e.*, "the amount … certified to the claimant by the [FCSC]," *id.*

§6082(a)(1)(i)(I).  After all, "a specific statutory provision trumps a general one."

*Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009).  That reading is

confirmed, moreover, by 22 U.S.C. §6082(b), which describes the "amount" that

may be "tripled as provided in [§6082(a)(3)]" by reference to "the applicable amount

under subclause (I), (II), or (III) of [§6082(a)(1)(i)]"—not the introductory clause of

§6082(a)(1)(i).

Any ambiguity here should be resolved by interpreting the Act to conform with—rather than contradict—the well-established rule that prejudgment interest is typically not included for statutory treble damages. *See* Joint.Br.82-83; Chamber.Amicus.Br.15-16. It is bedrock law that "[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered," not to punish or deter. *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987); *see Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987). HDC offers no good reason to conclude that Congress departed from that rule here. *See* HDC.Br.126-27.

## B. If the Act Does Require $440 Million in Damages, Due Process Compels Reduction.

At minimum, the Court should reduce damages to comply with due process. *See* Joint.Br.84-85; Chamber.Amicus.Br.7-22.

HDC attempts to portray the application of due process principles to statutory damages as a toothless vestige of the *Lochner* era. HDC.Br.127-28. That is wishful thinking. Courts continue to apply the Due Process Clause to statutory damages awards where the contrary result would be wholly disproportionate and obviously unreasonable. *See, e.g.*, *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022). To be sure, reductions of statutory damages under due-process principles are reserved for exceptional cases. But if the one-satisfaction rule is discarded, this becomes such a case: The district court awarded $440 million in damages on a

certified claim valued by the FCSC at roughly $9 million. Allowing for statutory trebling and interest, the value of the claim is about $54 million. HDC thus defends total damages between eight and nine times the plausible value of its claim—which far exceeds the 4:1 ratio that the Supreme Court has identified as "close to the line of constitutional impropriety" for *punitive* damages. *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408, 425 (2003).

That conclusion only becomes clearer when the damages are viewed through HDC's preferred lens, as compensation for each separate act of trafficking. *See* HDC.Br.123. HDC does not estimate the harm it suffered from each such act, but the amount can only be a fraction of the total claim's value. The ratio between statutory damages and harm is thus even more egregiously lopsided under HDC's theory. In the end, the reason HDC lacks any coherent theory for its windfall damages awards is that none exists.

# CONCLUSION

This Court should reverse the judgments below, or at a minimum, vacate them and remand for further proceedings.

Respectfully submitted,

<div style="display:flex">
<div>

/s/ Derek L. Shaffer
DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
JONATHAN G. COOPER
NICHOLAS J. CALUDA
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel for Defendants-Appellant
Norwegian Cruise Line Holdings Ltd.*

ROBERT M. LOEB
ROBBIE MANHAS
JONAS Q. WANG
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20015

ANDREW T. HERNACKI
JUSTIN B. NEMEROFF
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001

</div>
<div>

/s/ Paul D. Clement
PAUL D. CLEMENT
MATTHEW D. ROWEN[*]
CHADWICK J. HARPER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellant
Royal Caribbean Cruises, Ltd.*

/s/ E. Joshua Rosenkranz
E. JOSHUA ROSENKRANZ
KATHERINE MUNYAN
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
Columbia Center
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

</div>
</div>

*Counsel for Defendants-Appellants
MSC Cruises S.A. Co., MSC Cruises (USA), Inc., and MSC Cruises, S.A.*

November 20, 2023

## CERTIFICATE OF COMPLIANCE

1.  This brief contains 12,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

November 20, 2023

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement