[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10151

_____

HAVANA DOCKS CORPORATION,

Plaintiff-Appellee,

*versus*

ROYAL CARIBBEAN CRUISES, LTD.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23590-BB

_____

_____

No. 23-10171

_____

HAVANA DOCKS CORPORATION,

Plaintiff-Appellee
Cross Appellant,

*versus*

ROYAL CARIBBEAN CRUISES, LTD.,
NORWEGIAN CRUISE LINE HOLDINGS, LTD.,
CARNIVAL CORPORATION,
a foreign corporation doing business as
Carnival Cruise Lines,
MSC CRUISES S.A. CO.,
MSC CRUISES (USA), INC., et al.,

Defendants-Appellants
Cross Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23591-BB

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

JORDAN, Circuit Judge.

Title III of the Cuban Liberty and Democratic Solidarity Act, known as the Helms-Burton Act, provides a private cause of action for certain U.S. nationals against anyone who "traffics" in "property which was confiscated by the Cuban Government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1)(A). For over 20 years, Title III of the Act remained dormant because the right to bring an action under Title III was suspended by Presidential decree. *See* 22 U.S.C. § 6085(c)(1)(B) (granting the President the authority to suspend the right to bring an action under Title III if, among other things, the President determines the suspension is "necessary to the national interests of the United States and will expedite a transition to democracy in Cuba"). Title III has been fully effective since May of 2019, *see Garcia-Bengochea v. Carnival Corp.*, 57 F. 4th 916, 920 (11th Cir. 2023), and trafficking cases filed since then have posed a number of issues of first impression.

In these consolidated cases, the district court entered Title III judgments of over $100 million against each of four cruise lines (Royal Caribbean Cruises, Norwegian Cruise Line Holdings, Carnival Corporation, and MSC Cruises) for trafficking in the confiscated property of Havana Docks at the Port of Havana (now known as the Havana Cruise Port Terminal) from 2016 to 2019. The court ruled at summary judgment that the cruise lines had engaged in trafficking by having their ships dock at the Terminal and

one of its piers, by using that property to embark and disembark passengers, and by having that property serve as the starting and ending point for shore excursions for cruise travelers. *See Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088, 1153–55 (S.D. Fla. 2022).

Havana Docks' confiscated property, however, was not a fee simple ownership interest in real property at the Port of Havana. It was, instead, a 99-year usufructuary concession that would have expired in 2004 were it not for the Cuban Government's expropriation in 1960. So we must decide whether the cruise lines engaged in trafficking under Title III when they used the Terminal and one of its piers from 2016 to 2019.

After a review of the record, and with the benefit of oral argument, we hold that Havana Docks' limited property interest had expired, for purposes of Title III, at the time of the alleged trafficking by the cruise lines. We therefore set aside the judgments in favor of Havana Docks and remand for further proceedings as to its other claims against Carnival.[1]

## I

These cases come to us in a summary judgment posture. That means we view the evidence in the light most favorable to the cruise lines and determine whether Havana Docks was entitled to summary judgment on its trafficking claims as a matter of law

---

[1] Given our resolution, we need not and do not address other issues raised by the cruise lines.

under Rule 56. *See, e.g., Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Benning v. Comm'r, Ga. Dept. of Corr.*, 71 F. 4th 1324, 1328 (11th Cir. 2023).

## II

Title III allows a "[U.S.] national who owns the claim to [confiscated] property" to bring an action for trafficking. *See* 22 U.S.C. § 6082(a)(1)(A). The district court ruled, at summary judgment, that Havana Docks is a U.S. national under Title III and could therefore assert claims for trafficking. *See Havana Docks*, 592 F. Supp. 3d at 1161–65. The cruise lines contend that this constituted error, but we disagree.

Under Title III a U.S. national is "(A) any United States citizen" or "(B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." 22 U.S.C. § 6023(15)(A)–(B). It is undisputed that Havana Docks satisfies the first part of this second definition, as it is (and has been) organized under the laws of Delaware since the early part of the 20th century. The parties' main dispute centers around Havana Docks' principal place of business. Because we agree with the district court that Havana Docks is a U.S. national under § 6023(15)(B), we need not address § 6023(15)(A).

Havana Docks was incorporated in Delaware in 1917 and was a U.S. national in 1960 when the Cuban Government expropriated its usufructuary concession. Indeed, its corporate nationality

was a significant reason for the confiscation. *See In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Proposed Decision, at 2 (Apr. 21, 1971) (later finalized in *In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Final Decision (Sept. 28, 1971)); Carnival D.E. 73-8 at 6. *See also* Ada Ferrer, Cuba: An American History 347–48 (2021) (describing the Castro regime's expropriation of assets and property belonging to U.S. nationals and U.S. companies in the 1960s).

For purposes of diversity jurisdiction under 28 U.S.C. § 1332(c)(1), the principal place of business of a corporation is its "nerve center." "[I]n practice" that is "normally . . . the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.,* the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010). A corporation's nerve center is a "single place." *Id.*

Although *Hertz* was a diversity jurisdiction case, we think its nerve-center test should apply to determine a company's principal place of business for purposes of § 6023(15)(B) of Title III. Both § 1332(c)(1)—the diversity provision at issue in *Hertz*—and § 6023(15)(B)—the Title III provision at issue here—use the term "principal place of business," and *Hertz* manifests a preference for "simple jurisdictional tests." *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1071 (11th Cir. 2012).

Here's how the district court described the record evidence on the issue of Havana Docks' principal place of business:

> The only corporate address associated with Havana Docks is in Lexington, Kentucky. Havana Docks has only two functions: to exist and manage its income-producing assets. Indeed, Havana Docks has no employees. [Jerry] Johnson, who operates out of Kentucky, is tasked with performing both of those functions. It is undisputed that [Mr.] Johnson has performed duties to, among other things, maintain Havana Docks' corporate status active and in good standing; coordinate the filing of Havana Docks' taxes; and maintain Havana Docks' ledger, balance sheets, [and] income statements.
>
> Mickael Behn, Havana Docks' President, testified that "[a]ll decisions are executed by [Mr.] Johnson, and that Johnson could do "[p]retty much everything" without his input. [Mr.] Behn added that [Mr.] Johnson "has authority . . . to do what he needs to do for Havana Docks. It's a certified claim. And to keep the company running." [Mr.] Johnson similarly testified that although he reports to [Mr.] Behn as President, [he] is "largely responsible" for "the day-to-day business decisions for Havana Docks." [Mr.] Johnson further stated at deposition that [Mr.] Behn does not conduct any Havana Docks business in England.

*Havana Docks*, 592 F. Supp. 3d at 1163–64 (record citations omitted).

The cruise lines base their challenge on the fact that Mr. Behn lives in London, England. In their view, Mr. Behn directs Havana Docks' corporate affairs from there—for example, approving Mr. Johnson's hiring of an accountant and counsel—and as a result the company's "nerve center" is located outside of the United States. *See* Joint Br. for RC, NCL, and MSC Cruises at 65–69; Br. for Carnival at 46–60. We see things differently.

We first consider the "nature of [Havana Docks'] activities, as it is difficult to locate a corporation's brain without first identifying its body." *Johnson v. SmithKline Beecham Corp.*, 724 F. 3d 337, 356 n.21 (3d Cir. 2013). In this respect Havana Docks' only purposes are to maintain its corporate existence and manage its income-producing assets (e.g., its Title III trafficking claims). We must therefore look to where those activities are "controlled and directed." *Id.* Mr. Johnson, though an unpaid director, keeps Havana Docks' corporate status active and in good standing, coordinates the filing of Havana Docks' taxes, and maintains Havana Docks' ledger, balance sheets, and income statements. And he does all of those things in Kentucky, the place where Havana Docks has its only corporate address.

That Mr. Behn made some strategic corporate decisions from London does not call for that location to be Havana Docks' nerve center. Mr. Johnson made decisions about "paying taxes, investments, administration . . . [p]retty much everything." Carnival D.E. 508-17 at 39. Indeed, Mr. Behn testified that Mr. Johnson has full "authority" and "autonomy" to keep Havana Docks going and

to protect its certified claim.  *See id.*; NCL D.E. 279-1 at 8.  For his part, Mr. Johnson testified without contradiction that he could "bind the company" on any decision without Mr. Behn's authorization.  *See* Carnival D.E. 318-2 at 21.

The cruise lines point to evidence indicating that Mr. Behn could override Mr. Johnson if the two disagreed, but there is no evidence that there has been any such disagreement on a matter of importance.  The nerve center test, as articulated in *Hertz*, focuses on the actual management of a company and not theoretical possibilities.  *See Hertz*, 559 U.S. at 80 (explaining that the focus is on the "place where the corporation's high-level officers direct, control, and coordinate the corporation's activities").  *See also* 13F Arthur R. Miller, Fed. Prac. & Pro. § 3625 (3d ed. & June 2024 update) ("If . . . managerial control, as well as the company's actual operations, is dispersed among several states or is located in the same state as the executive offices, then there is a substantial amount of judicial precedent for the proposition that the site of executive and administrative offices should be relied upon to determine a corporation's principal place of business for purposes of diversity jurisdiction.").

The fact that Havana Docks is not registered or licensed to do business in Kentucky does not tip the scales in favor of England as the company's principal place of business.  That is because Havana Docks does not do any substantive business and because it is also not registered or licensed to do business in England.  At best, this matter is a wash.

In sum, Havana Docks is incorporated in Delaware and has its principal place of business—its nerve center—in Kentucky. On this record, no reasonable jury could have found otherwise. The district court correctly ruled that Havana Docks is a U.S. national under Title III.

## III

Havana Docks is the owner of an interest in, and claim to, certain commercial waterfront real property in the Port of Havana (now known as the Havana Cruise Port Terminal). Here's what that property interest consists of and how it came to be.

### A

In 1905, the Cuban Government issued Decree No. 467 granting a concession to Compañia del Puerto (as the successor to the interest of Sylvester Scovel) for a 50-year term. The concession, issued pursuant to the provisions of the Law of Public Works and the Law of Ports, allowed Compañia del Puerto to build at its own expense a pier at the Port of Havana—which constituted state property—under the control and supervision of the Cuban Government. The pier, which was to have mechanical installations, was to be used in the docking, loading, and unloading of vessels. Once the construction was completed, Compañia del Puerto could operate a cargo service on the premises subject to the regulations, fees, and tariffs of the Cuban Government. The concession granted Compañia del Puerto a "usufruct" in certain public areas on which the installed works were located, and in the public spaces between the streets that were established as public thoroughfares

between certain jetties.  *See Havana Docks*, 592 F. Supp. 3d at 1121
(quoting Carnival D.E. 73-3 at 3); Carnival D.E. 331-1 at 7–8, 10, 14
(Declaration of Ambar Diaz, Esq.); Decree No. 467, Condition No.
4 Nov. 29, 1905, Gaceta Oficial [G.O.] (Cuba).  *See also* Carnival D.E.
331-4 at 12 (English translation of Decree No. 467).[2]

  In civil law or mixed law jurisdictions, a "concession" is a
"franchise, license, permit, [or] privilege[.]" Henry Saint Dahl,
Dahl's Law Dictionary 79 (3d ed. 1999).  A "usufruct" is "the right
to enjoy a thing owned by another person and to receive all the
products, utilities, and advantages produced thereby, under the ob-
ligation of preserving its form and substance, unless the deed con-
stituting [the] usufruct or the law otherwise decrees." *Id*. at 496-
97.  *Accord* 2 Butterworths Spanish-English Legal Dictionary 659
(1991) (defining "usufruct" as a "right of enjoyment of or right to
use another's property and to take the fruits therefrom without
altering its substance," and explaining that it is "[u]sually tempo-
rary and may be gratuitous or for consideration"); Black's Law Dic-
tionary 1712 (4th ed. 1951) (defining "usufruct," in "the civil law,"
as the "right of enjoying a thing, the property of which is vested in

---

[2] The concession granted to Compañia del Puerto contained a provision con-
cerning expropriation.  The provision stated that "[i]f at any time during the
term of the concession the works were to be expropriated . . . by virtue of the
application of the [Law of Ports], the Government or its agencies shall indem-
nify the concession holder for the value of all works built by the latter, includ-
ing the Customs Inspectors Department and the dock on the north side of the
jetty." *Havana Docks*, 592 F. Supp. 3d at 1121.

another, and to draw from the same all the profit, utility, and advantage which it may produce, provided it be without altering the substance of the thing").

In 1910, the Cuban Government issued Decree 1022. This law allowed Compañia del Puerto to build four piers and set an approved fee schedule for use of the piers once constructed. *See* Carnival D.E. 331-1 at 9; Decree No. 1022, Nov. 19, 1910, Gaceta Oficial [G.O.] (Cuba). *See also* Carnival D.E. 331-4 at 21–24 (English translation of Decree No. 1022).

Compañia del Puerto assigned its rights and interests under the concession to Port of Havana Docks Company. Decree No. 184 approved this assignment in 1911, with all of the terms of the initial concession remaining in place. *See* Carnival D.E. 331-1 at 9; Decree No. 184, Mar. 13, 1911, Gaceta Oficial [G.O.] (Cuba). *See also* Carnival D.E. 331-4 at 3 (English translation of Decree No. 184). In 1920, the Cuban Government issued Decree No. 1944, which amended the concession so that two of the piers would become a single pier of larger capacity for cargo handling. Decree No. 1944 also extended the term of the concession from 50 years to 99 years (with the term beginning in 1905). *See* Decree No. 1944, Dec. 13, 1920, Gaceta Oficial [G.O.] (Cuba); Carnival D.E. 331-1 at 18–19. *See also* Royal Caribbean D.E. 31-4 at 2–4 (English translation of Decree No. 1944).[3]

---

[3] In one of its submissions to the Foreign Claims Settlement Commission in 1959, Havana Docks' appraisal expert stated that the concession "'ran for 99

Under the Law of Public Works, concessions could only be granted for a maximum term of 99 years, and any rights granted to the beneficiary would expire when the fixed term ended. This meant, effectively, that the beneficiary's property at the Port of Havana would revert back to the Cuban Government at the end of the 99-year term. *See* Carnival D.E. 331-1 at 11, 18–19. *See also* Ley General de Obras Públicas de la Isla de Cuba y Reglamento Para Su Ejecucion 15 (1891), *translated in* General Law of Public Works of the Island of Cuba and Regulations for its Execution 15 (U.S. Customs and Insular Affs., War Dep't, 1899). The concession did not provide the beneficiary with exclusive rights to the piers, and the Law of Ports provided that the concession could be unilaterally terminated by the Cuban Government at any time with the beneficiary having the exclusive recourse of seeking compensation for the work performed and the materials used. *See* Carnival D.E. 331-1 at 15–16, 20–21. *See generally* Ley de Puertos de la Isla de Cuba (1890), *translated in* The Law of Ports in Force in the Island of Cuba 11-12 (U.S. Customs and Insular Affs., War Dep't, 1900).

In 1928, Port of Havana Docks Company sold all of its corporate stock to Havana Docks, which as noted was and is a Delaware corporation. The deed was notarized in Cuba that same year, and Havana Docks thereby acquired the concession at the Port of Havana. The construction of the piers finished in 1930, and four years later the Cuban Government approved the assignment of the

---

years, to the year 2004.'" Carnival D.E. 331-1 at 20 (quoting Luis Parajon's appraisal report).

concession from Port of Havana Docks Company to Havana Docks. In doing so, the Cuban Government noted that the concession's purpose was to serve the public interest. *See* Carnival D.E. 331-1 at 10.

## B

Shortly after coming to power in 1959, the Castro regime began nationalizing and expropriating property owned or held by U.S. nationals and U.S. companies. *See generally* Ferrer, Cuba: An American History, at 347–48. In 1960, through Resolution No. 3 and pursuant to Law No. 851, the Castro regime confiscated (i.e., expropriated) the concession held by Havana Docks and forcibly took possession of its premises at the Port of Havana. *See* Carnival D.E. 73-6 at 7 & D.E. 337 at 6; NCL D.E. 367 at 29–30; Law No. 851, Oct. 24, 1960, Gaceta Oficial [G.O.] (Cuba). Havana Docks has never received any compensation from the Cuban Government for the expropriation of its concession or the taking of its property. *See* Carnival D.E. 318-1 at 17.

"In response to the takings of American property in Cuba by the Castro regime, Congress amended the International Claims Settlement Act of 1949 with the Cuban Claims Act of 1964, 22 U.S.C. §§ 1643–1643k. The Cuban Claims Act authorized the Foreign Claims Settlement Commission to gather information for an eventual negotiation on claims of confiscated properties in Cuba." *Garcia-Bengochea*, 57 F. 4th at 920 (citations omitted). The Commission "reviewed the applications of U.S. corporate and individual claimants and certified as legitimate nearly 6,000 claims valued at

about $1.9 billion." *Id.* "In 2005 and 2006 the Commission, pursuant to a subsequent grant of statutory authority, conducted a second round of claims review. *See* Pub. L. 105-277, § 2211, 112 Stat. 2681-812. Cuba and the United States, however, have never reached a settlement on these claims (or, for that matter, on claims by Cuba against the United States)." *Id.*

Havana Docks filed a claim with the Foreign Claims Settlement Commission. The Commission issued a proposed decision on the claim in April of 1971. It then rendered a final decision September of 1971 which affirmed the proposed decision except for an increase in some land values. *See In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Proposed Decision (Apr. 21, 1971); *In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Final Decision (Sept. 28, 1971); Carnival D.E. 73-8.

First, the Commission found that Havana Docks was a U.S. national within the meaning of the Cuban Claims Act. This was because more than 50% of its stock was held by persons who were U.S. nationals. *See In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Proposed Decision, at 2 (Apr. 21, 1971) (later finalized in *In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Final Decision (Sept. 28, 1971)).

Second, the Commission made a number of findings about Havana Docks' concession and the Cuban Government's expropriation. It found that (a) Havana Docks had a concession which was renewed in 1934 for the construction and operation of wharves and warehouses in the Port of Havana and which was set "to expire in

2004, at which time [it] had to deliver the piers to the [Cuban Government] in good state of preservation;" (b) Havana Docks acquired at the same time certain real property facing the Bay of Havana; (c) Havana Docks owned certain installation machinery, loading and unloading equipment, vehicles, furniture, and fixtures at the Port of Havana and at its corporate offices; (d) in June of 1946 Havana Docks' property was encumbered with a $1.6 million mortgage in favor of certain bondholders; and (e) in 1960 the Cuban Government nationalized and expropriated Havana Dock's property and assets in Cuba. *See id.* at 3.

Third, the Commission certified that Havana Docks suffered a loss as a result of the Cuban Government's actions and valued its "concession and tangible assets" at $8.684 million and its securities, accounts receivable, and government debts collectively at $495,340. The certified loss, then, totaled $9.179 million with interest to accrue at 6% per year from the respective dates of loss to the date of settlement. *See In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Final Decision, at 3 (Sept. 28, 1971).

## C

Title III establishes a private right of action for "any United States national who owns the claim to [confiscated] property" against "any person that . . . traffics in [such] property." 22 U.S.C. § 6082(a)(1)(A) ("Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall

be liable to any United States national who owns the claim to such property for money damages."). Under Title III, "confiscated" means "the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959, . . . without . . . adequate and effective compensation provided." 22 U.S.C. § 6023(4)(A)(i). The term "property" is defined as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12)(A). It also includes some, but not all, real property used for residential purposes. *See* 22 U.S.C. § 6023(12)(B).

Under Title III, a certification by the Foreign Claims Settlement Commission pursuant to the International Claims Settlement Act, 22 U.S.C. §§ 1643 et seq., constitutes "conclusive proof of ownership of an interest in property." 22 U.S.C. § 6083(1). As set out earlier, Havana Docks has a claim certified by the Commission. But due to the operative language of § 6082(a)(1)(A)—"traffics in property which was confiscated by the Cuban Government"—the trafficking must be in the property that was confiscated, and not in the claim held by the U.S. national based on that confiscated property. [4]

**1**

---

[4] We limit our discussion to the property interest at issue here—a 99-year usufructuary concession at the Port of Havana.

The issue presented here is one of first impression, and it is not easy. Indeed, the district court was of two minds about the effect of the concession's 99-year term on Havana Docks' trafficking claims against the cruise lines.

The district court first denied a motion to dismiss by Carnival and rejected the argument that Havana Docks could not sue because it no longer had a property interest at the time of the alleged trafficking from 2016 to 2019. The court explained that Title III "does not expressly make any distinction whether [the] trafficking needs to occur while a party holds a property interest in the property at issue," and agreed with Havana Docks that Carnival was "incorrectly conflat[ing] a claim to a property and a property interest." *Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-21724, 2019 WL 8895241, at *4 (S.D. Fla. Aug. 28, 2019).

Then the district court reversed course and granted motions to dismiss filed by MSC Cruises and NCL on the ground that Havana Docks' concession had expired in 2004, well before the alleged trafficking by the cruise lines. *See Havana Docks Corp. v. MSC Cruises SA Co.*, 431 F. Supp. 3d 1367, 1371–74 (S.D. Fla. 2020); *Havana Docks v. Norwegian Cruise Line Holdings, Ltd.*, 431 F. Supp. 3d 1375, 1378–80 (S.D. Fla. 2020). The court noted that Havana Docks admitted that its concession "expired in 2004." *MSC*, 431 F. Supp. 3d at 1372. Havana Docks, moreover, "d[id] not appear to dispute that the Cuban Government's confiscation extinguished [its] property rights." *NCL*, 431 F. Supp. 3d at 1379. The court ruled that a property interest "involving a time-limited concession . . . does not give

[Havana Docks] right to sue for activities that took place years after it no longer has an interest in the property." *MSC*, 431 F. Supp. 3d at 1373. A cruise line "could only 'traffic' in [Havana Docks'] confiscated property if it undertook one of the prohibited activities before [Havana Docks'] interest in the property expired." *NCL*, 431 F. Supp. 3d at 1380. Turning to the purposes of Title III—to deter trafficking and to provide a remedy for trafficking—the court explained that "there is nothing to suggest that Congress intended to grant victims of property confiscations more rights to the property than they would otherwise have simply by virtue of the confiscation." *MSC*, 431 F. Supp. 3d at 1374.

Havana Docks moved for reconsideration. The district court changed its mind again and reverted to the rationale it employed in denying Carnival's motion to dismiss in 2019. The court explained that it had made a factual error in the *MSC* and *NCL* cases by determining, at the Rule 12(b)(6) stage, that Havana Docks' concession expired in 2004. According to the court, Havana Docks had a 99-year concession, and not a concession which was to end in 2004. The court also stated that its finding that the concession ended in 2004 was contrary to the language in the certified claim because the Foreign Claims Settlement Commission only stated that the concession was set to expire in 2004. *See Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 454 F. Supp. 3d 1259, 1271–72 (S.D. Fla. 2020). The court noted as well that Havana Docks had more than the concession itself; it owned the fixtures and equipment it had installed at the Port of Havana. *See id.* at 1272. Finally, the court concluded that though the Cuban

Government's expropriation extinguished the property rights of victims like Havana Docks, the Eleventh Circuit's decision in *Glen v. Club Mediterranee S.A.*, 450 F.3d 1251 (11th Cir. 2006), indicated that victims of trafficking could bring Title III actions based on claims to the confiscated property.  *See NCL*, 454 F. Supp. 3d at 1273.  "[T]he Cuban Government's expropriation" extinguished "all rights Havana Docks had to the remaining concession term of 44 years," but as no trafficking could occur on property already confiscated, Havana Docks could maintain its Title III claim.  *See id.* at 1274.

In its summary judgment order, the district court adopted the reasoning set out in *NCL*, 454 F. Supp. 3d at 1272–73.  It rejected the cruise lines' argument that because Havana Docks' concession would have expired in 2004 there could be no trafficking from 2016 to 2019.  *See Havana Docks*, 592 F. Supp. 3d at 1255.

## 2

We conclude that the district court correctly assessed the limited nature of Havana Docks' property interest when it granted the motions to dismiss filed by MSC Cruises and NCL.  *See MSC*, 431 F. Supp. 3d at 1373; *NCL*, 431 F. Supp. 3d at 1379.  Havana Docks' usufructuary concession ended, for purposes of Title III, in 2004 when the 99-year term would have expired by its own terms. As a result, when the cruise lines used the Terminal and one of its

piers from 2016 to 2019, they did not traffic in property that had been confiscated by the Cuban Government.[5]

No one disputes that the 1960 expropriation by the Cuban Government extinguished Havana Docks' usufructuary concession under Cuban law. *See Glen*, 450 F.3d at 1255. The district court correctly noted in one of its orders that a Title III plaintiff, following expropriation, no longer owns property that can be trafficked because that property now belongs to the Cuban Government (or whomever else it has conveyed the property to). *See NCL*, 454 F. Supp. 3d at 1274.

There is a reasonable argument that the Cuban Government's expropriation of Havana Docks' usufructuary concession— i.e., the taking of the property of a national of another country— without payment of compensation violated international law. *See Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1326 (11th Cir. 2018) ("[U]nder the third prong of the [expropriation] exception [of the Foreign Sovereign Immunities Act, 28 U.S.C.

---

[5] Title III's definition of "property" includes "future" and "contingent" interests, 22 U.S.C. § 6023(12)(A), but this case does not require us to address such interests. At the time of the Cuban Government's confiscation, Havana Docks' usufructuary concession was fully vested and was therefore not contingent on the occurrence of any future events. *See generally* Restatement (Third) of Property § 25.3 (Am. Law Inst. 2011) ("A future interest is either contingent or vested. A future interest is contingent if it might not take effect in possession or enjoyment."); 31 C.J.S. Estates § 185 (May 2024 update) (explaining that a "contingent right is one that only comes into existence on an event or condition which may not happen until another event prevents vesting").

§ 1605(a)(3)], there are three ways in which a taking may violate international law: (1) when it does not serve a public purpose; (2) when it discriminates against those who are not nationals of the country; or (3) when it is not accompanied by provision for just compensation."); Restatement (Third) of Foreign Relations § 712 (Am. Law Inst. 1987) ("A state is responsible under international law for injury resulting from . . . a taking by the state of the property of a national of another state that (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation."). But a Title III claim is an action against a third party for trafficking in "property which was confiscated by the Cuban Government," and not an action against the Cuban Government for expropriating that property decades ago. *See Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F. Supp. 3d 1, 16 (D.D.C. 2021) ("Trafficking in expropriated property is the 'gravamen' of a Title III claim, not Cuba's expropriation of the property."), *vacated on other grounds and remanded*, 111 F.4th 12 (D.C. Cir. 2024).

In our view, the way to give effect to the statutory language ("traffics in property which was confiscated"), and to acknowledge that not all property rights are the same, is to view the property interest at issue in a Title III action as if there had been no expropriation and then determine whether the alleged conduct constituted trafficking in that interest. We set out our reasoning below.

"A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278

(2002). An "interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 331–32 (2002).

Interests in real property are as varied as the colors and shades on a paint wheel. At one end are freehold estates like an estate in fee simple absolute, which is ownership "not subject to a special limitation . . . or a condition subsequent . . . or an executory limitation." Restatement (First) of Property § 15 (Am. Law Inst. 1936). "If one conceives of property as likened thus to a bundle of rights, privileges, immunities and liabilities adaptable to any physical thing, the fee simple absolute is the largest segment thereof that the political philosophy of the time and place permits any private individual to obtain." 2 David A. Thomas, Thompson on Real Property, Thomas Editions § 14.04(c)(1) (Matthew Bender Apr. 2024 update). At the other end are limited possessory rights like those created by a tenancy at will, which endures "only so long as both the landlord and the tenant desire." Restatement (Second) of Property—Landlord and Tenant § 1.6 (Am. Law Inst. 1977).

Congress, we think, understood the varied nature of property interests when it drafted Title III. For example, 22 U.S.C. § 6023(12)(A) includes "leasehold interests" in the definition of property, and a leasehold interest is necessarily restricted in terms of location and duration. *See generally* Restatement (Second) of Property—Landlord and Tenant § 1.1 (Am. Law Inst. 1977) ("The

landlord-tenant relationship exists only with respect to a space that is intended to have a fixed location for the duration of the lease.").

We do not believe that Congress, in enacting Title III, meant to convert property interests which were temporally limited at the time of their confiscation into fee simple interests in perpetuity such that the holders of such limited interests could assert trafficking claims through what Buzz Lightyear called "infinity and beyond." *Toy Story* (Pixar Animation Studios/Walt Disney Pictures 1995). In the words of the district court, "there is nothing to suggest that Congress intended to grant victims of property confiscations more rights to the property than they would otherwise have simply by virtue of the confiscation." *MSC*, 431 F. Supp. 3d at 1374. *Cf. Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976) ("[T]he holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States."); *Lafayette Airport Comm'n v. Roy*, 328 So.2d 182, 186 (La. App. 3d Cir. 1976) (once the value of a parcel of land taken by the government through eminent domain is established for just compensation purposes, it is the burden of the usufructuary, "as a claimant of a portion of that total award, to prove the value of her interest").

For purposes of Title III, therefore, we treat Havana Docks' property interest—the concession—as if the Cuban Government had never expropriated it, i.e., without the distorting effect of the confiscation. To recap, Havana Docks did not have any fee simple

ownership rights in any real property at the Port of Havana; it had only a usufructuary concession, i.e., a "personal servitude granting the right to use another's property and take its 'fruits' or profits." 8 Thompson on Real Property, Thomas Editions § 64.03 n.23. By its own terms the concession had a 99-year term and was to end in 2004. Havana Docks, moreover, had no option for unilateral renewal of the concession and had to return the property and piers to the Cuban Government in a state of good preservation when the term expired.

In statutory terms, what the Cuban Government confiscated from Havana Docks in 1960 was its "control" and enjoyment of the property at the Port of Havana through a time-limited usufructuary concession. *See* 22 U.S.C. § 6023(4)(A). When that concession expired in 2004, any property interest that Havana Docks had by virtue of that concession ended. Thus, the cruise lines' conduct from 2016 to 2019 did not constitute trafficking in Havana Docks' confiscated property. Two contrasting examples will help explain our holding.

Imagine that in October of 1965 the Cuban Government confiscated a private airport for small aircraft which was owned (land and all) by a corporation that was (and remains) a U.S. national. Imagine also that the Cuban Government has since been operating the airport as its own and collecting fees for its use. If the corporation owned the airport in fee simple at the time of its expropriation, an airline which landed its planes on that airport today and paid the Cuban Government a fee for the privilege of doing so

would be engaged in trafficking and the corporation could (assuming other statutory requisites were satisfied) sue that airline under Title III.  That is because a fee simple interest, if not for the expropriation, would have continued unabated into the future without any inherent temporal limitation.

On the other hand, imagine that the same U.S. corporation had only a five-year lease to operate the same airport, which was owned (land and all) by a Cuban national.  Imagine also that the Cuban Government confiscated the corporation's leasehold interest and took over the airport in October of 1965, when the lease had only two months left to go in its five-year term.  If an airline landed its planes on the airport today and paid the Cuban Government a fee for the privilege of doing so, the corporation could not sue the airline for trafficking under Title III.  The reason is that its leasehold interest, if not for the expropriation, would have expired by its own terms in December of 1965.  The airline would not have trafficked in the corporation's confiscated property by using the airport today.

### 3

Havana Docks, defending the district court's final decisions on this issue, *see NCL*, 454 F. Supp. 3d at 1271–74, and *Havana Docks*, 592 F. Supp. 3d at 1255, maintains that it can assert trafficking claims against the cruise lines for conduct taking place from 2016 to 2019.  At the end of the day, we are not convinced by its arguments.

First, Havana Docks is wrong in asserting that the certified claim from the Foreign Claims Settlement Commission in 1971 establishes that the cruise lines trafficked in its confiscated property. *See* Br. for Appellee at 39–45. Title III provides that a certification of a claim by the Commission constitutes "conclusive proof of ownership of an interest in property," 22 U.S.C. § 6083(a)(1), and we accept that Havana Docks owned a property interest in the usufructuary concession at the time of the confiscation. But Title III's conclusive presumption of Havana Docks' ownership interest at some point in the past does not speak to the nature of the interest today. Nor does it tell us whether trafficking in the concession can occur beyond its scheduled end date in 2004.

Though a U.S. national with a certified claim has a basis for seeking compensation in any future settlement proceedings between the United States and Cuba, and has to some degree monetized the value of the property (or property interest) confiscated by the Cuban Government, the certified claim is not a means for expanding the nature of a limited property interest in a Title III action. And to the extent that its decision is relevant to the issue before us, the Commission recognized that Havana Docks' concession was set to expire in 2004, at which point Havana Docks had to return the property and piers to the Cuban Government in a good state of preservation. *See In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Proposed Decision, at 5 (Apr. 21, 1971) (later finalized in *In re Havana Docks Corp.*, Foreign Cl. Settlement Comm'n No. 2492, Final Decision (Sept. 28, 1971)).

Second, we disagree with Havana Docks that the nature of its usufructuary concession allows it to assert trafficking claims against the cruise lines for conduct which took place from 2016 to 2019. *See* Br. for Appellee at 45–46. Havana Docks cites *Boggs v. Boggs*, 520 U.S. 833, 836 (1997), for the proposition that a "lifetime usufruct is the rough equivalent of a common-law life estate," but that citation is misplaced because the concession here was limited to 99 years and did not give Havana Docks any unilateral rights of renewal.

Third, we reject Havana Docks' argument that a Title III claim can be brought against the cruise lines because the interest in the usufructuary concession—having been extinguished in 1960 by the Cuban Government's confiscation, *see Glen*, 450 F.3d at 1255—has been replaced with a certified claim for compensation against the Cuban Government. *See* Br. for Appellee at 52–57. Havana Docks is right that it now holds a certified claim from the Commission for the value of the confiscated property interest, but under the language of Title III that claim does not provide the basis for a trafficking action. As explained earlier, Title III provides that "any person" who "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages." 22 U.S.C. § 6082(a)(1)(A). As this language indicates, the trafficking must be in the "property which was confiscated," and not in the claim later certified by the Commission. A U.S. national who owns "the claim to such property" can bring a Title III action for trafficking, but the existence of the claim does

not do away with the requirement that the trafficking be in the confiscated property.

Fourth, contrary to Havana Docks' contention, the use of the past tense in § 6082(a)(1)(A) ("was confiscated") does not point to a different result. We recognize that the Cuban Government's confiscations of property belonging to U.S. nationals largely took place in the 1960s. And we understand that through the Title III remedy Congress sought to both deter the use of confiscated properties by third parties and to compensate the owners of such properties for their use (i.e., their exploitation). *See* 22 U.S.C. § 6081(1)-(11) (congressional findings). But Havana Docks does not offer any persuasive support for its assertion that "[a]ny temporal limitations on [confiscated] property interests are reflected in the value of the claim, not the scope of the property subject to trafficking." Br. for Appellee at 54. Accepting Havana Docks' position would mean that a U.S. national with a temporally-limited and now-expired property interest would (a) have that interest turned into a fee simple interest of infinite duration as a result of the Cuban Government's confiscation, and (b) be allowed to sue any third party which used or benefited from any portion of that expired property interest in 2025, 2050, 2075, 2100, and so on. Congress conceivably could have created such a scheme, but we do not think that it did.

## 4

Our resolution does not dispose of all of Havana Docks' trafficking claims. Havana Docks also alleged that Carnival trafficked

in its concession from 1996 to 2001 through its interests in two other companies, Airtours and Costa. The district court did not separately address these claims given its ruling in favor of Havana Docks on the 2016–2019 trafficking claims.

Havana Docks and Carnival agree that we should remand the 1996–2001 claims for further proceedings. *See* Br. for Carnival at 17 n.2; Br. for Appellee at 51 n.6. We concur in their assessment. Because Havana Docks' concession would not have expired until 2004, our holding today does not preclude claims for trafficking based on conduct taking place before then.

**IV**

We affirm the district court's ruling that Havana Docks is a U.S. national under Title III of the Helms-Burton Act but reverse the judgments in favor of Havana Docks and against the cruise lines for conduct taking place between 2016 and 2019. We remand for further proceedings as to the trafficking claims against Carnival based on conduct taking place from 1996 to 2001.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

23-10151                BRASHER, J., Dissenting                1

BRASHER, Circuit Judge, dissenting:

When Fidel Castro came to power in 1959, the Cuban Government confiscated all property in Cuba owned by United States nationals. After nearly four decades of those nationals receiving no compensation from the Cuban Government for their stolen property, Congress passed the Helms-Burton Act as another way for those nationals to seek compensation for their losses. To that end, Title III of the Act creates a private cause of action for any U.S. national who owns a "claim" to "property which was confiscated" against anyone who commercially benefits from the stolen property.

Havana Docks is a U.S. national that owned a concession to construct and operate piers and terminal facilities at the Port of Havana for a term of 99 years beginning in 1905. Under the auspices of that concession, it constructed multiple piers and docks in Havana. The Cuban Government ended that concession and confiscated its docks in 1960. Even though the Foreign Claims Settlement Commission certified the value of Havana Docks' stolen property and recognized its claim against the Cuban Government, the Cuban Government has not paid for confiscating Havana Docks' property. Nonetheless, over the last ten years, various cruise lines have been coordinating with the Cuban Government to deliver passengers to its confiscated docks.

The majority opinion holds that Havana Docks cannot sue those cruise lines for using its confiscated property in the present day because its 99-year right to operate the docks (that it built)

ended in 2004. But the majority opinion is wrong. The Cuban Government ended Havana Docks' concession in 1960 when that concession still had 44 years left to run. The majority's counterfactual analysis—asking what would have happened to Havana Docks' docks if they had not been confiscated in 1960—is incompatible with the text of the Act and undermines its remedial purpose. Nothing in the statute requires that a claimant establish that, absent the confiscation, it would have a current, present day property interest in its stolen property. Accordingly, I respectfully dissent.

## I.

Congress enacted the Helms-Burton Act to provide a comprehensive remedial regime for the property that the Cuban Government confiscated in 1959. The Act explains that it seeks to resolve "the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6)(B). And a certified claim from the Foreign Claims Settlement Commission—like the one Havana Docks has obtained—is "conclusive proof of ownership of an interest in property" that was confiscated and entitles the owner to compensation under the Act. *Id.* § 6083(a)(1). In other words, the Act recognizes that a U.S. national's pre-1959 property interests are no more; they have been replaced by claims against the Cuban Government. We have explained that, under the Act, "former owners of confiscated property now have . . . ownership of a 'claim to such property,'" instead of any rights in the property itself. *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (quoting 22 U.S.C. § 6082(a)(1)(A)).

In an ideal world, the Cuban Government would pay the claims for the property it confiscated in 1959. But, because the Cuban Government has no intention of doing so, the Act provides another path to compensation through a private right of action for claim-holding U.S. nationals to obtain the value of their claim from any person that traffics in the property that underlies their claim. 22 U.S.C. § 6082(a)(1)(A). Specifically, the Act creates a cause of action against "any person that . . . traffics in property which was confiscated by the Cuban Government" in favor of "any United States national who owns the claim to such property." *Id.* The Act broadly defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12)(A). And the Act broadly defines "traffics" as "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property" without the authorization of a U.S. national who owns a claim to the property. 22 U.S.C. § 6023(13)(A)(ii).

As damages, a successful Title III plaintiff is entitled to the value of its "claim." The Act provides three different ways to measure that value: (1) the amount of a certified claim from the Foreign Claims Settlement Commission, plus interest, (2) the amount determined by a special master, plus interest, or (3) the fair market value at present or at the time of confiscation, whichever is greater, plus interest. 22 U.S.C. § 6082(a)(1)(A)(i). A successful plaintiff is

also entitled to court costs and reasonable attorneys' fees. *Id.* § 6082(a)(1)(A)(ii).

Before Castro came to power, Havana Docks owned a concession to construct piers and terminal facilities at the Port of Havana and to own, maintain, and operate those facilities for a term of 99 years beginning in 1905 and expiring in 2004. By the time Castro took control, Havana Docks had finished construction and begun operating those facilities. Because Havana Docks is a U.S. national, the Cuban Government confiscated the docks and ended its concession and all related rights in 1959.

After the confiscation, Havana Docks sought restitution with the Foreign Claims Settlement Commission, which has the authority to issue a "final and binding decision[] with respect to claims by United States nationals against" the Cuban Government. *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981); *see also* 22 U.S.C. §§ 1621, 1643. The Commission agreed with Havana Docks that it was owed money from the Cuban Government and certified a claim for Havana Docks against the Cuban Government for over $9 million.

Between 2015 and 2019, the defendant cruise lines brought almost a million tourists to Cuba through the Port of Havana— using the very same piers in the very same terminal that the Cuban Government confiscated from Havana Docks. The district court held that the cruise lines trafficked in property to which Havana Docks "owns [a] claim." The cruise lines appealed.

## II.

The parties' briefs raise several questions, and some of them are difficult. But the question the majority opinion answers is, to me, very simple. The Cuban Government stole Havana Docks' property—its docks, piers, and other things that it had the right to operate under its concession. And the cruise lines have—all agree—commercially benefited by depositing paying customers on those docks and piers. Accordingly, the district court was correct that the cruise lines trafficked in confiscated property to which Havana Docks owns a claim.

To avoid this straightforward analysis, the cruise lines argue that they didn't traffic in confiscated property because their activity took place between 2015 and 2019, and Havana Docks' concession would have ended in 2004 if the docks had not been confiscated. The majority opinion agrees. In the words of the majority opinion, we should "view the property interest at issue in a Title III action as if there had been no expropriation and then determine whether the alleged conduct constituted trafficking of that interest." In other words, to prevail under the Act, a Title III plaintiff must establish a counterfactual—that the defendant trafficked in property that it *would have had* a present interest in at the time of the trafficking if the Cuban Government had not confiscated the property.

In my view, there are three problems with this judicially created prove-a-counterfactual requirement. First, it is not supported by the statute's text. The text of the statute says that the trafficking must occur when a plaintiff "owns the claim," not when the

23-10151            Brasher, J., Dissenting            6

plaintiff *would have owned the property*. Second, the majority is focused on the wrong confiscated property. Here, Havana Docks argues that the cruise lines trafficked by using the physical docks that the Cuban Government confiscated, not by using its concessionary interest in those docks. Third, this test effectively voids many of the property interests that are expressly protected by the statute. The statute was enacted in 1994 and it expressly protects interests that were contingent, future, and time limited when the underlying property was confiscated in 1959, but none of those interests are protectible under the majority's rule. I'll address each of these issues in turn.

*A.*

Let's start with the statute's text. At its most basic level, there are two elements to the Act's cause of action: (1) the defendant used confiscated property and (2) a U.S. national owns a claim to that confiscated property. As we have explained elsewhere, the Act replaces U.S. citizens' property interests with new claims against the Cuban Government because it confiscated that property. *Glen*, 450 F.3d at 1255. Then, the Act says that anyone who benefits commercially from "property which was confiscated by the Cuban Government" is liable to "any United States national who owns the claim to such property," unless that person has permission from the U.S. national. 22 U.S.C. § 6082(a)(1)(A).

I think Havana Docks has established that it meets these statutory elements. Did the cruise lines benefit commercially from "property which was confiscated by the Cuban Government?" Of

course they did. They used the docks and piers that Havana Docks built and had the right to operate when they were taken in 1960. Does Havana Docks own a "claim to such property?" Of course it does. The Commission's judgment on that point is "conclusive proof" under the terms of the statute. 22 U.S.C. § 6083(a)(1). But, even without the Commission's judgment, it can hardly be contested that Havana Docks' claim arises from the confiscation of the same piers and docks that the cruise lines used.

Under the text of the Act, there is no requirement that the plaintiff would have owned a present interest in the property at the time of the trafficking if its property had not been confiscated. Instead, the timing that matters is that a U.S. national "owns *the claim*" to confiscated property at the time of the trafficking. Unlike Havana Docks' original concessionary interest in the docks, its claim is not time limited. The claim persists until the plaintiff recovers in full either directly from the Cuban Government or indirectly by bringing an action under the Act. *See BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008) (explaining the general rule that "a plaintiff is entitled to only one satisfaction for a single injury").

To be sure, that an interest in confiscated property was limited in duration is not irrelevant under the text of the Act. But any temporal limitation on an interest in confiscated property—such as the 44 years remaining on Havana Docks' concession when the docks were confiscated—goes to the value of the claim, not the scope of the property subject to trafficking. A one-day leasehold

interest in property that was confiscated would presumably be less valuable than a fee simple interest in that same property. The cruise lines acknowledge as much throughout their arguments. They recognize that the International Claims Settlement Act of 1949, which authorized the Foreign Claims Settlement Commission to certify these types of claims against foreign governments, "focuses on the temporal dimensions of the property interest and would award nothing for a leasehold that expired just before expropriation" and "[t]he Act similarly would award only a small amount for a leasehold set to expire shortly after expropriation." And that is exactly what the Commission did when it certified Havana Docks' claim: it expressly noted that the concession would have expired in 2004 had it not been confiscated and valued the claim at $9 million in light of this limited term.

In short, nothing in the text of the Act requires a plaintiff to prove a counterfactual to succeed on its trafficking claim. The defendant must have used confiscated property and the plaintiff must "own the claim" at the time of the trafficking. But those are the only two elements in the statute's text.

### B.

Moving to the second problem with the majority's rule: it is directed at the wrong "confiscated property." Havana Docks isn't suing the cruise lines on the theory that they are trafficking by using its intangible concessionary interest. Its theory is not, for example, that the cruise lines are trading its old lease among themselves as a security. Instead, Havana Docks' theory is that the cruise lines

are using *the docks*—which still exist, are still in use, and have not expired, ended, or fallen into the sea.

A claim can represent a wide range of interests in confiscated property. 22 U.S.C. § 6082(a)(1)(A). The Act defines "property" as any "real, personal, or mixed" property, 22 U.S.C. § 6023(12)(A), which covers the physical docks and their surroundings. To be sure, the definition also covers "any present, future, or contingent right, security, or other interest [in any property], including any leasehold interest." *Id.* But Havana Docks alleges trafficking through the use of the physical property itself, not trafficking in a lease. As Havana Docks explains in its brief, it "filed a claim to the Havana docks—the very terminal and piers used by the cruise lines—in 1967, see Dkt. 331-14 (Tab B), the Commission certified that claim in 1971, see Dkt. 1-1 (Tab C), and that certified claim facially and conclusively establishes that the cruise lines used Havana Docks' 'property' confiscated by the Cuban government." Br. for Havana Docks at 105.

The majority opinion focuses on temporal limitations in Havana Docks' concession, but those temporal limits have nothing to say about whether the cruise lines are trafficking in the physical docks. All Havana Docks' property rights—whatever they were—ceased to exist the moment the Cuban Government confiscated the docks. *See Glen*, 450 F.3d at 1255. From that day forward Havana Docks no longer had any enforceable rights in the docks. The same is true for anyone else who ever had a property interest of any kind that the Cuban Government confiscated. As we have recognized,

those original property interests are gone. *See Glen*, 450 F.3d at 1255. They cannot be vindicated by, for example, bringing a trespass or unjust enrichment action. Instead of owning property interests, former property owners have claims. And the Helms-Burton Act provides legal recourse for those former property owners to seek compensation for those claims from the people who are benefiting from the property that underlies that claim.

The issue in this case is not whether a plaintiff can sue someone who profits from an intangible concession or lease. Instead, this case is about real physical property. Havana Docks argues that the defendants have trafficked in "confiscated property" by using the docks and piers that the Cuban Government seized, Havana Docks has a claim against people who use that property, and there is no time limit on that claim.

*C.*

The third problem with the majority's rule is that it nullifies myriad property interests that are expressly protected by the Helms-Burton Act. The Act expressly covers certain property like "patents" and certain interests in property, such as "future" and "contingent" interests, that the majority's rule wouldn't protect. 22 U.S.C. § 6023(12)(A). Under the majority's view, it would not be possible to traffic in some of these interests at all. Consider patents—any patents that were confiscated in 1959 would have necessarily "expired" before the Act outlawed trafficking in 1996. For interests that were "contingent" or "future" in 1959, the majority's rule would require a trip to the multiverse to see how Cuban

history would have developed—and whether these interests would have realized into present interests—but for their confiscation.

The majority opinion says it need not address these problems with its rule, because these kinds of interests aren't present in this appeal. But the words of a statute can't be ignored just because they are inconvenient. Congress would not have written the Act expressly to cover "patents" if, under the majority opinion's rule, it did not, in fact, cover any patents. Likewise, if a statute expressly covers contingent and future interests, it doesn't make sense to hold, as the majority opinion does, that the statute protects only present interests. *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (explaining that "every word and every provision is to be given effect").

The majority opinion suggests some hypothetical problems with the district court's understanding of the Act. But they are easily resolved by recognizing that a temporal limitation on a property interest at the time of confiscation determines the value of a Title III "claim," not the existence of one. Consider the majority opinion's two hypothetical airport owners: one who owned a fee simple interest to the airport in 1959, and another who owned a five-year leasehold interest in the airport with two months remaining at the time of confiscation. Because both owners had a cognizable property interest that was confiscated by the Cuban Government, both own a claim to that confiscated property under the Act. 22 U.S.C. § 6082(a)(1)(A). So both can sue someone who is using the airport in Cuba without their permission. The previous owner of the fee

simple interest will likely have a more valuable claim—because a fee simple interest in 1959 was more valuable than the remaining two months on a lease—but the higher value of that claim doesn't mean the former owner of the leasehold interest has no claim at all. *See* 22 U.S.C. § 6082(a)(1)(A)(i) (explaining damages).

Unless and until the property confiscation claims of U.S. nationals are paid, those claims continue to exist and are enforceable under the Helms-Burton Act. But the majority opinion's interpretation means that the Act provides no remedy for U.S. nationals with property interests that were confiscated in 1959 but, absent confiscation, would have "expired" before the present day. It does so even though there is no textual support for that result and even though the Act expressly protects interests that were contingent or time-limited when they were confiscated. And it adopts that rule even though there is a perfectly rational alternative that better conforms to the Act—that the time-limited nature of an interest in confiscated property goes to the value of a claim, not to the claim's existence.

### III.

I believe the district court correctly interpreted the Act in this respect, and I would go on to address the other issues in the appeal. Because the majority opinion instead reverses on this ground, I respectfully dissent.